UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | |
|---|---|
| IRIS WEINSTEIN HAGGAI, on her own behalf : | |
| and on behalf of JUDITH LYNNE WEINSTEIN : | |
| HAGGAI and GAD HAGGAI, JOHN DOE, : | |
| RICHARD ROE, JANE MOE, SHLOMI ZIV, : | 25 Cv. 2400 (JAV) |
| AYELET SAMERANO, on her own behalf and on : | |
| behalf of YONATAN SAMERANO, : | Hon. Jeanette A. Vargas |
| TALIK GVILI, on her own behalf and on behalf of : | |
| RAN GVILI, ROEE BARUCH, on his own behalf : | |
| and on behalf of URIEL BARUCH, and : | |
| JAMES POE, on his own behalf and on behalf of : | |
| LEO POE, : | |
| : | |
| Plaintiffs, : | |
| : | |
| – against – : | |
| : | |
| NERDEEN KISWANI, individually and as the : | |
| representative of WITHIN OUR LIFETIME- : | |
| UNITED FOR PALESTINE, MARYAM ALWAN, : | |
| individually and as the representative of : | |
| COLUMBIA STUDENTS FOR JUSTICE IN : | |
| PALESTINE, CAMERON JONES, individually : | |
| and as the representative of COLUMBIA- : | |
| BARNARD JEWISH VOICE FOR PEACE, and : | |
| MAHMOUD KHALIL, individually and as the : | |
| representative of COLUMBIA UNIVERSITY : | |
| APARTHEID DIVEST, COLUMBIA : | |
| STUDENTS FOR JUSTICE IN PALESTINE, and : | |
| COLUMBIA-BARNARD JEWISH VOICE FOR : | |
| PEACE, : | |
| : | |
| Defendants. : | |

---------------------------------------------------------------x

## DEFENDANT MAHMOUD KHALIL'S MOTION TO
## DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

DRATEL & LEWIS
29 Broadway Suite 1412
New York, New York 10006
(212) 732-0707
*Attorneys for Defendant Mahmoud Khalil*

Table of Contents

Table of Contents ............................................................................................................ i

Table of Authorities........................................................................................................iii

Introduction .....................................................................................................................1

Statement of the Facts......................................................................................................2

ARGUMENT....................................................................................................................3

POINT I

THE FAC SHOULD BE DISMISSED PURSUANT TO
RULE 12(b)(6), FED. R. CIV. P., BECAUSE IT FAILS TO
STATE CLAIMS UNDER EITHER THE ATA OR THE ATS,
AND/OR WITH RESPECT TO MR. KHALIL RELIES EXCLUSIVELY
ON PROTECTED FIRST AMENDMENT EXPRESSION AND ACTIVITY.................3

A. The FAC's Allegations Against Mr. Khalil Include Only
Expression and Conduct Protected Entirely by the First Amendment..............................4

1. Mr. Khalil's Alleged Conduct Constitutes Political Speech, Which
Is Afforded the Highest Level of Protection Under the First Amendment.........................4

2. The Speech Tort Doctrine Also Precludes
the Causes of Action Against Mr. Khalil...........................................................................7

3. The First Amendment Imposes Limits on Liability Under
the ATA and Justice Against Sponsors of Terrorism Act ("JASTA")................................9

B.        The FAC Fails to Allege Aiding and Abetting Under 18 U.S.C. §2333(d)(2).................13

1.        The Applicable Legal Standard.........................................................................13

2.        The Requisite Elements of Aiding and Abetting Are Absent from the FAC....................14

POINT II

THE FAC'S ATS CLAIM AGAINST MR. KHALIL SHOULD BE
DISMISSED PURSUANT TO RULE 12(b)(6) BECAUSE IT FAILS TO
STATE A CLAIM, AND/OR PURSUANT TO RULE 12(b)(1), FED. R.
CIV. P., BECAUSE THE COURT LACKS SUBJECT MATTER JURISDICTION.......20

POINT III

THE FAC SHOULD BE DISMISSED AGAINST
    MR. KHALIL IN HIS REPRESENTATIVE CAPACITY
    BECAUSE PLAINTIFFS FAILED TO EFFECT PROPER SERVICE...........................21

POINT IV

MR. KHALIL REQUESTS LEAVE TO JOIN IN THE MOTIONS
    BY HIS CO-DEFENDANTS TO THE EXTENT THEY BENEFIT HIM.......................24

CONCLUSION....................................................................................................................24

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
    LIMITATION, TYPEFACE REQUIREMENTS
    AND TYPE STYLE REQUIREMENTS...........................................................................25

Table of Authorities

Cases

Bartnicki v. Vopper, 532 U.S. 514 (2001).................................................................8

Boos v. Barry, 485 U.S. 312 (1988),108 S.Ct. 1157, 99 L.Ed.2d 333......................5, 10

Bridges v. California, 314 U.S. 252 (1941)...............................................................5

Cain v. Twitter Inc., No. 17-CV-02506,

    2018 WL 4657275 (N.D. Cal. Sept. 24, 2018).................................................19

Connick v. Myers, 461 U.S. 138 (1983).....................................................................4

Cox v. Louisiana, 379 U.S. 536 (1965)......................................................................5

Crosby v. Twitter, Inc., 921 F.3d 617 (6th Cir. 2019)..............................................19

Democratic Nat'l Comm. v. Russian Fed'n, 392 F. Supp. 3d 410 (S.D.N.Y. 2019).....................9

Denton v. Hernandez, 504 U.S. 25 (1992).................................................................11

Edwards v. South Carolina, 372 U.S. 229 (1963).......................................................6

Elfbrandt v. Russell, 384 U.S. 11 (1966)..................................................................17

Fed. Election Comm'n v. Wisconsin Right To Life, Inc.,

    551 U.S. 449, 127 S. Ct. 2652, 168 L. Ed. 2d 329 (2007)..................................9

Fields v. Twitter, Inc., 881 F.3d 739 (9th Cir. 2018).................................................19

Florida Star v. B.J.F., 491 U.S. 524, 109 S. Ct. 2603, 105 L. Ed. 2d 443 (1989)..........................9

Gallop v. Cheney, 642 F.3d 364 (2d Cir. 2011).................................................3, 11, 15

Garrison v. Louisiana, 379 U.S. 64 (1964)................................................................5

Gill v. Arab Bank, PLC, 893 F. Supp. 2d 542 (E.D.N.Y. 2012)...........................18, 19

Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983)................................................13

Herceg v. Hustler Mag., Inc., 814 F.2d 1017 (5th Cir. 1987)......................................8

Holder v. Humanitarian Law Project, 561 U.S. 1 (2010)...................................9, 10, 11

Hustler Mag., Inc. v. Falwell, 485 U.S. 46, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988)....................8

In re Chiquita Brands Int'l, Inc., 284 F. Supp. 3d 1284 (S.D. Fla. 2018).....................................18

In re Terrorism Attacks on Sept. 11, 2001, 714 F.3d 118 (2d Cir. 2013).....................................18

In re Terrorist Attacks on Sept. 11, 2001, 740 F. Supp. 2d 494 (S.D.N.Y. 2010)........................18

Jan v. People Media Project, No. 3:24-CV-05553-TMC,

    2025 WL 359009 (W.D. Wash. Jan. 31, 2025)...............................................................21

Jones v. Parmley, 465 F.3d 46 (2d Cir. 2006)...............................................................................5

Kemper v. Deutsche Bank AG, 911 F.3d 383 (7th Cir. 2018)......................................................19

Khalil v. Trump, No. 25-CV-1963 (MEF) (D.N.J. 2025)...............................................................6

Khalil v. Trump, No. 25-CV-01963 (MEF) (MAH),

    2025 WL 1514713 (D.N.J. May 28, 2025)........................................................................14

MacGregor v. Milost Glob., Inc., No. 17-CV-6691-LTS-KHP,

    2018 WL 4007642 (S.D.N.Y. Aug. 22, 2018)...................................................................23

New York Times Co. v. Sullivan,

    376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)........................................................7

Noto v. United States, 367 U.S. 290 (1961)...................................................................................17

Owens v. BNP Paribas, S.A., C.A.D.C. 2018, 897 F.3d 266..........................................................17

Ozturk v. Hyde, 136 F.4th 382 (2d Cir. 2025).................................................................................5

Scales v. United States, 367 U.S. 203 (1961)..................................................................................17

Shelley v. Kraemer, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161 (1948)............................................7

Smith v. Daily Mail Publishing Co., 443 U.S. 97 (1979).................................................................8

Snyder v. Phelps, 562 U.S. 443 (2011).....................................................................................4, 7

Terminiello v. City of Chicago, 337 U.S. 1 (1949).........................................................................5

Texas v. Johnson, 491 U.S. 397 (U.S.Tex., 1989)..........................................................................10

Tinker v. Des Moins Indep. Cmty. Sch. Dist. 393 U.S. 503 (1969)..................................................8

Twitter v. Taamneh, 598 U.S. 471 (2023)...............................................................................13, 21

Yates v. United States, 354 U.S. 297 (1957)..................................................................................17

iv

Statutes & Other Authorities

18 U.S.C. §2333......................................................................................*passim*

18 U.S.C. §2333B ...................................................................................*passim*

18 U.S.C. §2333(d)(2).............................................................................13, 20

28 U.S.C. §1350 ......................................................................................*passim*

Fed. R. Civ. P. Rule 4(e)(1).....................................................................23

Fed. R. Civ. P. Rule 4(h)..........................................................................23

Fed. R. Civ. P. Rule 4(h)(1)(A)................................................................23

Fed. R. Civ. P. Rule 4(h)(1)(B)................................................................23

Fed. R. Civ. P. Rule 12(b)(1)....................................................................1, 20

Fed. R. Civ. P.  Rule 12(b)(5)...................................................................1, 21

Fed. R. Civ. P.  Rule 12(b)(6)...................................................................1, 3, 11, 20

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222 (2016)....................................*passim*

Immigration and Nationality Act, Pub. L. No. 82-414, §237(a)(4)(C) (1952)............................15

U.S. Const. amend. I ................................................................................*passim*

## INTRODUCTION

This Memorandum of Law is respectfully submitted on behalf of defendant Mahmoud Khalil – personally and in his purported representative capacity for Columbia University Apartheid Divest ("CUAD") – and in support of his motion to dismiss Plaintiffs' First Amended Complaint ("FAC") because (1)  pursuant to Rule 12(b)(6), the FAC fails to state a claim with respect to either cause of action;  (2)  pursuant to Rule 12(b)(1), Fed.R.Civ.P., the Court lacks subject matter jurisdiction over the Alien Tort Statute claim;  and (3)  pursuant to Rule 12(b)(5), service upon Mr. Khalil as representative of CUAD was invalid.

Despite its length, and attention to extraneous allegations and theories, the FAC fails entirely to allege the necessary elements for both an ATA or ATS cause of action.  In fact, the FAC's omissions are more striking than its repeated scurrilous, unsupported innuendo.  Indeed, the FAC's grandiose attempt at "historical" narrative is designed to distract from the patent insufficiency of the requisite core allegations for either an ATA or ATS claim.

Plaintiffs allege against Mr. Khalil causes of action under both the Anti-Terrorism Act ("ATA"), 18 U.S.C. §2333 and the Alien Tort Statute ("ATS"), 28 U.S.C. §1350, but each suffers from multiple insurmountable flaws, including the overriding defect that they are based entirely on expression by Mr. Khalil (and others) protected by the First Amendment.

The FAC also fails to plead facts, rather than conclusory and florid supposition, that would establish either that Mr. Khalil aided and abetted any act of international terrorism, or that any speech or conduct by him was knowingly provided to facilitate any such acts, or in coordination with a Foreign Terrorist Organization ("FTO"), namely Hamas. Nor does the FAC provide sufficient connection between Mr. Khalil's conduct and Plaintiffs' alleged injuries.

Remarkably, while the FAC is devoid of the necessary elements of either an ATA or ATS

claim against Mr. Khalil, it spans 85 pages – not because it is an attempt at a viable lawsuit, but rather because it represents a wholly invented narrative intended to stifle and chill his and others' First Amendment expression with which Plaintiffs do not agree. That effort must fail, and the FAC should be dismissed against Mr. Khalil.

Mr. Khalil also joins his co-defendants' motions (namely their Memoranda of Law), two of which are cited below to avoid repetition herein: that by Maryam Alwan ("*Alwan Memo*") and Columbia Barnard A Jewish Voice for Peace and Nerdeen Kiswani ("*JVP Memo*").

## STATEMENT OF THE FACTS

Mr. Khalil adopts the Factual Background set forth in both the *Alwan Memo*, at 3-9, and the *JVP Memo*, at 2-6. Regarding allegations in the FAC specific to Mr. Khalil, they are integrated in the argument POINTs below not only to avoid repetition herein, but also because more important than what those allegations claim is what is *missing* from them when compared with the elements of an adequate ATA and/or ATS claim. That critical context is more illuminating than a separate factual presentation.

Essentially, the FAC alleges that Mr. Khalil has personal liability for "provid[ing] 'practical assistance' to Hamas's international terrorist operations 'before, during, and after October 7[]'" and by fostering a "mass culture of fear, threats, violence, and overt hatred on Columbia's campus" and by engaging in advocacy designed to "demonize Israel." FAC, at ¶¶ 235, 237. The FAC further alleges Mr. Khalil was "the representative of CUAD, Columbia SJP, and Columbia JVP[]" all at the same time. FAC, at ¶ 35.

The FAC's allegations against Mr. Khalil specifically are limited to five paragraphs (of the 240 within the entire FAC): Mr. Khalil's purported status as "de facto" leader of CUAD and, "upon information and belief," of SJP and JVP as well (¶ 35); leading a protest (¶ 112);

2

allegedly becoming a leader of those three organizations (¶ 124);  allegedly – "on information and belief," without any further factual support, posting a statement on Instagram (¶ 172);  and serving as "primary spokesperson and negotiator" for a group of protestors (¶ 188).

## ARGUMENT

### POINT I

**THE FAC SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(6), FED. R. CIV. P., BECAUSE IT FAILS TO STATE CLAIMS UNDER EITHER THE ATA OR THE ATS, AND/OR, WITH RESPECT TO MR. KHALIL, RELIES EXCLUSIVELY ON PROTECTED FIRST AMENDMENT EXPRESSION AND ACTIVITY**

As detailed below, and in the *Alwan Memo*, at 9-10, and *JVP Memo*, at 6-10, the FAC should be dismissed – in both Mr. Khalil's individual and purported representative capacities – pursuant to Rule 12(b)(6), Fed.R.Civ.P., because it fails to state a claim, and/or with respect to Mr. Khalil, it relies exclusively on expression and activity fully protected by the First Amendment.

The FAC fails entirely to allege the necessary elements for both an ATA or ATS cause of action, but instead strays into fabulist territory in alleging that somehow Mr. Khalil (and the other defendants) possessed foreknowledge of Hamas's October 7, 2023, attack.  Such "fanciful, fantastic, [and] delusional" claims are the very type that courts freely disregard on a motion to dismiss.  *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (cleaned up).

The principles applicable to Rule 12(b)(6) are set forth in the *Alwan Memo*, at 9, and the *JVP Memo*, at 6, and Mr. Khalil adopts those here to avoid repetition.  Mr. Khalil also joins in the analysis performed in those submissions, at 9-10 (*Alwan Memo*) and 6-10 (*JVP Memo*), with respect to the FAC generally.

3

Regarding Mr. Khalil specifically, the FAC suffers from multiple dispositive deficiencies discussed below:

(1)    the FAC is impermissibly based on Mr. Khalil's expression and activity fully protected by the First Amendment – with respect to both general First Amendment doctrine, as well as its specific application to the ATA and ATS;  and,

(2)    the FAC fails to plead the necessary elements of an ATA violation, including (a) aiding and abetting liability; (b)  any nexus between Mr. Khalil and any acts of international terrorism; (c)  *scienter*;  (d)  that Mr. Khalil provided any "substantial assistance" to Hamas; and (e)  that there was any proximate cause between Mr. Khalil's alleged conduct and Plaintiffs' claimed injuries.

**A.    *The FAC's Allegations Against Mr. Khalil Include Only Expression and Conduct Protected Entirely by the First Amendment***

**1.    *Mr. Khalil's Alleged Conduct Constitutes Political Speech, Which Is Afforded the Highest Level of Protection Under the First Amendment***

The FAC fails to state a claim under either the ATA or ATS because the First Amendment precludes tort liability for the expression and conduct the FAC alleges against Mr. Khalil.

None of the allegations against Mr. Khalil, set forth **ante**, at 2-3, describe anything but expression and conduct fully covered by the First Amendment.  In fact, the expression and conduct constitute "political speech," a particular category that occupies "the highest rung on the hierarchy of First Amendment values, and is entitled to special protection."  *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)) (quotation marks omitted).

4

The Supreme Court long ago explained that "the opportunity for free political discussion" is "a basic tenet of our constitutional democracy." *Cox v. Louisiana*, 379 U.S. 536, 552 (1965). *See also Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government").

In addition, the Court has held that "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). *See also Bridges v. California*, 314 U.S. 252, 263 (1941) (invalidating criminal convictions, including of a non-citizen, based on protected speech).[1]

That First Amendment protection indisputably extends to political protests as well. As the Second Circuit pointed out in *Jones v. Parmley*, 465 F.3d 46(2d Cir. 2006), "[t]he Supreme Court has declared that the First Amendment protects political demonstrations and protests -- activities at the heart of what the Bill of Rights was designed to safeguard." 465 F.3d at 56 (Sotomayor, J.) (citing *Boos v. Barry*, 485 U.S. 312, 318 (1988)). The Supreme Court itself has

---

[1]  Recently, the Second Circuit, in *Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025), denied the government a stay of the District Court's Order returning a habeas corpus petitioner to Vermont for an expedited bail hearing regarding the petitioner's immigration detention, observing that the basis for revoking the petitioner's visa was that she had "expressed strong views on an undisputedly controversial topic criticizing the University," and demanded the University "acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments and divest from companies with direct or indirect ties to Israel." Rumeysa Ozturk et al., *Op-ed: Try Again, President Kumar: Renewing Calls for Tufts to Adopt March 4 TCU Senate Resolutions*, The Tufts Daily (Mar. 26, 2024), available at https://www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj [https://perma.cc/84ZQ-EVZ7]." *Id.* at 388.

emphasized that political protests are an exercise of "basic constitutional rights in their most pristine and classic form." *Edwards v. South Carolina*, 372 U.S. 229, 235 (1963).

In addition, generally, advocacy and political speech are permitted wide latitude, as the standard for when speech loses its First Amendment protection is defined in *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam):  only when "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  395 U.S. at 448.

Here, the factual allegations in the FAC do not come remotely close to alleging Mr. Khalil even approached, much less crossed, that line.  *See also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 888, 894 (1982);  *Hess v. Indiana*, 414 U.S. 105 (1973);  *Alwan Memo*, at 21-23;  *JVP Memo*, at 17-25.  Thus, his expression and conduct reside safely within the protection of the First Amendment.

In fact, Mr. Khalil's activities and expression alleged in the FAC have already been recognized by a federal court as political speech.  In *Khalil v. Trump*, Case No. 25 Civ. 1963 (MEF) (D.N.J. 2025), Mr. Khalil's habeas corpus challenge to his immigration detention, which is based on that same expression and conduct, the District Court found that Mr. Khalil's "speech-related activities concern political speech . . .  And political speech is entitled to special protection under the First Amendment."  Order, June 11, 2025 (ECF # 299), at 6 n.5.  *See also id.* at 6, n.6.  The Court also noted that the government had "not contested the evidence put forward by the Petitioner, . . ."  *Id*. at 11.

Thus, it is incontestable that Mr. Khalil was engaged in core First Amendment activity, namely political speech and protest, and that the FAC alleges *only* that protected expression and activity.

2. ***The Speech Tort Doctrine Also Precludes the Causes of Action Against Mr. Khalil***

Fifty years ago, the Supreme Court, in *New York Times Co. v. Sullivan*, 376 U.S. 254

(1964), declared that

> [i]t matters not that that law has been applied in a civil action and that it is common law
> only, though supplemented by statute. The test is not the form in which state power has
> been applied but, whatever the form whether such power has in fact been exercised.

*Id*, at 265. *See also Shelley v. Kraemer*, 334 U.S. 1, 14 (1948) (judicial action in contract dispute

constituted "state action").

Applying the rationale that "[a] profound national commitment to the principle that

debate on public issues should be uninhibited, robust, and wide-open[,]" *id.*, the Court in

*Sullivan* added that "[w]hat a State may not constitutionally bring about by means of a criminal

statute is likewise beyond the reach of its civil law of libel." *Id.* at 277.

Since *Sullivan*, the Court has expanded that principle well beyond defamation and libel.

For example, in *Snyder*, the Court reaffirmed that "[t]he Free Speech Clause of the First

Amendment -- 'Congress shall make no law . . . abridging the freedom of speech' – can serve as

a defense in . . . tort suits." 562 U.S. at 451.

In *Snyder*, members of the Westboro Baptist Church picketed outside the funeral of

Marine Lance Corporal Matthew Snyder, who had been killed in the line of duty in Iraq. In the

subsequent appeal of a judgment for Mr. Snyder's father for the tort of Intentional Infliction of

Emotional Distress, the Supreme Court overturned the verdict and ruled that the First

Amendment shielded the picketers from tort liability because they were exercising speech on

matters of public concern. *Id.* at 454.

In language equally pertinent here with respect to the FAC's allegations herein, the Court added that "Speech is powerful. It can stir people to action [and] inflict great pain […] we cannot react to that pain by punishing the speaker." *Id*. at 460-461 (cleaned up). The same is true here.

Likewise extending First Amendment protection beyond the domain of defamation, in *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988), the Court rejected a tort claim of Intentional Infliction of Emotional Distress because, the magazine's publishing of a "parody" advertisement was protected by the First Amendment. *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 53 (1988) ("in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment").

And in *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017 (5th Cir. 1987) the Fifth Circuit held that the First Amendment foreclosed damages on a theory of negligence because the state was precluded from imposing damages for publication of an article, if the state "could not constitutionally make the publication of that article a crime." *Id.* at 1023. *See also Tinker v. Des Moins Indep. Cmty. Sch. Dist.* 393 U.S. 503 (1969) (recognizing constitutional right of high school students to wear black armbands in protest); *Bartnicki v. Vopper*, 532 U.S. 514 (2001) (First Amendment precluded liability under state and federal wiretapping laws for disclosing conversations that Defendants knew had been taped in violation those laws, reiterating that "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Id.* at 527 *quoting Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979). *See also Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019); *Alwan Memo*, at 21.

In fact, speech-torts are subject to the same analysis as First Amendment cases challenging speech-restricting laws. for example, in *Florida Star v. B.J.F.*, 491 U.S. 524 (1989),

the Supreme Court held that a civil action against a newspaper for the release of a crime victim's

name was unconstitutional because, under the First Amendment, the remedy provided by the

state was not a narrowly tailored response to the interest in protecting rape victims' privacy.  491

U.S. at 541.

Laws, or the adjudication of statutory or common law torts, that burden political speech

are "subject to strict scrutiny," which requires the Plaintiff to prove that the restriction "furthers a

compelling interest and is narrowly tailored to achieve that interest." *Fed. Election Comm'n v.*

*Wisconsin Right To Life, Inc*., 551 U.S. 449, 451, 127 S. Ct. 2652, 2654, 168 L. Ed. 2d 329

(2007).

### 3. *The First Amendment Imposes Limits on Liability Under the ATA and Justice Against Sponsors of Terrorism Act ("JASTA")*

The First Amendment also imposes restrictions on liability under anti-terrorism statutes –

whether civil or criminal – including the ATA and JASTA.

In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court addressed

the scope of First Amendment protection in the context of legislation directed at international

terrorism.  Mr. Khalil adopts and joins in the discussion of *Holder* in the *Alwan Memo*, at 22-23,

and the *JVP Memo*, at 11, 17-20, neither of which will be repeated herein, but will supplement

them below.

The Court in *Holder* was clear to delineate that the statute at issue, 18 U.S.C. §2339B, "is

carefully drawn to cover only a narrow category of speech to, under the direction of, or in

coordination with foreign groups that the speaker knows to be terrorist organizations[,]" *id.* at 26,

holding that "[t]he statute reaches only material support coordinated with or under the direction

of a designated foreign terrorist organization."  *Id*. at 31.  Importantly, "[i]ndependent advocacy

that might be viewed as promoting the group's legitimacy is not covered." *Id.* at 31-32 (footnote omitted) (citation omitted).

Moreover, in elaborating on the protection accorded independent advocacy, the Court in *Holder* pointed out that "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." *Id*. at 27 (citation omitted). *See also id*. at 36 ("most importantly, Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

In *Holder* the Supreme Court found that 18 U.S.C. §2339B "regulates speech on the basis of its content," and consequently requires the Court to undertake a strict scrutiny analysis, citing *Texas v. Johnson*, which in turn, quotes *Boos v. Barry*, and calls for "the most exacting scrutiny." *Texas v. Johnson*, 491 U.S. 397 (1989), *quoting Boos v. Barry*, 485 U.S. at 321.[2]

Here, the FAC's allegations against Mr. Khalil consist of nothing more than the "independent advocacy" that *Holder* held is protected by the First Amendment even when it may parallel the cause of a Foreign Terrorist Organization. The FAC does not contain any allegations, other than conclusory assertions, that would remotely establish Mr. Khalil's *coordination with*, or *direction by* Hamas. Therefore, the FAC's allegations against him are not actionable because his expression and conduct are protected by the First Amendment.

---

[2] In *Holder*, the Court was careful not to set the limits of the statute in one direction or the other, pointing out that "[a]ll this is not to say that any future applications of the material-support statute to speech or advocacy will survive First Amendment scrutiny." 561 U.S. at 39. As a result, the Court expressly disclaimed any "suggest[ion] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations." *Id*.

Again, the FAC's highly conclusory and inflammatory allegations – in this instance that Mr. Khalil "directly coordinates with Hamas," FAC, at ¶ 35 – offered without any factual information whatsoever to support them, betrays the FAC's inadequacy. A pleading that could provide sufficient basis would not need to depart from credulity. *See Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (citing *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)) (even in Rule 12(b)(6) context court may dismiss claims with even well-pleaded facts if they are ultimately "clearly baseless").[3]

---

[3] The FAC's reliability is materially undermined by its citation to partisan, discredited sources. For example, the FAC cites the web site Canary Mission apparently as "factual support" for the allegations against Mr. Khalil. However, Canary Mission can and should not be credited as a reliable source of information. The magazine *Jewish Currents* recently described Canary Mission as:

> [a] website [] launched in 2015 to ensure, in the group's own words, that "today's radicals are not tomorrow's employees." To further this goal of rendering pro Palestine activists unemployable, the group posted profiles of thousands of students who spoke out for Palestinian rights, often including their photos, resumes, and links to their LinkedIn pages and published work.

Alex Kane, "Canary Mission's Newest Funders," *Jewish Currents* (Apr. 4, 2025), available at https://jewishcurrents.org/canary missions newest funders. *See also* Bridge Initiative, "Factsheet: Canary Mission" (June 3, 2025), available at https://bridge.georgetown.edu /research/factsheet-canary-mission/ (Canary Mission's "website smears Muslim, Arab, and pro Palestinian students, academics, and organizations by conflating criticism of Israel with antisemitism."); Erwin Chemerinsky, "Dean's Statement: Condemning Canary Mission," U.C. Berkeley Law (June 1, 2025), available at https://www.law.berkeley.edu/article/deans statement canary mission/; Committee on Academic Freedom, "Exposing Canary Mission: A Resource for College and University Leaders," Middle East Studies Association (2018), available at https://mesana.org/pdf/Exposing-Canary-Mission.pdf; James Bamford, "Who Is Funding Canary Mission? Inside the Doxxing Operation Targeting Anti Zionist Students and Professors," *The Nation* (Dec. 22, 2023), available at https://www.thenation.com/article/world/canary-mission-israel-covert-operations/; Stephanie Saul, "A Mysterious Group Says Its Mission Is to Expose Antisemitic Students," *The New York Times* (Apr. 1, 2025), available at https://www.nytimes. com/2025/04/01/us/israel-gaza-student-protests-canary-mission.html; Eli Clifton, "Pro Israel Group That Attacked UPenn Was Funded by Family of UPenn Trustee," *The Intercept* (Apr. 2, 2025), available at https://theintercept.com/2025/04/02/penn-israel-canary-mission-peisach/.

Indeed, the FAC assigns to Mr. Khalil the role of lead negotiator for the students with the University, the very antithesis of terroristic violence or involvement therewith.  The FAC also notes Mr. Khalil's objectives and demands communicated to the University administration during those negotiations -- the immediate reinstatement of the expelled students, amnesty for all individuals disciplined for pro-Palestinian activities, and the abolition of Barnard's disciplinary procedures – all parochial matters relating to the immediate events on campus and the consequences the students faced.  Indeed, the students' demands were specific to Columbia: disclose its investments in companies that were contributing to the Israeli military assault, and divest therefrom.  *See* FAC, at ¶ 145, ¶ 146, and ¶ 167.  *See also* Colette Holcomb and Emily Pickering, "Columbia University Apartheid Divest holds pro-Palestinian protest at Barnard Gates," *Columbia Spectator,* December 10, 2024, available at https://www.columbiaspectator.co com/news/2024/12/10/columbia-university-apartheid-divest-holds-pro-palestinian-protest-at-barnard-gates/.

Further, under the strict scrutiny standard, and considering the First Amendment protections for political speech and protest in particular, no remedy here could be sufficiently narrowly tailored – especially under the highly punitive ATA/JASTA statutes – to fit the stated interest of preventing the creation of any general "propaganda" benefit to Hamas.

Thus, because of the First Amendment limitations on the ATA/JASTA, Plaintiffs fail to state a claim upon which relief can be granted.

**B.**     ***The FAC Fails to Allege Aiding and Abetting Under 18 U.S.C. §2333(d)(2)***

      **1.**     ***The Applicable Legal Standard***

Even independent of the First Amendment protections that invalidate the FAC's claims against Mr. Khalil, the FAC has also failed to plead against Mr. Khalil a viable claim of aiding

and abetting under 18 U.S.C. §2333(d)(2). The elements of a proper ATA aiding and abetting claim are discussed and analyzed in the *Alwan Memo*, at 14-24, and the *JVP Memo*, at 10-17, which Mr. Khalil adopts and joins, and therefore will not repeat here.

In the context of the factors identified in *Twitter v. Taamneh*, 598 U.S. 471, 474, 490 (2023), as they apply to Mr. Khalil, the FAC fails to provide any facts to support an allegation that Mr. Khalil (1) *knowingly* provided (2) anything that could be deemed *substantial assistance* to (3) an *act of international terrorism*, (4) participated *consciously and culpably* therein as something he wished to make succeed, and (5) that his acts caused Plaintiffs' injuries. The same conclusion applies whether following the framework laid out in *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) or looking to the common law directly as the Court did in *Twitter. Twitter* at 488. *See also Alwan Memo*, at 14; *JVP Memo*, at 10-11.

As the Court in *Twitter* instructed "it is not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." *Id*. at 495. Instead "a defendant must have aided and abetted (by knowingly providing substantial assistance) another person in the commission of the actionable wrong – here, an act of international terrorism." *Id*.

## 2.    *The Requisite Elements of Aiding and Abetting Are Absent from the FAC*

Here, regarding the FAC's allegations against Mr. Khalil, the omissions are glaring and conclusive. For example, the FAC fails to allege *any* facts establishing or identifying

- any contact or communication between Mr. Khalil and Hamas;

- any direction from Hamas to Mr. Khalil;

- any act of international terrorism to which Mr. Khalil provided substantial assistance;

- any intent by Mr. Khalil to provide substantial assistance for such an act; and

- any connection between Mr. Khalil's expression and conduct and Plaintiffs' alleged injuries.

Regarding "substantial assistance," again the litigation attendant to Mr. Khalil's federal habeas corpus petition (discussed **ante**, at 6) provides relevant findings by the District Court, which held that the government "has not determined that [Mr. Khalil's] conduct" – the same conduct alleged in the instant complaint – "has impacted U.S. relations with another country." *Khalil v. Trump*, No. 25-CV-01963 (MEF)(MAH), 2025 WL 1514713, at *44 (D.N.J. May 28, 2025).[4]

Further, the U.S. Secretary of State's determination referred to above did *not* find that Mr. Khalil was engaged in unlawful activity. Rather, the basis for which it determined Mr. Khalil's removal was that he had engaged in "beliefs, statements, or associations *that are otherwise lawful*."  *In the matter of Mahmoud Khalil*, Notification of Removability Determinations under Section 237(a)(4)(C) of the Immigration and Nationality Act, April 9, 2025 (emphasis added).

Considering the investigative means available to the U.S. government, and the government's incentive and imperatives in the habeas litigation to portray Mr. Khalil's activities in the worst possible light, the Court's and the Secretary of State's conclusions not only are most illuminating, but they also vitiate the FAC's clearly baseless contentions of "substantial assistance." *See Gallop v. Cheney*, 642 F.3d at 368 (cited **ante**, at 3) (court may disregard even

---

[4] This "determination" refers to the "Memorandum for the Secretary of Homeland Security" from Secretary of State Marco Rubio on April 9, 2025, hereinafter the "Rubio Determination," available at https://www.aclu-nj.org/en/press-releases/secretary-state-letter-immigration-court-confirms-mahmoud-khalil-solely-targeted.

well-pleaded facts if they are ultimately "clearly baseless").  *See also Alwan Memo*, at 10;  *JVP*

*Memo*, at 9.

Regarding *scienter*, the FAC is entirely bereft of any factual basis for claiming Mr. Khalil

"participated consciously and culpably [in an act of terrorism] as something [Mr. Khalil] wished

to make succeed," and/or "knowingly" provided "substantial assistance" for a specific act of

international terrorism.

Indeed, the FAC enumerates five distinct types of acts of international terrorism:

- the attack on Israel on October 7, 2023;

- the holding of hostages in Gaza;

- the theft and withholding of the bodies of the deceased;

- rocket attacks against civilians in Israel;

- attacks on Israeli soldiers.

FAC, at ¶ 217.

Yet the FAC does not include any allegations regarding Mr. Khalil prior to October 7,

2023, and alleges that CUAD makes its first Instagram post on November 27, 2023, *see* FAC

¶175, nearly two months afterward, and at a time when Israel's military assault on Gaza had

generated considerable global concern – so much so that just one month later South Africa

lodged in the International Court of Justice ("ICJ") a complaint accusing Israel of committing

genocide in Gaza.[5]

---

[5] *See Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel)*, Application instituting proceedings and request for the indication of provisional measures (29 December 2023), available at https://www.icj-cij.org/case/. One month thereafter, the ICJ issued a ruling finding that the facts provided by South Africa were sufficient to conclude that intervention was necessary to present a plausible

In another example of the FAC's reliance on naked assertions absent substantiation, it alleges that Mr. Khalil "operated" CUAD's Instagram account, FAC ¶ 172, but fails to provide any facts to support that contention. Indeed, the FAC does not provide any facts that would establish even that Mr. Khalil composed any CUAD posts, approved or endorsed them, or was even aware of specific posts.

Nor does the FAC plead any connection between Mr. Khalil and those acts of international terrorism, much less a sufficient nexus. In *Twitter* the Court elucidated the importance of identifying the act of terrorism at issue in establishing ATA aiding and abetting liability. The plaintiffs in *Twitter* alleged that the social media platform Twitter was liable for an attack on the Reina nightclub in Istanbul. Section IV(A) of the Supreme Court's opinion expended substantial effort in analyzing the exact nexus between the actions of Twitter and the specific attack, finding that any connection was too attenuated to ascribe liability to Twitter. *See Twitter*, 598 U.S. at 497.

The Court in *Twitter* further warned of the very type of expansion of "acts of international terrorism" that the FAC presents here, recognizing that "[g]iven the lack of any concrete nexus between defendants' services and the Reina attack, plaintiffs' claims would necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world." 598 U.S. at 501.

Moreover, the rhetoric or acts of others do not bolster the FAC with respect to Mr. Khalil, particularly in light of the First Amendment issues at stake. *See, e.g., Elfbrandt v. Russell*, 384

---

risk of genocide. *See Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel)*, Provisional Measures, Order of 26 January 2024, para. 54.

U.S. 11, 17 (1966) ("laws such as this which are not restricted in scope to those who join with the 'specific intent' to further illegal action impose, in effect, a conclusive presumption that the member shares the unlawful aims of the organization"). *See also Noto v. United States,* 367 U.S. 290 (1961); *Scales v. United States*, 367 U.S. 203, 229 (1961); *Yates v. United States,* 354 U.S. 297, 326 (1957); *Alwan Memo*, at 21-23; *JVP Memo*, at 17-32.

Causation is also lacking between Mr. Khalil and Plaintiffs' alleged injuries. None of the facts alleged with respect to Mr. Khalil are causally related to the alleged acts of international terrorism identified in the FAC. *See* **ante**, at 15.

The ATA's civil liability provision requires proximate cause as that term is typically defined. *Owens v. BNP Paribas, S.A*., C.A.D.C.2018, 897 F.3d 266. Courts have used the "substantial factor" test in determining proximate cause under this provision, requiring a plaintiff to prove that the defendant's alleged act or omission was a material and substantial contributing cause to the injury. *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp.3d 1284, 1310 (S.D. Fla. 2018).

That test examines whether a defendant's conduct, *i.e.* the alleged ATA predicate conduct, was the proximate cause of a plaintiff's injuries, considering the temporal proximity and the magnitude of support on a fact-specific and *ad hoc* basis. *Gill v. Arab Bank, PLC*, 893 F. Supp.2d 542, 572 (E.D.N.Y. 2012) ("*Gil I*").

In conducting the test, the term "substantial" is used to denote that "that the defendant's conduct had more than a remote or trivial impact on *the circumstances leading up to the cause of the injury.*" *In Chiquita Brands Int'l*, 284 F. Supp.3d at 1311 (emphasis added)*. See also In re Terrorism Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013).

An instructive and analogous example occurred in the litigation instituted with respect to the September 11, 2001, attacks, and the allegations against the Council on American-Islamic

Relations ("CAIR").  *See In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494

(S.D.N.Y. 2010), aff'd sub nom. *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir.

2013).  While plaintiffs therein alleged that CAIR's true purpose was "to legitimize the activities

of Islamic militants and neutralize opposition to Islamic extremism," to engage in

"disinformation activities," and to operate "propaganda campaigns[,]" the Court dismissed the

action against CAIR because it concluded there was not "any basis to infer a causal connection

between defendants' alleged wrongdoing and the 9/11 terrorist attacks."  *Id*. at 519.

The Court also rejected plaintiffs' argument that the 9/11 attacks occurred "because the

United States and its citizenry had been desensitized into complacency as a result of the alleged

propaganda, disinformation and psychological operations attributable to the CAIR defendants."

*Id.* at 519.

Similarly, in *Crosby v. Twitter*, Inc., 921 F.3d 617 (6th Cir. 2019), the Court found that

Twitter was not liable under the ATA because the shooter in that case never had any contact with

the organization, but instead planned and committed an attack by himself without any help from

the organization or companies). *See, e.g.*, *Fields v. Twitter, Inc.*, 881 F.3d 739, 749 (9th Cir. 2018)

("we are troubled by the seemingly boundless litigation risks that would be posed by extending

the ATA's bounds as far as foreseeability may reach"); *Cain v. Twitter Inc.*, No. 17 Civ. 2506,

2018 WL 4657275, at *2 (N.D. Cal. Sept. 24, 2018) ("nevertheless, the direct relationship link is

missing. Most of the allegations are about ISIS's use of Twitter in general. The relatively few

allegations involving Twitter that are specific to the attacks that killed plaintiffs' family members

also provide little more than generic statements that some of alleged perpetrators of the attacks

were 'active' Twitter users who used the platform to follow [ISIS]").

Many ATA cases involve financial institutions and the transfer of funds, and in those cases as well the element of causation is demanding.  For example, Courts have refused to ascribe ATA civil liability when monetary transfers or contributions were "of insignificant size," and "not sufficiently linked to Hamas." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012) ("*Gill II*"). *See also Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018) (holding that procedures bank instituted to evade U.S. sanctions and facilitate banking transactions with Iran, as state sponsor of terrorism, were not proximate cause of U.S. citizen's death from bomb that Hezbollah placed in Iraq, since bank did not service terrorist group directly).

Here, regarding Mr. Khalil, the FAC fails to plead facts establishing causation at all, much less of the type necessary for an ATA claim.  Nor are there reasonable inferences that could be drawn to that effect.  In fact, as is the case for other aspects of the FAC, its bald assertions belie its fundamental weakness.  For instance, the allegation that the "Associational Defendants so pervasively and systemically assisted Hamas as to render them liable for every Hamas terror attack and action[,]" FAC, at ¶ 222, is plainly insufficient to satisfy the standard for causation for a proper ATA or ATS claim, which requires that a defendant's conduct be the proximate cause of specific acts of international terrorism.[6]

---

[6] In addition to the biased and discredited Canary Mission web site, the FAC also cites Ryan Mauro, another questionable source.  *See* FAC, at ¶ 163 n.167.  Georgetown University's Bridge Initiative web site devotes a separate page to Mr. Mauro, widely recognized as an Islamophobic conspiracy theorist, and who notably cites other similar cases (involving similar counsel) as evidence of his own findings – an entirely circular method of "confirmation."  *See* "Factsheet: Ryan Mauro, Bridge Initiative, Georgetown University (Apr. 3, 2018), available at https://bridge.georgetown.edu/research/factsheet-ryan-mauro/ ("Ryan Mauro is an analyst at the anti Muslim organization, the Clarion Project. Mauro regularly makes anti Muslim accusations and unfounded claims on Fox News programs and during trainings for law enforcement officials. He is a proponent of policies that criminalize Muslims and Muslim communities").  *See also* Countering the Islamophobia Industry:  Toward More Effective Strategies, *The Carter Center*

Accordingly, the FAC fails to plead against Mr. Khalil an ATA claim sufficiently because it fails to establish that Mr. Khalil engaged in anything more than "independent advocacy," or that he aided and abetted Hamas under 18 U.S.C. §2333(d)(2).

## POINT II

### THE FAC'S ATS CLAIM AGAINST MR. KHALIL SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(6) BECAUSE IT FAILS TO STATE A CLAIM, AND/OR PURSUANT TO RULE 12(b)(1), FED. R. CIV. P., BECAUSE THE COURT LACKS SUBJECT MATTER JURISDICTION

As set forth in POINT I, the FAC's ATS claim is deficient for many of same reasons as the ATA cause of action. In addition, for the reasons set forth in the *Alwan Memo*, at 26-27, and the *JVP Memo*, at 27-29, the Court lacks subject matter jurisdiction to adjudicate the ATS claim.

The specific elements of an ATS claim are addressed in the *Alwan Memo*, at 26-27, and the *JVP Memo*, at 27-29, and will not be repeated here.  In addition, the analysis in POINT I with respect to the First Amendment, aiding and abetting, substantial assistance, and *scienter* are relevant to the ATS claim as well because of their common elements. *See Jan v. People Media Project*, No. 3:24-CV-05553-TMC, 2025 WL 359009, at *6 (W.D. Wash. Jan. 31, 2025) ("[b]ecause this standard is analogous to the aiding-and-abetting provision of JASTA, which imposes civil liability on anyone "who aids and abets, by knowingly providing substantial assistance" to an "act of international terrorism," this Court also looks for guidance to the Supreme Court's recent decision interpreting JASTA in *Twitter v. Taamneh*") (cleaned up and citations omitted).

---

(May 2018), at 52 (noting Mr. Mauro in the "Countering Anti-Muslim Hate Groups" segment of the paper), available at https://www.cartercenter.org/resources/pdfs/peace/conflict_resolution/ countering isis/cr-countering-the-islamophobia-industry.pdf.

Accordingly, pursuant to that analysis, the same result should obtain: the ATS cause of action against Mr. Khalil should be dismissed.

## POINT III

### THE FAC SHOULD BE DISMISSED AGAINST MR. KHALIL IN HIS REPRESENTATIVE CAPACITY <u>BECAUSE PLAINTIFFS FAILED TO EFFECT PROPER SERVICE</u>

The FAC should also be dismissed against Mr. Khalil in his representative capacity for CUAD – and/or JVP and SJP – because Plaintiffs failed to effect proper service in that context. Motions directed at deficient service are governed by Rule 12(b)(5), Fed.R.Civ.P.  The *Alwan Memo*, at 11-14, sets forth the controlling legal principles and case law, and Mr. Khalil adopts that discussion herein rather than repeat it.

Service was not properly effectuated because the FAC does not establish that Mr. Khalil was authorized to accept service for CUAD, or any other organization (such as SJP or JVP). Merely alleging in wholly conclusory fashion, as the FAC does at ¶ 35, that Mr. Khalil was the "*de facto*" president of CUAD, or SJP, or JVP, is not sufficient.  *See also Alwan Memo*, at 5, 13, 25.

Indeed, the FAC alleges merely that Mr. Khalil was the "public face and de facto president of CUAD[,]" and that "[o]n information and belief, Khalil is also the de facto president of Columbia SJP and Columbia JVP."  FAC, at ¶ 35 (footnote omitted).

Yet that cannot suffice, as certainly "de facto" demands *facts* that would support the claim.  Instead, that characterization is devoid of any facts.  In addition, the footnote (31) to ¶ 35 of the FAC asserts that "[t]his allegations [sic] is made in the alternative to the allegations that Alwan and Jones are de facto leaders of Columbia SJP and Columbia JVP."

That is a ludicrous contention and illustrates the extent to which the FAC grasps at straws in an unavailing attempt to assign liability to Mr. Khalil. How many *de facto* leaders are there in these organizations? What are the criteria for holding such a position? None have been alleged regarding Mr. Khalil. Again, the omissions are glaring, and dispositive, and repetitions of that unsupported conclusion throughout the FAC do not lend any credence to the allegations.

Similarly, and again without the slightest support, the FAC, at ¶124, claims that "Khalil and former members and/or organizers of Columbia SJP became leaders of CUAD." Indeed, that allegation that Mr. Khalil "*became*" a leader of CUAD, contradicts its earlier claim of his prior *de facto* leadership.

In fact, the FAC does not provide any facts establishing that Mr. Khalil was even a member of CUAD, much less its leader. Nor does the FAC provide any basis for concluding that CUAD – a leaderless horizontal coalition composed loosely of approximately 120 organizations – had any hierarchy, much less that Mr. Khalil occupied some specific role that could satisfy the requirements imposed by Rule 4(h), Fed.R.Civ.P., with respect to service, *i.e.*, "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process," Fed. R. Civ. P. 4(h)(1)(B), or (ii) by serving in accordance with state law. *See* Fed. R. Civ. P. 4(h)(1)(A); Fed. R. Civ. P. 4(e)(1). *See also Alwan Memo*, at 10-11.

In addition, the person served must occupy the relevant position within the association "at the time he was served." *MacGregor v. Milost Glob., Inc.*, No. 17-CV-6691-LTS-KHP, 2018 WL 4007642, at *3 (S.D.N.Y. Aug. 22, 2018). Here, at the time he was served, Mr. Khalil had already been in immigration custody in Louisiana for three weeks, and the FAC fails again to provide any basis for concluding that Mr. Khalil – if he ever served as CUAD's president (or that

position for SJP or JVP), *de facto* or otherwise – still maintained that position 1,186 miles from Columbia and unable to provide any meaningful leadership.  *See also Alwan Memo*, at 12-14.

Accordingly, Plaintiffs have failed to meet their burden of demonstrating adequate service of Mr. Khalil as representative of any organizational defendant, and the claims alleged against Mr. Khalil in his purported representative capacity for CUAD should be dismissed.  *See also Alwan Memo*, at 24-26.

## POINT IV

### MR. KHALIL REQUESTS LEAVE TO JOIN IN THE MOTIONS BY HIS CO-DEFENDANTS TO THE EXTENT THEY BENEFIT HIM

Mr. Khalil respectfully requests leave to join in those motions made by his co-defendants to the extent they benefit him.

## CONCLUSION

Accordingly, for all the reasons set forth above, and in the other defendants' motions to dismiss, it is respectfully submitted that the Court should grant Mr. Khalil's motion to dismiss in the entirety, and dismiss all the causes of action against him in the FAC.

Dated:  19 June 2025

New York, New York

JOSHUA L. DRATEL

Dratel & Lewis

29 Broadway, Suite 1412

New York, New York 10006

(212) 732-0707

jdratel@dratellewis.com

*Attorneys for Defendant*

Mahmoud Khalil

Of counsel

Joshua L. Dratel

Amy E. Greer

Jacob C. Eisenmann (*pending admission*)

24

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REUIREMENTS
AND TYPE STYLE REQUIREMENTS

This memorandum complies with the type-volume limitation of Local Rule 7.1(c). This Memorandum of Law contains 6,904 words, excluding the parts exempted by the Court's Individual Rules.

This Memorandum of Law complies with the typeface requirements because this brief has been prepared in a proportionally spaced typeface using Word in Times New Roman font size 12.

Dated: 19 June 2025
        New York, New York

    /s/ Joshua L. Dratel
JOSHUA L. DRATEL
Dratel & Lewis
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-8805
jdratel@dratellewis.com