UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

IRIS WEINSTEIN HAGGAI, on her own behalf
and on behalf of JUDITH LYNNE WEINSTEIN
HAGGAI and GAD DOE, JOHN DOE,
RICHARD ROE, JANE MOE, SHLOMI ZIV,
AYELET SAMERANO, on her own behalf and on
behalf of YONATAN SAMERANO,
TALIK GVILI, on her own behalf and on behalf of
RAN GVILI, ROEE BARUCH, on his own behalf
and on behalf of URIEL BARUCH, and
JAMES POE, on his own behalf and on behalf of
LEO POE,

                              Plaintiffs,

             – *against* –

NERDEEN KISWANI, individually and as the
representative of WITHIN OUR LIFETIME-
UNITED FOR PALESTINE, MARYAM ALWAN,
individually and as the representative of
COLUMBIA STUDENTS FOR JUSTICE IN
PALESTINE, CAMERON JONES, individually
and as the representative of COLUMBIA-
BARNARD JEWISH VOICE FOR PEACE, and
MAHMOUD KHALIL, individually and as the
representative of COLUMBIA UNIVERSITY
APARTHEID DIVEST, COLUMBIA
STUDENTS FOR JUSTICE IN PALESTINE, and
COLUMBIA-BARNARD JEWISH VOICE FOR
PEACE,

                           Defendants.

------------------------------------------------------------x

25 Cv. 2400 (JAV)

Hon. Jeanette A. Vargas

## DEFENDANT MAHMOUD KHALIL'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

DRATEL & LEWIS
29 Broadway Suite 1412
New York, New York 10006
(212) 732-0707
*Attorneys for Defendant Mahmoud Khalil*

Table of Contents

Table of Contents ................................................................................................. i

Table of Authorities................................................................................................iii

Introduction ...........................................................................................................1

Statement of the Facts.............................................................................................2

ARGUMENT.............................................................................................................3

POINT I

THE SAC SHOULD BE DISMISSED PURSUANT TO
    RULE 12(b)(6), FED. R. CIV. P., BECAUSE IT FAILS TO
    STATE CLAIMS UNDER EITHER THE ATA OR THE ATS,
    AND/OR WITH RESPECT TO MR. KHALIL RELIES EXCLUSIVELY
    ON PROTECTED FIRST AMENDMENT EXPRESSION AND ACTIVITY.................3

A. The SAC's Allegations Against Mr. Khalil Include Only
    Expression and Conduct Protected Entirely by the First Amendment...............................4

1. Mr. Khalil's Alleged Conduct Constitutes Political Speech, Which
    Is Afforded the Highest Level of Protection Under the First Amendment.........................4

2. The Speech Tort Doctrine Also Precludes
    the Causes of Action Against Mr. Khalil.............................................................8

3. The First Amendment Imposes Limits on Liability Under
    the ATA and Justice Against Sponsors of Terrorism Act ("JASTA").............................10

B.    The SAC Fails to Allege Aiding and Abetting Under 18 U.S.C. §2333(d)(2).................14

1.    The Applicable Legal Standard......................................................................14

2.    The Requisite Elements of Aiding and Abetting Are Absent from the SAC...................15

POINT II

THE SAC'S ATS CLAIM AGAINST MR. KHALIL SHOULD BE
    DISMISSED PURSUANT TO RULE 12(b)(6) BECAUSE IT FAILS TO
    STATE A CLAIM, AND/OR PURSUANT TO RULE 12(b)(1), FED. R.

CIV. P., BECAUSE THE COURT LACKS SUBJECT MATTER JURISDICTION.......23

POINT III

THE SAC SHOULD BE DISMISSED AGAINST
    MR. KHALIL IN HIS REPRESENTATIVE
    CAPACITY BECAUSE PLAINTIFFS FAILED TO
    EFFECT PROPER SERVICE AND CUAD NEITHER
    HAS LEGAL EXISTENCE NOR IS IT A SUABLE ENTITY........................................24

A.    Plaintiffs Failed to Effect Proper Service on
    Mr. Khalil in His Representative Capacity for CUAD.......................................................24

B.    Plaintiffs Fail to Demonstrate that CUAD Has Legal
    Existence and is a Suable Entity Under both Federal and State Law................................26

POINT IV

MR. KHALIL REQUESTS LEAVE TO JOIN IN THE MOTIONS
    BY HIS CO-DEFENDANTS TO THE EXTENT THEY BENEFIT HIM.......................29

CONCLUSION.....................................................................................................................30

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
    LIMITATION, TYPEFACE REQUIREMENTS
    AND TYPE STYLE REQUIREMENTS..........................................................................31

Table of Authorities

Cases

*Ashley v. Deutsche Bank Aktiengesellschaft*,

    No. 23-132, 2025 WL 2025448 (2d Cir. July 21, 2025)............................................*passim*

*Bartnicki v. Vopper*, 532 U.S. 514 (2001)..................................................................................10

*Boos v. Barry*, 485 U.S. 312 (1988), 108 S.Ct. 1157, 99 L.Ed.2d 333....................................6, 12

*Bridges v. California*, 314 U.S. 252 (1941)..................................................................................5

*Brown v. Fifth Jud. Dist. Drug Task Force*, 255 F.3d 475 (8th Cir. 2001)............................26, 27

*Cain v. Twitter Inc.*,

    No. 17-CV-02506, 2018 WL 4657275 (N.D. Cal. Sept. 24, 2018)...................................21

*Connick v. Myers*, 461 U.S. 138 (1983)........................................................................................4

*Cox v. Louisiana,* 379 U.S. 536 (1965)........................................................................................5

*Crosby v. Twitter*, Inc., 921 F.3d 617 (6th Cir. 2019)..................................................................21

*Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019).....................10

*Denton v. Hernandez*, 504 U.S. 25 (1992)..................................................................................12

*Doe v. Sigma Chi Int'l Fraternity, Inc.*,

    No. 5:23-CV-1452 (BKS/ML), 2024 WL 4347799 (N.D.N.Y. Sept. 30, 2024)...............29

*Edwards v. South Carolina*, 372 U.S. 229 (1963)..........................................................................6

*Elfbrandt v. Russell*, 384 U.S. 11 (1966)....................................................................................19

*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 127 S. Ct. 2652,

    168 L. Ed. 2d 329 (2007)................................................................................................10

*Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018)....................................................................21

*Florida Star v. B.J.F.*, 491 U.S. 524, 109 S. Ct. 2603, 105 L. Ed. 2d 443 (1989)........................10

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.,*

991 F.3d 370 (2d Cir. 2021).............................................................................26

*Gallop v. Cheney*, 642 F.3d 364 (2d Cir. 2011)......................................3, 12, 16

*Garrison v. Louisiana*, 379 U.S. 64 (1964).....................................................5

*Gill v. Arab Bank*, PLC, 893 F. Supp. 2d 542 (E.D.N.Y. 2012)....................20, 22

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)...................................14

*Healy v. James*, 408 U.S. 169 (1972).............................................................7

*Hecht v. Malley*, 265 U.S. 144, 44 S. Ct. 462 (1924)....................................27

*Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017 (5th Cir. 1987).........................9

*Hess v. Indiana*, 414 U.S. 105 (1973).............................................................6

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).................10, 11, 12

*Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 108 S. Ct. 876, 99 L. Ed. 2d 41 (1988).....................9

*In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284 (S.D. Fla. 2018)....................20

*In re Terrorism Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013)....................20

*In re Terrorist Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494 (S.D.N.Y. 2010).................20, 21

*Jan v. People Media Project*, No. 3:24-CV-05553-TMC,

2025 WL 359009 (W.D. Wash. Jan. 31, 2025)....................................24

*Jones v. Parmley*, 465 F.3d 46 (2d Cir. 2006).............................................5

*Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018).........................22

*Khalil v. Trump*, No. 25-CV-1963 (MEF) (D.N.J. 2025)...............................6

*Khalil v. Trump*, No. 25-CV-01963 (MEF) (MAH),

2025 WL 1514713 (D.N.J. May 28, 2025).........................................16

*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013).........................23

*L&L Assoc. Holding Corp. v. Charity United Baptist Church*,

935 N.Y.S.2d 450 (N.Y. Dist. Ct. 2011).....................................28, 29

*La Russo v. St. George's Univ. Sch. of Med.*, 747 F.3d 90 (2d Cir. 2014)....................27

iv

*Linde v. Arab Bank, PLC*, 882 F.3d 314 (2d Cir. 2018)...................................................................11

*MacGregor v. Milost Glob., Inc.*, No. 17-CV-6691-LTS-KHP,

    2018 WL 4007642 (S.D.N.Y. Aug. 22, 2018)...................................................................23

*Martin v. Curran*, 303 N.Y. 276 (N.Y. 1951).............................................................................28, 29

*MacGregor v. Milost Glob., Inc.*,

    No. 17-CV-6691-LTS-KHP, 2018 WL 4007642 (S.D.N.Y. Aug. 22, 2018)...................25

*Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014)...............................................................23

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)........................................................6, 7, 8

*New York Times Co. v. Sullivan*,

    376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)..........................................................8

*Noto v. United States*, 367 U.S. 290 (1961)..............................................................................7, 17

*Owens v. BNP Paribas*, S.A., 897 F.3d 266 (D.C. Cir. 2018)......................................................20

*Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025)...............................................................................5

*Palladino v. CNY Centro, Inc.*, 23 N.Y.3d 140 (2014)..................................................................28

*Roby v. Corp. of Lloyd's*, 796 F. Supp. 103 (S.D.N.Y. 1992)...........................................26, 28, 29

*Scales v. United States*, 367 U.S. 203 (1961)................................................................................19

*Sendon v. Torres*,

    No. 15 Civ. 04538 (NSR), 2016 WL 1746111 (S.D.N.Y. Apr. 28, 2016).......................27

*Shelley v. Kraemer*, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161 (1948)...........................................8

*Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979)..............................................................10

*Application of the Convention on the Prevention and Punishment of the*

    *Crime of Genocide in the Gaza Strip* (*South Africa v. Israel*), I.C.J. (pending)...............18

*Snyder v. Phelps*, 562 U.S. 443 (2011)..................................................................................*passim*

*Terminiello v. City of Chicago*, 337 U.S. 1 (1949).........................................................................5

*Texas v. Johnson*, 491 U.S. 397 (U.S.Tex., 1989).......................................................................12

*Tinker v. Des Moins Indep. Cmty. Sch. Dist.* 393 U.S. 503 (1969)................................9

*Twitter v. Taamneh*, 598 U.S. 471 (2023).................................................14, 18, 21, 24

*Wildman v. Deutsche Bank Aktiengesellschaft*,

    21 Civ. 04400, 2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022).........................19

*Yates v. United States*, 354 U.S. 297 (1957).................................................................19

*Young Am.'s Found. v. Stenger*, 2023 WL 3559619 (N.D.N.Y. May 19, 2023).........27

## Statutes & Other Authorities

18 U.S.C. §2333 ....................................................................................................*passim*

18 U.S.C. §2333(d)(2)......................................................................................13, 20

18 U.S.C. §2339B ................................................................................................*passim*

28 U.S.C. §1350 ....................................................................................................*passim*

Fed. R. Civ. P. Rule 4(e)(1).......................................................................................25

Fed. R. Civ. P. Rule 4(h)............................................................................................25

Fed. R. Civ. P. Rule 4(h)(1)(A).................................................................................25

Fed. R. Civ. P. Rule 4(h)(1)(B).................................................................................25

Fed. R. Civ. P. Rule 12(b)(1)................................................................................*passim*

Fed. R. Civ. P.  Rule 12(b)(5)................................................................................*passim*

Fed. R. Civ. P.  Rule 12(b)(6)................................................................................*passim*

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222 (2016)...................*passim*

Immigration and Nationality Act, Pub. L. No. 82-414, §237(a)(4)(C) (1952)............15

N.Y. GEN. ASS'NS LAW § 13...............................................................................27, 28

U.S. Const. Amend. I .............................................................................................*passim*

## INTRODUCTION

This Memorandum of Law is respectfully submitted on behalf of defendant Mahmoud Khalil – personally and in his purported representative capacity for Columbia University Apartheid Divest ("CUAD") – and in support of his motion to dismiss Plaintiffs' Second Amended Complaint ("SAC") because (1) pursuant to Rule 12(b)(6), the SAC fails to state a claim with respect to either cause of action;  (2) pursuant to Rule 12(b)(1), Fed.R.Civ.P., the Court lacks subject matter jurisdiction over the Alien Tort Statute claim;  and (3) pursuant to Rule 12(b)(1) and 12(b)(5), service upon Mr. Khalil as representative of CUAD was invalid because CUAD is not a suable entity, and/or Mr. Khalil does not qualify as a representative of CUAD for purposes of service.

Despite its length, and attention to extraneous allegations and theories, the SAC fails entirely to allege the necessary elements for the SAC's two causes of action:  the Anti-Terrorism Act ("ATA"), 18 U.S.C. §2333, and the Alien Tort Statute ("ATS"), 28 U.S.C. §1350.  In fact, the SAC's omissions are more striking than its repeated scurrilous, unsupported innuendo.  Indeed, the SAC's grandiose attempt at "historical" narrative is designed to distract from the patent insufficiency of the requisite core allegations for either an ATA or ATS claim.

Here, each suffers from multiple insurmountable flaws, including the overriding defect that they are based entirely on expression by Mr. Khalil (and others) protected by the First Amendment.

The SAC also fails to plead facts, rather than conclusory and florid supposition, that would establish either that Mr. Khalil aided and abetted any act of international terrorism, or that any speech or conduct by him was knowingly provided to facilitate any such acts, or in coordination with a Foreign Terrorist Organization ("FTO"), namely Hamas. Nor does the SAC

provide sufficient connection between Mr. Khalil's conduct and Plaintiffs' alleged injuries.

Remarkably, while the SAC is devoid of the necessary elements of either an ATA or ATS claim against Mr. Khalil, it spans 90 pages – not because it is an attempt at a viable lawsuit, but rather because it represents a wholly invented narrative intended to stifle and chill his and others' First Amendment expression with which Plaintiffs do not agree. That effort must fail, and the SAC should be dismissed against Mr. Khalil with prejudice.

Mr. Khalil also joins his co-defendants' motions (namely their Memoranda of Law), two of which are cited below to avoid repetition herein: that by Maryam Alwan ("*Alwan Memo*") and Columbia Barnard A Jewish Voice for Peace and Nerdeen Kiswani ("*JVP Memo*").

## STATEMENT OF THE FACTS

Mr. Khalil adopts the Factual Background set forth in both the *Alwan Memo*, at 3-10, and the *JVP Memo*, at 3-6. Regarding allegations in the SAC specific to Mr. Khalil, they are integrated in the argument POINTs below not only to avoid repetition herein, but also because more important than what those allegations claim is what is *missing* from them when compared with the elements of an adequate ATA and/or ATS claim. That critical context is more illuminating than a separate factual presentation.

Essentially, the SAC alleges that Mr. Khalil has personal liability for "provid[ing] 'practical assistance' to Hamas's international terrorist operations 'before, during, and after October 7[]'" and by fostering a "mass culture of fear, threats, violence, and overt hatred on Columbia's campus" and by engaging in advocacy designed to "demonize Israel." SAC, at ¶¶ 257, 259. The SAC further alleges Mr. Khalil was "the public face and de facto president of CUAD." SAC, at ¶ 35.

The SAC's allegations against Mr. Khalil specifically are limited to nine paragraphs (of the 262 within the entire SAC):  Mr. Khalil's purported status as "de facto" leader of CUAD; leading a protest (¶ 113);  allegedly becoming a leader of that organizations (¶ 125);  allegedly – "on information and belief," without any further factual support, posting a statement on Instagram (¶ 173);  and serving as "primary spokesperson and negotiator" for a group of protestors (¶ 189).

## ARGUMENT

## POINT I

### THE SAC SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(6), FED. R. CIV. P., BECAUSE IT FAILS TO STATE CLAIMS UNDER EITHER THE ATA OR THE ATS, AND/OR, WITH RESPECT TO MR. KHALIL, RELIES EXCLUSIVELY ON PROTECTED FIRST AMENDMENT EXPRESSION AND ACTIVITY

As detailed below, and in the *Alwan Memo*, at 9-10, and *JVP Memo*, at 6-10, the SAC should be dismissed – in both Mr. Khalil's individual and purported representative capacities – pursuant to Rule 12(b)(6), Fed.R.Civ.P., because it fails to state a claim, and/or with respect to Mr. Khalil, it relies exclusively on expression and activity fully protected by the First Amendment.

The SAC fails entirely to allege the necessary elements for both an ATA or ATS cause of action, but instead strays into fabulist territory in alleging that somehow Mr. Khalil (and the other defendants) possessed foreknowledge of Hamas's October 7, 2023, attack.  Such "fanciful, fantastic, [and] delusional" claims are the very type that courts freely disregard on a motion to dismiss.  *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (cleaned up).

The principles applicable to Rule 12(b)(6) are set forth in the *Alwan Memo*, at 10-11, and the *JVP Memo*, at 6-7, and Mr. Khalil adopts those here to avoid repetition.  Mr. Khalil also joins

in the analysis performed in those submissions, at 15-27 (*Alwan Memo*) and 6-33 (*JVP Memo*), with respect to the SAC generally.

Regarding Mr. Khalil specifically, the SAC suffers from multiple dispositive deficiencies discussed below:

(1)     the SAC is impermissibly based on Mr. Khalil's expression and activity fully protected by the First Amendment – with respect to both general First Amendment doctrine, as well as its specific application to the ATA and ATS;  and,

(2)     the SAC fails to plead the necessary elements of an ATA violation, including (a) aiding and abetting liability; (b)  any nexus between Mr. Khalil and any acts of international terrorism; (c)  *scienter*;  (d)  that Mr. Khalil provided any "substantial assistance" to Hamas; and (e)  that there was any proximate cause between Mr. Khalil's alleged conduct and Plaintiffs' claimed injuries.

**A.    *The SAC's Allegations Against Mr. Khalil Include Only Expression and Conduct Protected Entirely by the First Amendment***

**1.    *Mr. Khalil's Alleged Conduct Constitutes Political Speech, Which Is Afforded the Highest Level of Protection Under the First Amendment***

The SAC fails to state a claim under either the ATA or ATS because the First Amendment precludes tort liability for the expression and conduct the SAC alleges against Mr. Khalil.

None of the allegations against Mr. Khalil, set forth **ante**, at 2-3, describe anything but expression and conduct fully covered by the First Amendment.  In fact, the expression and conduct constitute "political speech," a particular category that occupies "the highest rung on the hierarchy of First Amendment values, and is entitled to special protection."  *Snyder v. Phelps*,

562 U.S. 443, 452 (2011) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)) (quotation marks omitted).

The Supreme Court long ago explained that "the opportunity for free political discussion" is "a basic tenet of our constitutional democracy." *Cox v. Louisiana*, 379 U.S. 536, 552 (1965). *See also Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("speech concerning public affairs is more than self-expression; it is the essence of self-government").

In addition, the Court has held that "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). *See also Bridges v. California*, 314 U.S. 252, 263 (1941) (invalidating criminal convictions, including of a non-citizen, based on protected speech).[1]

That First Amendment protection indisputably extends to political protests as well. As the Second Circuit pointed out in *Jones v. Parmley*, 465 F.3d 46 (2d Cir. 2006), "[t]he Supreme Court has declared that the First Amendment protects political demonstrations and protests –

---

[1] Recently, the Second Circuit, in *Ozturk v. Hyde*, 136 F.4th 382 (2d Cir. 2025), denied the government a stay of the District Court's Order returning a habeas corpus petitioner to Vermont for an expedited bail hearing regarding the petitioner's immigration detention, observing that the basis for revoking the petitioner's visa was that she had "expressed strong views on an undisputedly controversial topic criticizing the University," and demanded the University "acknowledge the Palestinian genocide, apologize for University President Sunil Kumar's statements, disclose its investments and divest from companies with direct or indirect ties to Israel." Rumeysa Ozturk et al., "Op-ed: Try Again, President Kumar: Renewing Calls for Tufts to Adopt March 4 TCU Senate Resolutions," *The Tufts Daily* (Mar. 26, 2024), available at https://www.tuftsdaily.com/article/2024/03/4ftk27sm6jkj [https://perma.cc/84ZQ-EVZ7]." *Id.* at 388.

activities at the heart of what the Bill of Rights was designed to safeguard."  465 F.3d at 56

(Sotomayor, J.), *citing Boos v. Barry*, 485 U.S. 312, 318 (1988)).

 The Supreme Court itself has emphasized that political protests are an exercise of "basic

constitutional rights in their most pristine and classic form." *Edwards v. South Carolina*, 372

U.S. 229, 235 (1963).  *See also NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982)

("[e]ffective advocacy of both public and private points of view, particularly controversial ones,

is undeniably enhanced by group association, as this Court has more than once recognized by

remarking upon the close nexus between the freedoms of speech and assembly").

 In addition, generally, advocacy and political speech are permitted wide latitude, as the

standard for when speech loses its First Amendment protection is defined in *Brandenburg v.

Ohio*, 395 U.S. 444 (1969) (per curiam):  only when "such advocacy is directed to inciting or

producing imminent lawless action and is likely to incite or produce such action."  395 U.S. at

448.

 Here, the factual allegations in the SAC do not come remotely close to alleging Mr.

Khalil even approached, much less crossed, that line.  *See also NAACP v. Claiborne Hardware

Co.*, 458 U.S. at 888, 894;  *Hess v. Indiana*, 414 U.S. 105 (1973);  *Alwan Memo*, at 22-23;  *JVP

Memo*, at 18-27.  Thus, his expression and conduct reside safely within the protection of the First

Amendment.

 In fact, Mr. Khalil's activities and expression alleged in the SAC have already been

recognized by a federal court as political speech.  In *Khalil v. Trump*, Case No. 25 Civ. 1963

(MEF) (D.N.J. 2025), Mr. Khalil's habeas corpus challenge to his immigration detention, which

is based on that same expression and conduct, the District Court found that Mr. Khalil's "speech-

related activities concern political speech . . .  And political speech is entitled to special

protection under the First Amendment."  Order, June 11, 2025 (ECF # 299), at 6 n.5.  *See also id.*

at 6 n.6.  The Court also noted that the government had "not contested the evidence put forward

by the Petitioner, . . ."  *Id*. at 11.

Thus, it is incontestable that Mr. Khalil was engaged in core First Amendment activity,

namely political speech and protest, and that the SAC alleges *only* that protected expression and

activity.

Nor does the addition of allegations against the SAC's additional defendant, Tarek

Bazrouk, alter the analysis above.  Absent some connection to Mr. Khalil, any unlawful conduct

by Mr. Bazrouk does not taint Mr. Khalil's exercise of First Amendment rights.  *See JVP Memo*,

at 22-23.

As the Supreme Court explained in *NAACP v. Claiborne Hardware Co*.,

[c]ivil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.[]

458 U.S. 886 at 920 (footnote omitted).

Moreover, the Court in *Claiborne* emphasized that the specific intent required "must be

judged 'according to the strictest law,'[] for 'otherwise there is a danger that one in sympathy

with the legitimate aims of such an organization, but not specifically intending to accomplish

them by resort to violence, might be punished for his adherence to lawful and constitutionally

protected purposes, because of other and unprotected purposes which he does not necessarily

share.'" *Id*. at 919, *quoting Noto v. United States*, 367 U.S. 290, 299-300 (1961).

As an example, the Court in *Claiborne* cited *Healy v. James*, 408 U.S. 169 (1972) in

which "the Court applied these principles in a noncriminal context[,]" and "held that a student

group could not be denied recognition at a state-supported college merely because of its

affiliation with a national organization associated with disruptive and violent campus activity."

458 U.S. at 919.

As a result, "the presence of activity protected by the First Amendment imposes restraints

on the grounds that may give rise to damages liability and on the persons who may be held

accountable for those damages." *Id*. at 916-17. *See also id*. at 918 ("[w]hile the State

legitimately may impose damages for the consequences of violent conduct, it may not award

compensation for the consequences of nonviolent, protected activity. Only those losses

proximately caused by unlawful conduct may be recovered").

    2.    ***The Speech Tort Doctrine Also Precludes
the Causes of Action Against Mr. Khalil***

Fifty years ago, the Supreme Court, in *New York Times Co. v. Sullivan*, 376 U.S. 254

(1964), declared that

> [i]t matters not that that law has been applied in a civil action and that it is common law
> only, though supplemented by statute. The test is not the form in which state power has
> been applied but, whatever the form whether such power has in fact been exercised.

*Id*, at 265. *See also Shelley v. Kraemer*, 334 U.S. 1, 14 (1948) (judicial action in contract dispute

constituted "state action")*.

Applying the rationale that "[a] profound national commitment to the principle that

debate on public issues should be uninhibited, robust, and wide-open[,]" *id.*, the Court in

*Sullivan* added that "[w]hat a State may not constitutionally bring about by means of a criminal

statute is likewise beyond the reach of its civil law of libel." *Id.* at 277.

Since *Sullivan*, the Court has expanded that principle well beyond defamation and libel.

For example, in *Snyder*, the Court reaffirmed that "[t]he Free Speech Clause of the First

8

Amendment – 'Congress shall make no law . . . abridging the freedom of speech' – can serve as a defense in . . . tort suits." 562 U.S. at 451.

In *Snyder*, members of the Westboro Baptist Church picketed outside the funeral of Marine Lance Corporal Matthew Snyder, who had been killed in the line of duty in Iraq. In the subsequent appeal of a judgment for Mr. Snyder's father for the tort of Intentional Infliction of Emotional Distress, the Supreme Court overturned the verdict and ruled that the First Amendment shielded the picketers from tort liability because they were exercising speech on matters of public concern. *Id.* at 454.

In language equally pertinent here with respect to the SAC's allegations herein, the Court added that "[s]peech is powerful. It can stir people to action [and] inflict great pain […] we cannot react to that pain by punishing the speaker." *Id*. at 460-461 (cleaned up).  The same is true here.

Likewise extending First Amendment protection beyond the domain of defamation, in *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46 (1988), the Court rejected a tort claim of Intentional Infliction of Emotional Distress because, the magazine's publishing of a "parody" advertisement was protected by the First Amendment. *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 53 (1988) ("in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment").

Also, in *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017 (5th Cir. 1987) the Fifth Circuit held that the First Amendment foreclosed damages on a theory of negligence because, if the state was precluded from imposing damages for publication of an article, it "could not constitutionally make the publication of that article a crime." *Id.* at 1023. *See also Tinker v. Des Moins Indep. Cmty. Sch. Dist.* 393 U.S. 503 (1969) (recognizing constitutional right of high school students to

wear black armbands in protest); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (First Amendment precluded liability under state and federal wiretapping laws for disclosing conversations that Defendants knew had been taped in violation those laws, reiterating that "state action to punish the publication of truthful information seldom can satisfy constitutional standards," *quoting Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979)). *See also Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410 (S.D.N.Y. 2019); *Alwan Memo*, at 22.

In fact, speech-torts are subject to the same analysis as First Amendment cases challenging speech-restricting laws. For example, in *Florida Star v. B.J.F.*, 491 U.S. 524 (1989), the Supreme Court held that a civil action against a newspaper for the release of a crime victim's name was unconstitutional because, under the First Amendment, the remedy provided by the state was not a narrowly tailored response to the interest in protecting rape victims' privacy.  491 U.S. at 541.

Laws, or the adjudication of statutory or common law torts, that burden political speech are "subject to strict scrutiny," which requires the Plaintiff to prove that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 451 (2007).

### 3.    *The First Amendment Imposes Limits on Liability Under the ATA and Justice Against Sponsors of Terrorism Act ("JASTA")*

The First Amendment also imposes restrictions on liability under anti-terrorism statutes – whether civil or criminal – including the ATA and JASTA.

In *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), the Supreme Court addressed the scope of First Amendment protection in the context of legislation directed at international

terrorism.  Mr. Khalil adopts and joins in the discussion of *Holder* in the *Alwan Memo*, at 23, and the *JVP Memo*, at 12, 19-23, neither of which will be repeated herein, but will supplement them below.

The Court in *Holder* was clear to delineate that the statute at issue, 18 U.S.C. §2339B, "is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations[,]" *id.* at 26, holding that "[t]he statute reaches only material support coordinated with or under the direction of a designated foreign terrorist organization." *Id*. at 31.  Importantly, "[i]ndependent advocacy that might be viewed as promoting the group's legitimacy is not covered." *Id.* at 31-32 (footnote omitted) (citation omitted).

Liability under §2339B is much broader than under JASTA.  As the Second Circuit noted in *Ashley*, the Court had previously "distinguished between the requirements to bring a JASTA aiding-and-abetting claim and a claim under 18 U.S.C. §2339B . . . ," pointing out that "[w]hereas a material support claim 'requires only knowledge of the organization's connection to terrorism,' a JASTA claim requires 'intent to further [a terrorist organization's] terrorist activities' and 'awareness that one is playing a role in those activities.'" *Ashley v. Deutsche Bank Aktiengesellschaft*, No. 23-132, 2025 WL 2025448, at *15 (2d Cir. July 21, 2025), *quoting Linde v. Arab Bank, PLC*, 882 F.3d 314, 329-30 (2d Cir. 2018)*. See also Alwan Memo*, at 25.

Moreover, elaborating on the protection accorded independent advocacy, the Court in *Holder* pointed out that "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." *Id*. at 27 (citation omitted).  *See also id*. at

36 ("most importantly, Congress has avoided any restriction on independent advocacy, or indeed any activities not directed to, coordinated with, or controlled by foreign terrorist groups").

In *Holder* the Supreme Court found that 18 U.S.C. §2339B "regulates speech on the basis of its content," and consequently requires the Court to undertake a strict scrutiny analysis, citing *Texas v. Johnson*, which calls for "the most exacting scrutiny." *Texas v. Johnson*, 491 U.S. 397 (1989), *quoting Boos*, 485 U.S. at 321.[2]

Here, the SAC's allegations against Mr. Khalil consist of nothing more than the "independent advocacy" that *Holder* held is protected by the First Amendment even when it may parallel the cause of a Foreign Terrorist Organization.  The SAC does not contain any allegations, other than conclusory assertions, that would remotely establish Mr. Khalil's aiding and abetting Hamas.  Therefore, the SAC's allegations against him are not actionable because his expression and conduct are protected by the First Amendment.

Again, the SAC's highly conclusory and inflammatory allegations – in this instance that Mr. Khalil "directly coordinates with Hamas," SAC, at ¶ 35 – offered without any factual information whatsoever to support them, betrays the SAC's inadequacy.  A pleading that could provide sufficient basis would not need to depart from credulity.  *See Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011), *citing Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992) (even in Rule

---

[2] In *Holder*, the Court was careful not to set the limits of the statute in one direction or the other, pointing out that "[a]ll this is not to say that any future applications of the material-support statute to speech or advocacy will survive First Amendment scrutiny." 561 U.S. at 39.  As a result, the Court expressly disclaimed any "suggest[ion] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits foreign terrorist organizations."  *Id*.

12(b)(6) context court may dismiss claims with even well-pleaded facts if they are ultimately "clearly baseless").[3]

Indeed, the SAC assigns to Mr. Khalil the role of lead negotiator for the students with the University, the very antithesis of terroristic violence or involvement therewith.  The SAC also notes Mr. Khalil's objectives and demands communicated to the University administration during those negotiations – the immediate reinstatement of the expelled students, amnesty for all individuals disciplined for pro-Palestinian activities, and the abolition of Barnard's disciplinary procedures – all parochial matters relating to the immediate events on campus and the consequences the students faced. The students' demands were specific to Columbia:  disclose its investments in companies that were contributing to the Israeli military assault, and divest therefrom.  *See* SAC, at ¶ 146, ¶ 147, and ¶ 168.  *See also* Colette Holcomb and Emily Pickering, "Columbia University Apartheid Divest Holds Pro-Palestinian Protest at Barnard Gates," *Columbia Spectator*, December 10, 2024, available at https://bit.ly/4oiHHoX.

---

[3] The SAC's reliability is materially undermined by its citation to partisan, discredited sources. For example, the SAC cites the web site Canary Mission apparently as "factual support" for the allegations against Mr. Khalil.  However, Canary Mission can and should not be credited as a reliable source of information.  The magazine *Jewish Currents* recently described Canary Mission as:

> [a] website [] launched in 2015 to ensure, in the group's own words, that "today's radicals are not tomorrow's employees."  To further this goal of rendering pro Palestine activists unemployable, the group posted profiles of thousands of students who spoke out for Palestinian rights, often including their photos, resumes, and links to their LinkedIn pages and published work.

Alex Kane, "Canary Mission's Newest Funders," *Jewish Currents* (Apr. 4, 2025), available at https://jewishcurrents.org/canary-missions-newest-funders.*See also* Erwin Chemerinsky, "Dean's Statement: Condemning Canary Mission," U.C. Berkeley Law (June 1, 2025), available at https://www.law.berkeley.edu/article/deans-statement-canary-mission.

Further, under the strict scrutiny standard, and considering the First Amendment protections for political speech and protest in particular, no remedy here could be sufficiently narrowly tailored – especially under the highly punitive ATA/JASTA statutes – to fit the stated interest of preventing the creation of any general "propaganda" benefit to Hamas.

Thus, because of the First Amendment limitations on ATA/JASTA, Plaintiffs fail to state a claim upon which relief can be granted.

**B.**     ***The SAC Fails to Allege Aiding and Abetting Under 18 U.S.C. §2333(d)(2)***

     **1.**     ***The Applicable Legal Standard***

Even independent of the First Amendment protections that invalidate the SAC's claims against Mr. Khalil, the SAC has also failed to plead against Mr. Khalil a viable claim of aiding and abetting under 18 U.S.C. §2333(d)(2). The elements of a proper ATA aiding and abetting claim are discussed and analyzed in the *Alwan Memo*, at 15-25, and the *JVP Memo*, at 10-18, which Mr. Khalil adopts and joins, and therefore will not repeat here.

In the context of the factors identified in *Twitter v. Taamneh*, 598 U.S. 471, 474, 490 (2023), applied in the Second Circuit's recent decision in *Ashley v. Deutsche Bank Aktiengesellschaft*, 2025 WL 2025448, the SAC fails to provide any facts to support an allegation that Mr. Khalil (1) *knowingly* provided (2) anything that could be deemed *substantial assistance* to (3) an *act of international terrorism*, (4) participated *consciously and culpably* therein as something he wished to make succeed, and (5) that his acts caused Plaintiffs' injuries. Both *Twitter* and *Ashley* relied on common law to determine aiding-and-abetting liability, using the framework articulated in *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) as an analytical "tool." 2025 WL 2025448, at *10; *Twitter*, 598 U.S. at 488. *See also Alwan Memo*, at 15, 19-21; *JVP Memo*, at 15-18.

14

As the Court in *Twitter* instructed "it is not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." *Id*. at 495. Instead "a defendant must have aided and abetted (by knowingly providing substantial assistance) another person in the commission of the actionable wrong – here, an act of international terrorism." *Id*.

Following *Twitter*, the Second Circuit in *Ashley* recently affirmed "the district court's dismissal of this claim because JASTA does not provide relief where a 'campaign' is alleged to be the 'act of international terrorism,'" reasoning that "[t]his conclusion is supported by the statute's text. The ATA provides liability for injury suffered 'by reason of *an act* of international terrorism.'" 2025 WL 2025448, at *18 (emphasis in original) (citations omitted).

Thus, the SAC's allegation, at SAC ¶¶ 257, 259, that defendants promoted a "mass culture of fear, threats, violence, and overt hatred on Columbia's campus" and by engaging in advocacy designed to "demonize Israel[,]" fails to state an actionable ATA claim.

**2.     *The Requisite Elements of Aiding and Abetting Are Absent from the SAC***

Here, regarding the SAC's allegations against Mr. Khalil, the omissions are glaring and conclusive.  For example, the SAC fails to allege *any* facts establishing or identifying

- any contact or communication between Mr. Khalil and Hamas;

- any direction from Hamas to Mr. Khalil;

- any act of international terrorism to which Mr. Khalil provided substantial assistance;

- any intent by Mr. Khalil to provide substantial assistance for such an act;  and

- any connection between Mr. Khalil's expression and conduct and Plaintiffs' alleged injuries.

Regarding "substantial assistance," again the litigation attendant to Mr. Khalil's federal habeas corpus petition (discussed **ante**, at 6) provides relevant findings by the District Court, which held that the government "has not determined that [Mr. Khalil's] conduct" – the same conduct alleged in the instant complaint – "has impacted U.S. relations with another country." *Khalil v. Trump*, No. 25-CV-01963 (MEF) (MAH), 2025 WL 1514713, at *44 (D.N.J. May 28, 2025).[4]

Further, the Secretary of State's determination referred to above did *not* find that Mr. Khalil was engaged in unlawful activity. Rather, the basis for which it determined Mr. Khalil's removal was that he had engaged in "beliefs, statements, or associations *that are otherwise lawful*."  *In the matter of Mahmoud Khalil*, Notification of Removability Determinations under Section 237(a)(4)(C) of the Immigration and Nationality Act, April 9, 2025 (emphasis added).

Considering the investigative means available to the U.S. government, and the government's incentive and imperatives in the habeas litigation to portray Mr. Khalil's activities in the worst possible light, the Court's and the Secretary of State's conclusions not only are most illuminating, but they also vitiate the SAC's clearly baseless contentions of "substantial assistance." *See Gallop v. Cheney*, 642 F.3d at 368 (cited **ante**, at 3) (court may disregard even well-pleaded facts if they are ultimately "clearly baseless").  *See also Alwan Memo*, at 11;  *JVP Memo*, at 9.

---

[4] This "determination" refers to the "Memorandum for the Secretary of Homeland Security" from Secretary of State Marco Rubio on April 9, 2025 (hereinafter the "Rubio Determination"), available at https://www.aclu-nj.org/en/press-releases/secretary-state-letter-immigration-court-confirms-mahmoud-khalil-solely-targeted.

Regarding *scienter*, the SAC is entirely bereft of any factual basis for claiming Mr. Khalil "participated consciously and culpably [in an act of terrorism] as something [Mr. Khalil] wished to make succeed," and/or "knowingly" provided "substantial assistance" for a specific act of international terrorism.

As in *Ashley*, in which the Court concluded Plaintiff's "allegations, while serious, unfortunately focus 'primarily on the value' of [the defendant bank]'s services to the Companies and assume that those services ultimately inured to the benefit of the [the terrorist group]**,** as opposed to 'whether [the defendant bank] culpably associated' itself with the [the terrorist group]'s wrongful actions," the SAC fails to present any facts alleging Mr. Khalil's culpable involvement with the perpetrator(s) of the alleged acts of international terrorism. 2025 WL 2025448 at *11.

Indeed, the SAC enumerates five distinct types of acts of international terrorism:

- the attack on Israel on October 7, 2023;

- the holding of hostages in Gaza;

- the theft and withholding of the bodies of the deceased;

- rocket attacks against civilians in Israel;

- attacks on Israeli soldiers.

SAC, at ¶ 235.

Yet the SAC does not include any allegations regarding Mr. Khalil prior to October 7, 2023, and alleges that CUAD made its first Instagram post November 27, 2023, *see* SAC ¶176, nearly two months afterward, and at a time when Israel's military assault on Gaza had generated considerable global concern – so much so that just one month later South Africa lodged in the

International Court of Justice ("ICJ") a complaint accusing Israel of committing genocide in Gaza.[5]

In another example of the SAC's reliance on naked assertions absent substantiation, it alleges that Mr. Khalil "operated" CUAD's Instagram account, SAC ¶ 173, but fails to provide any facts to support that contention. Indeed, the SAC does not provide any facts that would establish even that Mr. Khalil composed any CUAD posts, approved or endorsed them, or was even aware of specific posts.

Nor does the SAC plead any connection between Mr. Khalil and those acts of international terrorism, much less a sufficient nexus. In *Twitter* the Court elucidated the importance of identifying the act of terrorism at issue in establishing ATA aiding and abetting liability. The plaintiffs in *Twitter* alleged that the social media platform Twitter was liable for an attack on the Reina nightclub in Istanbul. Section IV(A) of the Supreme Court's opinion expended substantial effort in analyzing the exact nexus between the actions of Twitter and the specific attack, finding that any connection was too attenuated to ascribe liability to Twitter. *See Twitter*, 598 U.S. at 497.

*Ashley*, following *Twitter*, also focused both on scope of the "acts" of international terrorism alleged, and the lack of any discernable nexus between the defendants' conduct and the alleged acts, explaining that the District Court correctly "characterized the complaint as 'a series

---

[5] *See Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel)*, Application instituting proceedings and request for the indication of provisional measures (29 December 2023), available at https://www.icj-cij.org/case/. One month thereafter, the ICJ issued a ruling finding that the facts provided by South Africa were sufficient to conclude that intervention was necessary to present a plausible risk of genocide. *See Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel)*, Provisional Measures, Order of 26 January 2024, para. 54.

of vignettes describing a wide range of criminal activity' that 'go into great detail about the complex interplay between different criminal players, and how those criminals or terrorists contributed to Plaintiffs' injuries' but, in the end, failed 'to establish the necessary nexus between any Defendant and the alleged terrorist acts that injured Plaintiffs.'" 2025 WL 2025448, at *7, *quoting Wildman v. Deutsche Bank Aktiengesellschaft*, 21 Civ. 04400, 2022 WL 17993076, at *5 (E.D.N.Y. Dec. 29, 2022). Ultimately, in *Ashley*, "Plaintiffs allege[d] sweeping theories of international criminal conspiracies spanning different continents and terrorist organizations without ever persuasively tying those theories to the terrorist attacks here." *Id*. at *11.

Regarding the necessity of an identifiable "act" of terrorism, both *Twitter* and *Ashley* directed adherence to the statutory text. *Twitter* cautioned against the very type of expansion of "acts of international terrorism" that the SAC presents here, recognizing that "[g]iven the lack of any concrete nexus between defendants' services and the Reina attack, plaintiffs' claims would necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world." 598 U.S. at 501.

*Ashley* was even more forceful, finding that "Plaintiffs contend that the word 'act,' as used in the statute, can describe a 'multifaceted enterprise,' but that reading is strained," and holding that a defendant may only be held "liable for the injury-causing act, not an overall group of activity that may or may not have led to the plaintiff's particular injuries." 2025 WL 2025448, at *18 (citations omitted).

Moreover, the rhetoric or acts of others do not bolster the SAC with respect to Mr. Khalil, particularly in light of the First Amendment issues at stake. *See, e.g., Elfbrandt v. Russell*, 384 U.S. 11, 17 (1966) ("laws such as this which are not restricted in scope to those who join with the 'specific intent' to further illegal action impose, in effect, a conclusive presumption that the

19

member shares the unlawful aims of the organization"). *See also Noto v. United States,* 367 U.S. 290 (1961);  *Scales v. United States*, 367 U.S. 203, 229 (1961);  *Yates v. United States,* 354 U.S. 297, 326 (1957);  *Alwan Memo*, at 25-26;  *JVP Memo*, at 23-24.

Causation is also lacking between Mr. Khalil and Plaintiffs' alleged injuries.  None of the facts alleged with respect to Mr. Khalil are causally related to the alleged acts of international terrorism identified in the SAC.  *See* **ante**, at 17.

The ATA's civil liability provision requires proximate cause as that term is typically defined. *Owens v. BNP Paribas, S.A.,* 897 F.3d 266 (D.C. Cir. 2018). Courts have used the "substantial factor" test in determining proximate cause under this provision, requiring a plaintiff to prove that the defendant's alleged act or omission was a material and substantial contributing cause to the injury. *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp.3d 1284, 1310 (S.D. Fla. 2018).

That test examines whether a defendant's conduct, *i.e.* the alleged ATA predicate conduct, was the proximate cause of a plaintiff's injuries, considering the temporal proximity and the magnitude of support on a fact-specific and *ad hoc* basis. *Gill v. Arab Bank, PLC*, 893 F. Supp.2d 542, 572 (E.D.N.Y. 2012) ("*Gil I*").

In conducting the test, the term "substantial" is used to denote that "that the defendant's conduct had more than a remote or trivial impact on *the circumstances leading up to the cause of the injury.*" *In Chiquita Brands Int'l*, 284 F. Supp.3d at 1311 (emphasis added)*. See also In re Terrorism Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013).

An instructive and analogous example occurred in the litigation instituted with respect to the September 11, 2001, attacks, and the allegations against the Council on American-Islamic Relations ("CAIR").  *See In re Terrorist Attacks on Sept. 11, 2001,* 740 F. Supp. 2d 494 (S.D.N.Y. 2010), *aff'd sub nom.*, *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir.

2013).  While plaintiffs therein alleged that CAIR's true purpose was "to legitimize the activities of Islamic militants and neutralize opposition to Islamic extremism," to engage in "disinformation activities," and to operate "propaganda campaigns[,]" the Court dismissed the action against CAIR because it concluded there was not "any basis to infer a causal connection between defendants' alleged wrongdoing and the 9/11 terrorist attacks."  *Id*. at 519.

The Court also rejected plaintiffs' argument that the 9/11 attacks occurred "because the United States and its citizenry had been desensitized into complacency as a result of the alleged propaganda, disinformation and psychological operations attributable to the CAIR defendants." *Id.* at 519.

Similarly, in *Crosby v. Twitter*, Inc., 921 F.3d 617 (6th Cir. 2019), the Court found that Twitter was not liable under the ATA because the shooter in that case never had any contact with the organization, but instead planned and committed an attack by himself without any help from the organization or companies). *See, e.g.*, *Fields v. Twitter, Inc.*, 881 F.3d 739, 749 (9th Cir. 2018) ("we are troubled by the seemingly boundless litigation risks that would be posed by extending the ATA's bounds as far as foreseeability may reach"); *Cain v. Twitter Inc.*, No. 17 Civ. 2506, 2018 WL 4657275, at *2 (N.D. Cal. Sept. 24, 2018) ("nevertheless, the direct relationship link is missing. Most of the allegations are about ISIS's use of Twitter in general. The relatively few allegations involving Twitter that are specific to the attacks that killed plaintiffs' family members also provide little more than generic statements that some of alleged perpetrators of the attacks were 'active' Twitter users who used the platform to follow [ISIS]").

Many ATA cases involve financial institutions and the transfer of funds, and in those cases as well the element of causation is demanding.  For example, Courts have refused to ascribe ATA civil liability when monetary transfers or contributions were "of insignificant size," and "not

sufficiently linked to Hamas." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012)

("*Gill II*"). *See also Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018) (holding that

procedures bank instituted to evade U.S. sanctions and facilitate banking transactions with Iran,

as state sponsor of terrorism, were not proximate cause of U.S. citizen's death from bomb that

Hezbollah placed in Iraq, since bank did not service terrorist group directly). In *Ashley*, too, the

Court found that "Plaintiffs do not allege that [the defendant bank] directly aided the [terrorist

group] in carrying out the bombings." *Ashley*, 2025 WL 2025448, at *11.

Here, regarding Mr. Khalil, the SAC fails to plead facts establishing causation at all, much

less of the type necessary for an ATA claim.  Nor are there reasonable inferences that could be

drawn to that effect.  In fact, as is the case for other aspects of the SAC, its bald assertions belie

its fundamental weakness.  For instance, the allegation that the "Associational Defendants so

pervasively and systemically assisted Hamas as to render them liable for every Hamas terror

attack and action[,]" SAC, at ¶ 240, is plainly insufficient to satisfy the standard for causation for

a proper ATA or ATS claim, which requires that a defendant's conduct be the proximate cause of

specific acts of international terrorism.[6]

---

[6] In addition to the biased and discredited Canary Mission web site, the SAC also cites Ryan Mauro, another questionable source.  *See* SAC, at ¶ 164 n.165.  Georgetown University's Bridge Initiative web site devotes a separate page to Mr. Mauro, widely recognized as an Islamophobic conspiracy theorist, and who notably cites other similar cases (involving similar counsel) as evidence of his own findings – an entirely circular method of "confirmation."  *See* "Factsheet: Ryan Mauro, Bridge Initiative, Georgetown University (Apr. 3, 2018), available at https://bridge.georgetown.edu/research/factsheet-ryan-mauro/ ("Ryan Mauro is an analyst at the anti Muslim organization, the Clarion Project. Mauro regularly makes anti Muslim accusations and unfounded claims on Fox News programs and during trainings for law enforcement officials. He is a proponent of policies that criminalize Muslims and Muslim communities").  *See also* Countering the Islamophobia Industry:  Toward More Effective Strategies, *The Carter Center* (May 2018), at 52 (noting Mr. Mauro in the "Countering Anti-Muslim Hate Groups" segment of the paper), available at https://www.cartercenter.org/resources/pdfs/peace/conflict_resolution/ countering isis/cr-countering-the-islamophobia-industry.pdf.

Accordingly, the SAC fails to plead against Mr. Khalil an ATA claim sufficiently because it fails to establish that Mr. Khalil engaged in anything more than "independent advocacy," or that he aided and abetted Hamas under 18 U.S.C. §2333(d)(2).

## POINT II

### THE SAC'S ATS CLAIM AGAINST MR. KHALIL SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(6) BECAUSE IT FAILS TO STATE A CLAIM, AND/OR PURSUANT TO RULE 12(b)(1), FED. R. CIV. P., BECAUSE THE COURT LACKS SUBJECT MATTER JURISDICTION

As set forth in POINT I, the SAC's ATS claim is deficient for many of same reasons as the ATA cause of action. In addition, for the reasons set forth in the *JVP Memo*, at 29-30, the Court lacks subject matter jurisdiction to adjudicate the ATS claim. The specific elements of an ATS claim – and the SAC's deficiencies – are addressed in the *Alwan Memo*, at 27, and the *JVP Memo*, 30-31, and will not be repeated here.

ATS liability requires a finding that the "conduct which constitutes a violation of the law of nations or aiding and abetting such a violation [] sufficiently 'touches and concerns' the territory of the United States so as to displace the presumption against extraterritoriality." *Mastafa v. Chevron Corp.*, 770 F.3d 170, 186 (2d Cir. 2014), *quoting Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013).

Yet here the SAC fails to provide any facts establishing that Mr. Khalil's conduct sufficiently "touches and concerns" the territory of the United States that merits displacing the "weighty concerns underlying the presumption against extraterritoriality." *Kiobel*, 569 U.S. at 123.

In addition, the analysis in POINT I with respect to the First Amendment, aiding and abetting, substantial assistance, and *scienter* are relevant to the ATS claim as well because of

23

their common elements. *See Jan v. People Media Project*, No. 3:24-CV-05553-TMC, 2025 WL

359009, at *6 (W.D. Wash. Jan. 31, 2025) ("[b]ecause this standard is analogous to the aiding-

and-abetting provision of JASTA, which imposes civil liability on anyone 'who aids and abets,

by knowingly providing substantial assistance' to an 'act of international terrorism,' this Court

also looks for guidance to the Supreme Court's recent decision interpreting JASTA in *Twitter v.

Taamneh*") (cleaned up and citations omitted).

Accordingly, pursuant to that analysis, the same result should obtain: the ATS cause of

action against Mr. Khalil should be dismissed.

## POINT III

**THE SAC SHOULD BE DISMISSED AGAINST
MR. KHALIL IN HIS REPRESENTATIVE CAPACITY
BECAUSE PLAINTIFFS FAILED TO EFFECT PROPER SERVICE AND
<u>CUAD NEITHER HAS LEGAL EXISTENCE NOR IS IT A SUABLE ENTITY</u>**

### A.  *Plaintiffs Failed to Effect Proper Service on
Mr. Khalil in His Representative Capacity for CUAD*

Motions directed at deficient service are governed by Rule 12(b)(5), Fed.R.Civ.P.  The

*Alwan Memo*, at 11-14, sets forth the controlling legal principles and case law, and Mr. Khalil

adopts that discussion herein rather than repeat it.

Service was not properly effectuated because the SAC does not establish that Mr. Khalil

was authorized to accept service for CUAD.  Merely alleging in wholly conclusory fashion, as

the SAC does at ¶ 35, that Mr. Khalil was the "*de facto*" president of CUAD is not sufficient.

*See also Alwan Memo*, at 6, 13, 25. Indeed, the SAC alleges merely that Mr. Khalil was the

"public face and de facto president of CUAD[.]" SAC at ¶ 35 (footnote omitted). Yet that cannot

suffice, as certainly "de facto" demands *facts* that would support the claim.  Instead, that characterization is devoid of any facts.

The SAC fails to provide any basis for alleging a structure or hierarchy within CUAD – a coalition the SAC, at ¶125, acknowledges is composed of "over 80 . . . signatory chapters" – or Mr. Khalil's alleged presence in it.  Nor does the SAC allege any criteria for holding such a position in a broad-based coalition that includes a wide variety of groups – from poetry slams to cultural associations to human rights and political advocacy groups.[7] Again, the omissions are glaring and repetitions of that unsupported conclusion do not lend any credence to the allegations.

Similarly, and again without support, the SAC, at ¶125, claims that "Khalil and former members and/or organizers of Columbia SJP became leaders of CUAD."  Indeed, that allegation that Mr. Khalil "*became*" a leader of CUAD, contradicts its earlier claim of his prior *de facto* leadership.

The SAC does not provide any facts establishing that Mr. Khalil occupied some specific role that could satisfy the requirements imposed by Rule 4(h), Fed.R.Civ.P., with respect to service, *i.e.*, "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process," Fed. R. Civ. P. 4(h)(1)(B), or (ii) by serving in accordance with state law. *See* Fed. R. Civ. P. 4(h)(1)(A);  Fed. R. Civ. P. 4(e)(1).  *See also Alwan Memo*, at 12-14.

In addition, the person served must occupy the relevant position within the association "at the time he was served."  *MacGregor v. Milost Glob., Inc.*, No. 17-CV-6691-LTS-KHP, 2018 WL

---

[7] These facts are drawn from the article Plaintiffs cite at SAC, at ¶125 n.129.

4007642, at *3 (S.D.N.Y. Aug. 22, 2018).  Here, at the time he was served, Mr. Khalil had

already been in immigration custody in Louisiana for three weeks, and the SAC fails again to

provide any basis for concluding that Mr. Khalil maintained such a position 1,186 miles from

Columbia and unable to provide any meaningful leadership.  *See also Alwan Memo*, at 12-14.

Accordingly, Plaintiffs have failed to meet their burden of demonstrating adequate

service of Mr. Khalil as representative of any organizational defendant, and the claims alleged

against Mr. Khalil in his purported representative capacity for CUAD should be dismissed.  *See

also Alwan Memo*, at 12-14.

### B.    *Plaintiffs Fail to Demonstrate that CUAD Has Legal Existence and is a Suable Entity Under both Federal and State Law*

Plaintiffs' suit against Mr. Khalil in his representative capacity cannot be sustained under

Rule Fed. R. Civ. P.  Rule 12(b)(1) and Rule 12(b)(6) because CUAD lacks legal existence under

both New York State and federal law, stripping this Court of subject matter jurisdiction over the

claims against CUAD through Mr. Khalil.  Alternatively, even if CUAD has a legal existence,

Plaintiffs fail to plead sufficient facts that demonstrate CUAD is an unincorporated association

that has the capacity to be sued.

Because "[c]apacity to be sued and legal existence are separate and distinct concepts,"

*Roby v. Corp. of Lloyd's*, 796 F. Supp. 103, 110 (S.D.N.Y. 1992), courts must first determine that

a "group of persons working together for a common purpose [are] found to have legal existence

before the question of capacity to sue or be sued can arise[,]" *Brown v. Fifth Jud. Dist. Drug Task

Force*, 255 F.3d 475, 477 (8th Cir. 2001), *citing Roby*, 796 F.Supp. at 109–10. *See also Fund

Liquidation Holdings LLC v. Bank of Am. Corp.,* 991 F.3d 370, 382–83 (2d Cir. 2021).

When determining whether an entity has "the requisite legal personhood for Plaintiffs to invoke the Article III jurisdiction of this Court against them as a collective unit," *Young Am.'s Found. v. Stenger*, 2023 WL 3559619, at *25 (N.D.N.Y. May 19, 2023), federal courts, pursuant to Fed.R.Civ.P. Rule 17(b), "look to state law [which] governs whether a party has the capacity to be sued." *La Russo v. St. George's Univ. Sch. of Med.*, 747 F.3d 90, 95 (2d Cir. 2014).

The critical question courts must answer is "whether that entity is a legal person, with legal rights and obligations of its own." *Stenger*, 2023 WL 3559619, at *25. An unincorporated association is "a body of persons united without a charter, but *upon the methods and forms used by incorporated bodies* for the prosecution of some common enterprise." *Hecht v. Malley*, 265 U.S. 144, 157, 44 S. Ct. 462, 467 (1924) (emphasis added).

CUAD is not an entity with "legal rights and obligations of its own." *Id*. As described **ante,** at 24, CUAD has not adopted the "method and forms used by incorporated bodies." *Id.* It exists only as long as the numerous organizations who agree to form CUAD continue to agree CUAD should exist, and thus "has no legal existence apart from the individuals who make it up." *Brown,* 255 F.3d at 477.

If every organization and individual decided today to withdraw from CUAD, CUAD would immediately cease to exist. There would be nothing to dissolve or resolve; CUAD would simply cease to exist "as a collection of Columbia student organizations" – as it did between 2016 and 2023. *See* SAC, at ¶35.

Furthermore, CUAD does not have "a president or treasurer," and therefore is *not* an "unincorporated association" under New York law. *Sendon v. Torres*, No. 15 Civ. 04538 (NSR), 2016 WL 1746111, at *2 (S.D.N.Y. Apr. 28, 2016), *quoting* N.Y. GEN. ASS'NS LAW § 13. As

explained **ante**, at 25, CUAD is a horizontal organization without a hierarchy of leaders, as §13 requires.

Consequently, CUAD does not legally exist under Fed.R.Civ.P. Rule 17 and N.Y. GEN. ASS'NS LAW §13, and Plaintiffs allege no facts to show otherwise. Accordingly, Plaintiffs' allegations against CUAD assert no case or controversy, and this Court does not have subject matter jurisdiction over those claims.

Even if this Court determines that CUAD is "an unincorporated association," *Stenger*, 2023 WL 3559619, at *18, Plaintiffs have not pleaded sufficient facts that CUAD is a juridical entity capable of being sued.  Here again, federal courts look to state law to determine whether an entity is suable under the law. *Roby*, 796 F. Supp. at 110.

"[U]nder New York law, unincorporated associations have no legal existence separate and apart from [their] individual members." *L&L Assoc. Holding Corp. v. Charity United Baptist Church*, 935 N.Y.S.2d 450, 452 (N.Y. Dist. Ct. 2011) (cleaned up) ("*L&L*"). New York State law allows plaintiffs to sue an unincorporated association through a representative when "the plaintiff may maintain such an action . . . against all the associates, by reason of . . .  their liability therefor, either jointly or severally." N.Y. Gen. Ass'ns Law §13.

Courts have "limited such suits against association officers . . . to cases where the individual liability of *every single member* can be alleged and proven." *Martin v. Curran*, 303 N.Y. 276, 282 (N.Y. 1951) (emphasis added). *See also*, *e.g.*, *L&L*, 935 N.Y.S.2d at 452; *Palladino v. CNY Centro, Inc.*, 23 N.Y.3d 140, 146 (2014).

The rule laid out in *Martin* thus "bars all actions against an unincorporated voluntary membership association, and bars claims against the officers of such an association in their representative capacities where there is *no allegation* that the members of the association

authorized or ratified the wrongful conduct complained of." *Doe v. Sigma Chi Int'l Fraternity, Inc.*, No. 5:23-CV-1452 (BKS/ML), 2024 WL 4347799, at *12 (N.D.N.Y. Sept. 30, 2024) (emphasis added) (collecting cases).

Here, CUAD "as an organization has 'no legal existence separate and apart from its individual members.'" *See L&L*, 935 N.Y.S.2d at 452. *See also Roby*, 796 F. Supp. at 104; **ante**, at 25. Plaintiffs plead no facts that *all* "members are liable [and] expressly or impliedly with full knowledge authorize[d] or ratif[ied] the specific acts in question." *Martin*, 303 N.Y. at 282. Nor does the SAC address how Mr. Khalil, along with the approximately 80 student groups, and the hundreds of students in those groups, "authorized or ratified" *any* of the alleged conduct, as required by the *Martin* rule. *See Martin*, 303 N.Y. at 282. *See also Sigma Chi Int'l Fraternity, Inc.*, 2024 WL 4347799, at *12. Therefore, CUAD is not a suable entity as a matter of law, and Plaintiffs claims against Mr. Khalil in his representative capacity and against CUAD more generally are barred under both state and federal law.

## POINT IV

### MR. KHALIL REQUESTS LEAVE TO JOIN IN THE MOTIONS BY HIS CO-DEFENDANTS TO THE EXTENT THEY BENEFIT HIM

Mr. Khalil respectfully requests leave to join in those motions made by his co-defendants to the extent they benefit him.

**CONCLUSION**

Accordingly, for all the reasons set forth above, and in the other defendants' motions to dismiss, it is respectfully submitted that the Court should grant Mr. Khalil's motion to dismiss in the entirety, and dismiss with prejudice all the causes of action against him in the SAC.

Dated:  August 4, 2025
New York, New York

_____

JOSHUA L. DRATEL
Dratel & Lewis
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707
jdratel@dratellewis.com
*Attorneys for Defendant*
Mahmoud Khalil

Of counsel
Joshua L. Dratel
Amy E. Greer
Jacob C. Eisenmann

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REUIREMENTS
AND TYPE STYLE REQUIREMENTS

This memorandum complies with the type-volume limitation of Local Rule 7.1(c). This

Memorandum of Law contains 8,676 words, excluding the parts exempted by the Court's

Individual Rules.

This Memorandum of Law complies with the typeface requirements because this brief

has been prepared in a proportionally spaced typeface using Microsoft Word in Times New

Roman font size 12.

Dated: 4 August, 2025
      New York, New York

                                    /s/ Joshua L. Dratel
                                    JOSHUA L. DRATEL
                                    Dratel & Lewis
                                    29 Broadway, Suite 1412
                                    New York, New York 10006
                                    (212) 732-8805
                                    jdratel@dratellewis.com