**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IRIS WEINSTEIN HAGGAI, on her own behalf and on behalf of JUDITH LYNNE WEINSTEIN HAGGAI and GAD HAGGAI, JOHN DOE, RICHARD ROE, JANE MOE, SHLOMI ZIV, AYELET SAMERANO, on her own behalf and on behalf of YONATAN SAMERANO, TALIK GVILI, on her own behalf and on behalf of RAN GVILI, ROEE BARUCH, on his own behalf and on behalf of URIEL BARUCH, and JAMES POE, on his own behalf and on behalf of LEO POE,

                  Plaintiffs,

- against -

NERDEEN KISWANI, individually and as the representative of WITHIN OUR LIFETIME-UNITED FOR PALESTINE, MARYAM ALWAN, individually and as the representative of COLUMBIA STUDENTS FOR JUSTICE IN PALESTINE, CAMERON JONES, individually and as the representative of COLUMBIA-BARNARD JEWISH VOICE FOR PEACE, MAHMOUD KHALIL, individually and as the representative of COLUMBIA UNIVERSITY APARTHEID DIVEST, and TAREK BAZROUK,

                  Defendants.

|  |
| --- |
| Case No. 1:25-cv-02400-JAV |
| Hon. Jeannette A. Vargas |
| **JURY TRIAL DEMANDED** |
| **ORAL ARGUMENT REQUESTED** |

---

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS, MOTION TO STRIKE, AND REQUEST FOR JUDICIAL NOTICE**

## TABLE OF CONTENTS

Preliminary Statement ................................................................................................1

Argument ....................................................................................................................5

I.  Legal Standards................................................................................................5

    A.  General Standards ..................................................................................5
    B.  The Court Should Accept Plaintiffs' Interpretations of Defendants' Terror
        Euphemisms............................................................................................6

II.  Plaintiffs State an Antiterrorism Act Claim....................................................9

    A.  Statutory Framework ..............................................................................9
    B.  Plaintiffs Allege Injuries Caused by Hamas' Acts of International
        Terrorism...............................................................................................10
    C.  The Complaint Sufficiently Allege General Awareness........................14

        1.  Defendants Were Informed That Their "Work" Was Important to
            Hamas.......................................................................................15
        2.  Defendants Repeatedly Heeded Hamas' Calls for Action.........18
        3.  Defendants Have Consciously Aligned Themselves with Hamas............21
        4.  Defendants Are Closely Associated with Hamas' Domestic
            Propaganda Organization..........................................................25
        5.  Defendants' Members Include a Violent Criminal With Hamas
            Connections...............................................................................29
        6.  Defendants' Contrary Arguments Fail.......................................31

    D.  The Complaint Alleges Knowing and Substantial Assistance...............34

        1.  Defendants Provided Substantial Assistance ............................36
        2.  Defendants' Assistance Was Knowing ......................................44
        3.  Defendants' Contentions Lack Merit.........................................45

    E.  No Separate Showing of Causation is Required....................................48
    F.  The Individual Defendants Are Personally Liable.................................50

III.  The Alien Tort Statute Claims Withstand Defendants' Arguments ...............52

    A.  Aiding and Abetting Crimes Against Humanity Is an Actionable Norm............53
    B.  Plaintiffs State a Claim Under the Alien Tort Statute...........................54

        1.  Plaintiffs Satisfy the Conduct Requirement..............................55
        2.  Plaintiffs Satisfy the Mental State Requirement.......................56

    C.  Plaintiffs Allege Sufficient Domestic Conduct....................................57

IV.  The *Parizer* Decision Is Distinguishable ..................................................................59

V.  Defendants' First Amendment Challenges Fail ........................................................60

    A.  Defendants Coordinated Their Activities with Hamas ...........................60
    B.  Defendants' Contrary Arguments Fail .....................................................65

        1.  First Amendment Protections Are Not Absolute .......................65
        2.  Plaintiffs' Coordination Allegations Are Sufficient ..................68
        3.  Defendants' Freedom of Association Arguments Fail ................71
        4.  Khalil's Strict Scrutiny Argument Fails ....................................73

VI.  Plaintiffs Have Standing ............................................................................................75

VII.  Defendants' Service and Capacity Arguments Fail ....................................................78

    A.  Alwan Was Properly Served .....................................................................78
    B.  Columbia SJP and CUAD Were Properly Served ...................................80
    C.  CUAD Was Properly Sued Through Khalil ..............................................83

VIII.  The Complaint Withstands Defendants' Rule 8 Challenge .........................................85

IX.  Columbia JVP's Miscellaneous Arguments Fail ......................................................86

X.  Leave to Amend Should Not Be Denied .....................................................................87

XI.  No Allegations Should be Stricken .............................................................................88

XII.  Judicial Notice of Disputed Facts Should Be Denied ................................................90

Conclusion ...............................................................................................................................92

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*131 Main St. Assocs. v. Manko,*
  897 F. Supp. 1507 (S.D.N.Y. 1995)...................................................................79

*A & R Eng'g & Testing, Inc. v. City of Hous.,*
  582 F. Supp. 3d 415 (S.D. Tex. 2022), *rev'd on other grounds sub nom. A & R*
  *Eng'g & Testing, Inc. v. Scott,* 72 F.4th 685 (5th Cir. 2023)...................................73

*In re A.N. Frieda Diamonds, Inc.,*
  633 B.R. 190 (S.D.N.Y. 2021)........................................................................50

*Abecassis v. Wyatt,*
  704 F. Supp. 2d 623 (S.D. Tex. 2010) ...............................................................77

*Al-Ahmed v. Twitter, Inc.,*
  603 F. Supp. 3d 857 (N.D. Cal. 2022), *appeal dismissed*, 2022 WL 4352712
  (9th Cir. July 7, 2022).................................................................................77

*Allianz Ins. Co. v. Otero,*
  No. 01-CV-2598, 2003 WL 262335 (S.D.N.Y. Jan. 29, 2003) .............................80

*Almog v. Arab Bank, PLC,*
  471 F. Supp. 2d 257 (E.D.N.Y. 2007) ...............................................................53

*Amadei v. Nielsen,*
  348 F. Supp. 3d 145 (E.D.N.Y. 2018) ...............................................................17

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany,*
  250 F. Supp. 2d 48 (N.D.N.Y. 2003).................................................................84

*Arista Recs., LLC v. Doe 3,*
  604 F.3d 110 (2d Cir. 2010)......................................................................29, 47

*Arpaio v. Obama,*
  797 F.3d 11 (D.C. Cir. 2015) .........................................................................20

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)...........................................................................6, 51, 58

*Ashley v. Deutsche Bank Aktiengesellschaft,*
  144 F.4th 420 (2d Cir. 2025) .................................................................. *passim*

*Attestor Value Master Fund v. Republic of Argentina,*
  940 F.3d 825 (2d Cir. 2019)...........................................................................88

*Atuahene v. City of Hartford,*
  10 F. App'x 33 (2d Cir. 2001) .......................................................................86

*Aziz v. Alcolac, Inc.,*
  658 F.3d 388 (4th Cir. 2011) .........................................................................57

*Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*,
  No. 14-CV-09687, 2016 WL 4916969 (S.D.N.Y. Feb. 11, 2016)............................86

*Bano v. Union Carbide Corp.*,
  273 F.3d 120 (2d Cir. 2001)..................................................................................50

*Barrett v. Forest Labs., Inc.*,
  39 F. Supp. 3d 407 (S.D.N.Y. 2014)......................................................................29

*Barron v. Helbiz, Inc.*,
  No. 21-278, 2021 WL 4519887 (2d Cir. Oct. 4, 2021)...........................................88

*Baum v. Harman Int'l Indus., Inc.*,
  575 F. Supp. 3d 289 (D. Conn. 2021)......................................................................9

*Bernhardt v. Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022)..........................................................................33, 34

*Boim v. Am. Muslims for Palestine*,
  No. 17-CV-3591, 2022 WL 1556085 (N.D. Ill. May 17, 2022)....................26, 64, 89

*Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief And Dev.*,
  291 F.3d 1000 (7th Cir. 2002).................................................................................72

*Boos v. Barry*,
  485 U.S. 312 (1988)................................................................................................66

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969)................................................................................................67

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
  No. 18-CV-25337, 2020 WL 7481302 (S.D. Fla. May 20, 2020)...........................12

*Cain v. Twitter Inc.*,
  No. 17-CV-2506, 2018 WL 4657275 (N.D. Cal. Sept. 24, 2018)...........................50

*Carter v. HealthPort Techs., LLC*,
  822 F.3d 47 (2d Cir. 2016).....................................................................................78

*Cenedella v. Metro. Museum of Art*,
  348 F. Supp. 3d 346 (S.D.N.Y. 2018)...............................................................20, 70

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)...................................................................................91

*In re Chiquita Brands Int'l, Inc.*,
  284 F. Supp. 3d 1284 (S.D. Fla. 2018)..................................................................49

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*,
  690 F. Supp. 2d 1296 (S.D. Fla. 2010), *on reconsideration in part*, No. 08-
  01916-MD, 2015 WL 71562 (S.D. Fla. Jan. 6, 2015)...........................................12

*Conn. Nat'l Bank v. Fluor Corp.*,
  808 F.2d 957 (2d Cir. 1987)...................................................................................15

*Cotarelo v. Vill. of Sleepy Hollow Police Dep't*,
  460 F.3d 247 (2d Cir. 2006)...................................................................................66

*Cox v. Louisiana,*
  379 U.S. 536 (1965)..............................................................................68

*Crosby v. Twitter, Inc.,*
  921 F.3d 617 (6th Cir. 2019) ......................................................34, 35, 49, 50

*Cruz v. United Auto. Workers Union Loc. 2300,*
  No. 18-CV-48, 2019 WL 3239843 (N.D.N.Y. July 18, 2019) .............................85

*Ctr. for Bio-Ethical Reform, Inc. v. Black,*
  234 F. Supp. 3d 423 (W.D.N.Y. 2017).......................................................67

*Dhinsa v. Krueger,*
  917 F.3d 70 (2d Cir. 2019)....................................................................76

*In re DNTW Chtd. Accountants Sec. Litig.,*
  96 F. Supp. 3d 155 (S.D.N.Y. 2015)..........................................................20

*Doe v. Cisco Sys.,*
  73 F.4th 700 (9th Cir. 2023), *reh'g and reh'g en banc denied*, No. 15-16909
  (9th Cir. Sept. 3, 2024), *cert. filed*, No. 24-856 (U.S. Jan. 31, 2025)....................57

*Doe v. Intel. Corp.,*
  No. 24-CV-6117, 2024 WL 4553985 (S.D.N.Y. Oct. 22, 2024), *appeal
  dismissed*, No. 24-3330, 2025 WL 919026 (2d Cir. Feb. 24, 2025).......................66

*Doe v. Sigma Chi Int'l Fraternity, Inc.,*
  No. 23-CV-1452, 2024 WL 4347799 (N.D.N.Y. Sept. 30, 2024)....................84, 85

*Edwards v. Ctr. Moriches Union Free Sch. Dist.,*
  No. 05-CV-2735, 2006 WL 8439627 (E.D.N.Y. Aug. 14, 2006) .........................85

*Farmer v. Cnty. of Westchester,*
  No. 18-CV-2691, 2021 WL 4199944 (S.D.N.Y. Sept. 15, 2021)..........................86

*FEC v. Wisconsin Right To Life, Inc.,*
  551 U.S. 449 (2007)............................................................................74

*Ferrarese v. Shaw,*
  164 F. Supp. 3d 361 (E.D.N.Y. 2016) ........................................................80

*Fields v. Twitter, Inc.,*
  881 F.3d 739 (9th Cir. 2018) ..................................................................49

*Finn v. Barney,*
  471 F. App'x 30 (2d Cir. 2012) ...............................................................91

*Flores v. S. Peru Copper Corp.,*
  414 F.3d 233 (2d Cir. 2003)...................................................................52

*Friend v. Gasparino,*
  61 F.4th 77 (2d Cir. 2023) ...............................................................61, 67

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.,*
  991 F.3d 370 (2d Cir. 2021)...................................................................84

*Gallop v. Cheney*,
    642 F.3d 364 (2d Cir. 2011)......................................................................................69, 86

*Gerwaski v. Nevada ex rel. Bd. of Regents of the NV Sys. of Higher Educ.*,
    No. 24-CV-985, 2025 WL 1294107 (D. Nev. May 5, 2025)......................................73

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) .....................................................................49

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 542 (E.D.N.Y. 2012) .....................................................................49

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ...................................................................... *passim*

*Haley v. Tchrs. Ins. & Annuity Assoc. of Am.*,
    377 F. Supp. 3d 250 (S.D.N.Y. 2019)......................................................................29

*Han v. InterExchange, Inc.*,
    No. 23-CV-07786, 2024 WL 3990770 (S.D.N.Y. Aug. 28, 2024)............................86

*United States ex rel. Hart v. McKesson Corp.*,
    602 F. Supp. 3d 575 (S.D.N.Y. 2022).....................................................................91

*Heldman on Behalf of T.H. v. Sobol*,
    962 F.2d 148 (2d Cir. 1992) ....................................................................................46

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ........................................................................................ *passim*

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    219 F. Supp. 2d 57 (D.D.C. 2002) ...........................................................................71

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) .......................................................................................14

*Hunley v. BuzzFeed, Inc.*,
    No. 20-CV-08844, 2021 WL 4482101 (S.D.N.Y. Sept. 30, 2021)............................88

*Idaho Conservation League v. Mumma*,
    956 F.2d 1508 (9th Cir. 1992) ..................................................................................76

*Ins. Co. of N. Am. v. S/S "Hellenic Challenger"*,
    88 F.R.D. 545 (S.D.N.Y. 1980) ...............................................................................81

*Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*,
    500 U.S. 72 (1991).....................................................................................................76

*Jaffe & Asher v. Van Brunt*,
    158 F.R.D. 278 (S.D.N.Y. 1994) (Sotomayor, J.) ....................................................79

*Jan v. People Media Proj.*,
    No. 24-CV-05553, 2025 WL 359009 (W.D. Wash. Jan. 31, 2025) ...................55, 67

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005)..................................................8, 20, 46, 69

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir. 1995)......................................................................53

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021)...................................................9, 14, 15, 35

*Karlin v. Avis*,
    326 F. Supp. 1325 (E.D.N.Y. 1971) .......................................................79

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) .................................................................49

*Khalil v. Joyce*,
    780 F. Supp. 3d 476 (D.N.J. 2025) ........................................................67

*Khalil v. Trump*,
    No. 25-CV-01963, 2025 WL 1649197 (D.N.J. June 11, 2025)................67

*Khulumani v. Barclay Nat'l Bank, Ltd.*,
    504 F.3d 254 (2d Cir. 2007)............................................................53, 55

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013).................................................................................57

*Koontz v. Watson*,
    283 F. Supp. 3d 1007 (D. Kan. 2018).....................................................73

*Kumaran v. Northland Energy Trading, LLC*,
    762 F. Supp. 3d 322 (S.D.N.Y. 2025).............................................88, 89

*Licci v. Lebanese Canadian Bank SAL*,
    834 F.3d 201 (2d Cir. 2016).........................................................54, 55, 56

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018).......................................................10, 32, 34

*Long v. Byrne*,
    146 F.4th 282 (2d Cir. 2025) ...........................................................5, 7, 9

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015).............................................................87, 88

*MacGregor v. Milost Glob., Inc.*,
    No. 17-CV-6691, 2018 WL 4007642 (S.D.N.Y. Aug. 22, 2018)...........83

*Markewich v. Adikes*,
    422 F. Supp. 1144 (E.D.N.Y. 1976) .......................................................84

*Mastafa v. Chevron Corp.*,
    770 F.3d 170 (2d Cir. 2014)..............................................................57, 58

*Merriam v. Demoulas*,
    No. 11-CV-10577, 2013 WL 2422789 (D. Mass. June 3, 2013).............77

*Moore v. Hadestown Broadway Ltd. Liab. Co.*,
    722 F. Supp. 3d 229 (S.D.N.Y. 2024)......................................................66

*Mustafa v. Australian Wheat Bd.*,
 No. 07-CV-7955, 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008)....................................76, 77

*J. S. ex rel. N.S. v. Attica Cent. Schs.*,
 386 F.3d 107 (2d Cir 2004)...................................................................................................78

*NAACP v. Claiborne Hardware Co.*,
 458 U.S. 886 (1982)........................................................................................................71, 72

*Nat'l Dev. Co. v. Triad Holding Corp.*,
 930 F.2d 253 (2d Cir. 1991)...................................................................................................79

*New York v. Mountain Tobacco Co.*,
 55 F. Supp. 3d 301 (E.D.N.Y. 2014) .......................................................................................6

*Novartis Pharma AG v. Incyte Corp.*,
 777 F. Supp. 3d 340 (S.D.N.Y. 2025).....................................................................................91

*Ong v. Chipotle Mexican Grill, Inc.*,
 No. 16-CV-141, 2017 WL 933108 (S.D.N.Y. Mar. 8, 2017).................................................20

*Owens v. BNP Paribas, S.A.*,
 897 F.3d 266 (D.C. Cir. 2018) .........................................................................................48, 49

*Packingham v. North Carolina*,
 582 U.S. 98 (2017)..................................................................................................................66

*Palisades Ests. EOM, LLC v. Cty. of Rockland*,
 No. 23-CV-4215, 2025 WL 1295333 (S.D.N.Y. May 5, 2025) .............................................71

*Parizer v. AJP Educ. Found., Inc.*,
 No. 24-CV-724, 2025 WL 2382933 (E.D. Va. Aug. 15, 2025)...............................................59

*Pescatore v. Palmera Pineda*,
 No. 08-CV-2245, 2010 WL 11748172 (D.D.C. Nov. 4, 2010) ..............................................12

*Presbyterian Church of Sudan v. Talisman Energy, Inc. (Talisman I)*,
 244 F. Supp. 2d 289 (S.D.N.Y. 2003)....................................................................................55

*Presbyterian Church of Sudan v. Talisman Energy, Inc.* (Talisman II),
 582 F.3d 244 (2d Cir. 2009).......................................................................................53, 54, 57

*Raanan v. Binance Holdings Ltd.*,
 No. 24-CV-697, 2025 WL 605594 (S.D.N.Y. Feb. 25, 2025)........................................ *passim*

*Reves v. Ernst & Young*,
 507 U.S. 170 (1993).................................................................................................................35

*Revolon Monterey Energy LLV v. Operator*,
 No. 13-CV-7048, 2014 WL 12576644 (C.D. Cal. Sept. 18, 2014) ........................................51

*Roby v. Corp. of Lloyd's*,
 796 F. Supp. 103 (S.D.N.Y. 1992) .........................................................................................84

*Roe v. City of New York*,
 151 F. Supp. 2d 495 (S.D.N.Y. 2001)....................................................................................89

*Rosemond v. United States*,
  572 U.S. 65 (2014)...................................................................................................35

*Rothstein v. Mahne*,
  No. 15-CV-3236, 2015 WL 6828061 (S.D.N.Y. Nov. 5, 2015).......................30, 31

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013)......................................................................................78

*Salazar v. Nat'l Basketball Ass'n*,
  118 F.4th 533 (2d Cir. 2024) .....................................................................................6

*Salim v. Mitchell*,
  268 F. Supp. 3d 1132 (E.D. Wash. 2017) ..............................................................57

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019)...............................................................................32, 33

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976)..............................................................................................78, 87

*Slue v. NYU Med. Ctr.*,
  409 F. Supp. 2d 349 (S.D.N.Y. 2006).....................................................................88

*SM Kids, LLC v. Google LLC*,
  963 F.3d 206 (2d Cir. 2020).....................................................................................78

*Snyder v. Phelps*,
  562 U.S. 443 (2011)..................................................................................................68

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)..................................................................................................76

*In re Stillwater Cap. Partners Inc. Litig.*,
  853 F. Supp. 2d 441 (S.D.N.Y. 2012).....................................................................80

*Strategic Funding Source v. Hendon*,
  No. 10-CV-5935, 2011 WL 13383679 (S.D.N.Y. July 7, 2011)..............................80

*Sutherland v. Islamic Republic of Iran*,
  151 F. Supp. 2d 27 (D.D.C. 2001) ..........................................................................12

*In re Terrorists Attacks on Sept. 11, 2001*,
  740 F. Supp. 2d 494 (S.D.N.Y. 2010), *aff'd sub nom. In re Terrorist Attacks*
  *on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013)....................................49, 68, 69, 74

*The Haskell Co. v. Radiant Energy Corp.*,
  No. 05-CV-0440, 2007 WL 2746903 (E.D.N.Y. Sept. 19, 2007) ...........................81

*Trans-Radial Sols., LLC v. Burlington Med., LLC*,
  No. 18-CV-656, 2019 WL 3557879 (E.D. Va. Aug. 5, 2019).................................51

*Tribin v. Herrera*,
  No. 21-CV-24198, 2023 WL 5625615 (S.D. Fla. July 18, 2023)............................12

*Triestman v. Fed. Bureau of Prisons*,
  470 F.3d 471 (2d Cir. 2006)........................................................................................6

*Twitter v. Taamneh,*
    598 U.S. 471 (2023) ................................................................ *passim*

*United Stated v. Rahim,*
    860 F. App'x 47 (5th Cir. 2021) ........................................62, 66

*United States v. Al Safoo,*
    No. 18-CR-696, 2025 WL 1331682 (N.D. Ill. May 7, 2025) ....................62, 63, 66

*United States v. Daugerdas,*
    No. 09-CR-581, 2020 WL 346601 (S.D.N.Y. Jan. 22, 2020)........................30, 31

*United States v. Delgado,*
    972 F.3d 63 (2d Cir. 2020).................................................46

*United States v. Haipe,*
    769 F.3d 1189 (D.C. Cir. 2014) ..........................................12

*United States v. Hendricks,*
    950 F.3d 348 (6th Cir. 2020) ...........................................63, 70

*United States v. Lindh,*
    212 F. Supp. 2d 541 (E.D. Va. 2002) ...................................72

*United States v. Masel,*
    54 F. Supp. 2d 903 (W.D. Wis. 1999) ..................................71

*United States v. Mehanna,*
    735 F.3d 32 (1st Cir. 2013)..............................................61

*United States v. Mustafa,*
    406 F. App'x 526 (2d Cir. 2011) ........................................63

*United States v. Nagi,*
    254 F. Supp. 3d 548 (W.D.N.Y. 2017) .................................72

*United States. v. Osadzinski,*
    97 F.4th 484 (7th Cir. 2024) ..................................61, 62, 66, 74

*United States v. Svoboda,*
    347 F.3d 471 (2d Cir. 2003)..............................................65

*United States v. Taleb-Jedi,*
    566 F. Supp. 2d 157 (E.D.N.Y. 2008) .................................72

*USHA Holdings, LLC v. Franchise India Holdings Ltd.,*
    11 F. Supp. 3d 244 (E.D.N.Y. 2014) ...................................9

*Volokh v. James,*
    656 F. Supp. 3d 431 (S.D.N.Y. 2023)..................................66

*Weiss v. Nat'l Westminster Bank, PLC,*
    993 F.3d 144 (2d Cir. 2021)...........................................34, 46

*Windward Bora LLC v. Edinboro,*
    719 F. Supp. 3d 238 (E.D.N.Y. 2024) .................................80

*Wolfe v. Enochian BioSciences Den. ApS*,
    No. 21-CV-00053, 2022 WL 656747 (D. Vt. Mar. 3, 2022) ............................80

*Young Am.'s Found. v. Stenger*,
    No. 20-CV-822, 2025 WL 874840 (N.D.N.Y. Mar. 20, 2025) ..........................66

*Young Am.'s Found. v. Stenger*,
    No. 20-CV-0822, 2023 WL 3559619 (N.D.N.Y. May 19, 2023) ........................84

*Zinaman v. USTS N.Y. Inc.*,
    798 F. Supp. 128 (S.D.N.Y. 1992) ..............................................88

*Zobay v. MTN Grp. Ltd.*,
    695 F. Supp. 3d 301 (E.D.N.Y. 2023) ..................................... *passim*

## State Cases

*Irizarry v. Balton LLC*,
    No. 155520/2017, 2023 WL 3034722 (Sup. Ct. N.Y. Cty. Apr. 21, 2023)........81, 82, 85

*Mourtil v. Chi Ming Peng*,
    295 A.D.2d 582 (2nd Dep't 2002) ..............................................80

*N.Y. Bd. of Fire Underwriters v. Whipple*,
    36 A.D. 49 (1st Dep't 1898) ..................................................83

*New York State Higher Educ. Servs. Corp. v. Perchik*,
    207 A.D.2d 1040 (4th Dep't 1994) .............................................80

*RKJW1 Doe v. Watchtower Bible & Tract Socy. of N.Y., Inc.*,
    232 A.D.3d 637 (2d Dep't 2024) ............................................82, 85

## Federal Statutes

18 U.S.C. § 2331(1) ...............................................................11

18 U.S.C. § 2331(1)(B)(iii) .......................................................11

18 U.S.C. § 2333(a) ...............................................................48

18 U.S.C. § 2333(d)(2) ............................................................10

18 U.S.C. § 2339B(a)(1) ...........................................................60

28 U.S.C. § 1350 ..................................................................52

Pub. L. No. 114-222, 130 Stat. 852, § 2(b) (2016) .................................76

## State Statutes

N.Y. Gen. Ass'ns Law § 13 .........................................................84

N.Y. Gen. Ass'ns Law § 14 .........................................................84

Pub. L. No. 114-222, § 2(b) ........................................................9

**Rules**

Fed. R. Civ. P. 4(e) ................................................................................................79, 81

Fed. R. Civ. P. 4(h) ......................................................................................................81

Fed. R. Civ. P. 8(a) ......................................................................................................86

Fed. R. Evid. 201(b)......................................................................................................91

Fed. R. Evid. 401(a)......................................................................................................89

N.Y. C.P.L.R. § 1025.....................................................................................................84

**Other Authorities**

Restatement (Second) of Torts § 876...........................................................................35

Plaintiffs respectfully submit this memorandum of law in opposition to the motions to dismiss the Second Amended Complaint (the "Complaint") and for other relief filed by defendants Nerdeen Kiswani, Maryam Alwan, Cameron Jones, and Mahmoud Khalil (the "Individual Defendants") and the organizations they respectively represent, Within Our Lifetime – United for Palestine ("Within Our Lifetime"), Columbia Students for Justice in Palestine ("Columbia SJP"), Columbia-Barnard Jewish Voice for Peace ("Columbia JVP"), and Columbia University Apartheid Divest ("CUAD")  (the "Associational Defendants") (collectively, "Defendants").[1]

## PRELIMINARY STATEMENT

This case is about the horrific terrorist attacks committed by Hamas against Plaintiffs and countless others on and after October 7, 2023, with the extensive support of the Defendants. The Plaintiffs include current and former hostages of Hamas terrorists, civilians who were murdered by Hamas either on October 7 or during captivity, Americans who traveled to Gaza to fight Hamas after October 7, and their surviving family members. The Defendants are four of the most important affiliates of Hamas' domestic propaganda organization and their respective leaders. Together, they form Hamas' propaganda arm in New York City and on the campus of Columbia University. Even as Plaintiffs suffered in Hamas captivity or battled Hamas terrorists in Gaza, the Defendants provided Hamas with invaluable propaganda services. Starting right after October 7,

---

[1] *See* Defendant Columbia-Barnard A Jewish Voice for Peace's Memorandum of Law in Support of Its Motion to Dismiss Second Amended Complaint ("Columbia JVP Mem."), ECF No. 70; Memorandum of Law in Support of Maryam Alwan's Motion to Dismiss the Second Amended Complaint ("Alwan Mem."), ECF No. 72; Request in Support of Motion to Dismiss for Judicial Notice and for the Court to Consider Documents Incorporated by Reference in the Second Amended Complaint ("Judicial Notice Mem."), ECF No. 74; Defendant Mahmoud Khalil's Motion to Dismiss Plaintiffs' Second Amended Complaint ("Khalil Mem."), ECF No. 80; Letter Brief in Support of Motion to Dismiss ("Jones Letter"), ECF No. 75-1; Declaration in Support of Defendant Nerdeen Kiswani's Motion  to Dismiss the Second Amended Complaint in Her Personal and Alleged Representative Capacities ("Kiswani Decl."), ECF No. 82. Defendant Tarek Bazrouk, first named in the Second Amended Complaint, does not have a pending motion.

for month after month, Defendants publicly declared their support for Hamas and October 7, they defended Hamas' actions and encouraged its crimes, and they organized disruptive events at Columbia and around New York to mobilize public support for Hamas. Defendants organized their events at Hamas' behest, and Hamas repeatedly expressed its gratitude for their services.

Plaintiffs bring claims against Defendants for aiding and abetting Hamas' acts of international terrorism under the Antiterrorism Act and for aiding and abetting Hamas' violations of the laws of nation under the Alien Tort Statute. The claims are grounded in well-established principles of secondary liability and withstand each of Defendants' efforts to dismiss them.

The Antiterrorism Act claim should be sustained. The three principal elements are supported by detailed factual allegations. First, Plaintiffs were the victims of Hamas' international terror attacks on and after October 7. The U.S. Plaintiffs include Iris Weinstein Haggai, an American citizen whose parents were kidnapped by Hamas on October 7 and murdered at an unknown date thereafter. Hamas held their remains hostage through June 2025, when the Israeli military finally rescued them. That course of conduct is an ongoing terror attack that persisted for so long as Hamas refused to release their bodies. The Plaintiffs also include three American citizens (John Doe, Richard Roe, and Jane Moe) who either personally fought or whose close family member fought Hamas terrorists for up to a year after October 7. Every engagement with Hamas was its own terror attack. This case is thus wholly unlike other cases brought by victims of Hamas' crimes who were injured in discrete attacks that began and ended on October 7.

Second, Defendants were generally aware of their role in Hamas' terror organization. After October 7, Hamas publicly called for its supporters abroad to engage in disruptions to rally support for its wicked goals. The Defendants repeatedly heeded their calls, delivering pro-Hamas rally after rally. Some of Defendants' disruptions were delivered on the day Hamas demanded such

disruptions and bore the names Hamas suggested for them. Several Defendants also issued public statements in support of Hamas and October 7. And, most importantly, Hamas repeatedly thanked Defendants for their efforts, both in public and in private. In one especially shocking episode, a Hamas surrogate stated at one of Defendants' events at Columbia that his "friends and brothers in Hamas" viewed Defendants' "work" as "so important to the resistance in Gaza"—*i.e.*, to Hamas itself. A few weeks after that, Defendants delivered their biggest event yet: the so-called "Gaza Solidarity Encampment," a thirteen-day takeover of Columbia campus characterized by pro-Hamas rhetoric, property destruction, and intimidation.

General awareness is further shown by the Defendants' close affiliation with AJP Educational Foundation, Inc. a/k/a American Muslims for Palestine ("AMP") and its on-campus brand name, National Students for Justice in Palestine ("NSJP") (together, "AMP/NSJP"). AMP/NSJP is functionally a U.S.-based public relations firm for Hamas. It is the reincarnation of pro-Hamas groups that disbanded after American courts adjudicated them as material supporters of Hamas. The connections between AMP/NSJP and its predecessors run so deep that another court sustained a claim that AMP/NSJP is the alter ego of its forebears. When Hamas put out a call on October 7 for mobilizations abroad, AMP/NSJP amplified it in the "NSJP Toolkit," a straightforwardly pro-Hamas document that encouraged domestic disruptions and the sowing of pro-Hamas propaganda. AMP/NSJP sent the Toolkit to the Defendants, who closely followed its instructions. That creates a strong inference that they agreed with its content and acted to further Hamas' goals—and were thus generally aware of their role in Hamas' enterprise.

Another allegation showing general awareness is that Defendants count among their ranks an admitted violent felon with significant Hamas ties: Defendant Tarek Bazrouk, who recently pleaded guilty to conspiracy to commit antisemitic hate crimes. Bazrouk is a longtime member of

Within Our Lifetime and a frequent attendee at events organized by the Defendants. Bazrouk physically attacked Jews at three of Defendants' events and was arrested at several more. Bazrouk is an avid consumer of pro-Hamas propaganda, has traveled to the West Bank and Jordan, and was "mad happy" when he learned that he had family members who were in Hamas itself. When Bazrouk was arrested, he had access to an astonishing $750,000 in cash for no credible reason. When a violent, Hamas-connected felon is part of a group, it is reasonable to infer that group is generally aware of its role in Hamas' enterprise.

Third, Defendants knowingly and substantially assisted in the terror attacks on Plaintiffs. Under long-established principles of aiding and abetting liability, a defendant may be held liable for providing the principal with valuable intangible services. A defendant can also be liable for encouraging and advising the principal to commit wrongdoing. And as the Supreme Court suggested in 2023, liability under the Antiterrorism Act can properly be applied to defendants who "consciously and selectively chose to promote content provided by a particular terrorist group." *Twitter v. Taamneh*, 598 U.S. 471, 502 (2023). Defendants are liable under each of these rationales. Even as Iris's parents were held hostage and Doe, Roe, and Moe's brother were fighting Hamas terrorists, Defendants encouraged Hamas to proceed "by any means necessary," including violence; they distributed pro Hamas propaganda, including a document bearing the name "Hamas Media Office"; and they repeatedly answered Hamas' calls to rally further support. That is knowing and substantial assistance.

The claim under the Alien Tort Statute should be sustained for many of the same reasons. The Israeli Plaintiffs are current and former hostages (living and deceased) and their family members. Hamas' crimes against the Plaintiffs are actionable crimes against humanity, and the Second Circuit has held that aiding and abetting a primary violation of the law of nations is itself

actionable under the Alien Tort Statute. The standard of liability is similar to the standard under the Antiterrorism Act, with the main exception being that an aiding-and-abetting claim under the Alien Tort Statute requires a different mental state. Defendants' conduct meets that bar, and Plaintiffs state a claim for aiding and abetting Hamas' crimes against humanity.

Finally, it does not offend the First Amendment to hold Defendants liable for their grave misconduct. Although the Constitution protects independent pro-terror advocacy, abhorrent as that advocacy is, it does not protect speech, advocacy, and services that are addressed to or coordinated with a terror group like Hamas. This case is about the latter. Defendants publicly coordinated with Hamas and its allies, repeatedly responding to their calls for disruptions abroad, engendering Hamas' deep gratitude. They privately coordinated with Hamas through a Hamas surrogate who stated that Hamas loved Defendants' work, and through Bazrouk, the violent felon with significant Hamas ties. And, of course, Defendants coordinated with Hamas through AMP/NSJP, Hamas' U.S.-based propaganda organization. There was nothing independent about Defendants' activities, and the First Amendment does not shield their conduct.

Defendants' remaining contentions are likewise unavailing. For all the reasons given below, the Court should sustain Plaintiffs' claims and permit this case to proceed to discovery.

## ARGUMENT

### I.    Legal Standards

#### A.    General Standards

Defendants move to dismiss for lack of subject matter jurisdiction under the Alien Tort Statute, for lack of constitutional standing, for defective service, and for failure to state a claim. On a motion to dismiss for failure to state a claim, courts accept the truth of all factual allegations and draw all reasonable inferences in the plaintiff's favor. *Long v. Byrne*, 146 F.4th 282, 290 (2d Cir. 2025). "As long as 'the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged,' then the complaint will survive a motion to dismiss." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The standards are similar for a Rule 12(b)(1) motion for lack of subject matter jurisdiction, *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006), including where a challenge is made to standing, *see Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 540 (2d Cir. 2024), and under a motion to dismiss for lack of service, *see New York v. Mountain Tobacco Co.*, 55 F. Supp. 3d 301, 308–09 (E.D.N.Y. 2014).

### B.    The Court Should Accept Plaintiffs' Interpretations of Defendants' Terror Euphemisms

A major dispute between the parties is whether Defendants' references to "the resistance" and similar terms are culpable references to Hamas, as Plaintiffs argue, or something less sinister, as Defendants imply. In this posture, the answer to that question is clear. The Court should credit Plaintiffs' interpretations of those terms and evaluate the conduct in the Complaint in that light. Because this issue cuts across many of the arguments discussed below, Plaintiffs address the meaning of the relevant terms and euphemisms at the threshold.

First, the term "Towfan Al-Aqsa" and its translation "Al-Aqsa Flood" means the attacks that commenced on October 7. Complaint ("SAC") ¶ 101, ECF No. 66. That is Hamas' own name for the event, as was widely reported at the time.[2] Second, the term the "Uprising," which Defendants use interchangeably with Al-Aqsa Flood, means the same thing. *E.g.*, Ex. 3 at 3.[3] Third, and most critically, the terms "the resistance" "the Palestinian resistance," and "the armed

---

[2] *See, e.g.*, "Israel Retaliation Kills 230 Palestinians After Hamas Operation," AL JAZEERA (Oct. 7, 2023), https://www.aljazeera.com/news/2023/10/7/sirens-warn-of-rockets-launched-towards-israel-from-gaza-news-reports.

[3] Citations to "Ex. _" are to the Exhibits to the Complaint. Page references are to the page of the PDF document and not to any internal pagination of the document.

resistance" mean Hamas or both Hamas and other terror organizations working under its command. SAC ¶¶ 95, 194.

At this stage, the Court should accept these allegations as true simply because that is what Plaintiffs allege. *See Long*, 146 F.4th at 290. Were anything more needed, the context in which these terms are used places the question beyond doubt. A few examples suffice. On October 8, 2023, AMP/NSJP distributed the NSJP Toolkit to its chapters and affiliates, including Columbia SJP, Columbia JVP, and Within Our Lifetime. SAC ¶ 94. The Toolkit directly attributes the October 7 attack to "the resistance" and "the Palestinian resistance," and it uses Hamas' name for the attack:

> Referred to as Operation *Towfan Al-Aqsa* (Al-Aqsa Flood), **the resistance** has taken occupation soldiers hostage, fired thousands of rockets, taken over Israeli military vehicles, and gained control over illegal Israeli settlements. . . .

> Today, we witness a historic win for **the Palestinian resistance**: across land, air, and sea, our people have broken down the artificial barriers of the Zionist entity . . . .

*Id.* ¶ 95 (emphasis added); *see id.* ¶ 101. The October 7 attack was masterminded by Hamas and carried out by Hamas in collaboration with other terror groups. *Id.* ¶¶ 78–80. It was Hamas that took hostages, fired rockets, and took over Israeli military vehicles, and engaged in extensive butchery and atrocities the Toolkit fails to mention. When the Toolkit says "the resistance" or "the Palestinian resistance" committed these crimes, it means Hamas. It means the same thing when Defendants say it.

Another example can be found in the "Bears for Palestine Solidarity Statement: Resistance Uprising in Gaza" (the "Towfan Al-Aqsa Statement"). *Id.* ¶¶ 101–04; Ex. 3 at 3. The Towfan Al-Aqsa Statement was drafted while the October 7 attack was in progress and signed by Columbia SJP on the same day. The title alone gives away the game: someone referring the "Resistance

Uprising in Gaza" on October 7 can only be referring to Hamas' cold-blooded attack. The body of the document confirms as much. Referring to the "Towfan Al-Aqsa [translates to Al-Aqsa flood]," the document states that "[t]he occupational borders of 1967 haven't been broken like this since the Second Intifada. Towfan Al-Aqsa now stands as a revolutionary moment in contemporary Palestinian resistance." Ex. 3 at 2. The statement also declares, (1) "We display our unwavering support of ***the resistance*** in Gaza and the broader occupied Palestinian lands," (2) "We support ***the resistance***, we support the liberation movement, and we indisputably support ***the Uprising***," and (3) "Glory to Palestine, glory to ***the resistance***, and glory to our martyrs." Ex. 3 at 2, 3 (emphases added). Again, "Towfan Al-Aqsa" is Hamas' own name for October 7, and it was Hamas that "broke[]" the "occupational borders"—*i.e.*, invaded Israel—that day. This document admits only a single reading: "the resistance" is Hamas and the "Uprising" is the October 7 attack.

Further confirmation can be found in Hamas' own pro-October 7 propaganda document, which CUAD handed out at an event in March 2025. SAC ¶ 191. Titled "Our Narrative… Operation Al-Aqsa Flood" and bearing the name "Hamas Media Office," the document refers to Hamas as "the Palestinian resistance" and "the resistance," just as the Toolkit and the Towfan Al-Aqsa Statement does.[4] And, of course, the word "Hamas" is an Arabic-language acronym that translates to Islamic ***Resistance*** Movement.[5]

In short, these terms have clear meanings in Defendants' milieu. Even if the meaning of these terms was contestable, the Court must construe them in Plaintiffs' favor. *See JP Morgan*

---

[4] *E.g.*, Our Narrative … Operation Al-Aqsa Flood, Hamas Media Office at 7, as published by the Palestine Chronicle: https://www.palestinechronicle.com/wp-content/uploads/2024/01/PDF.pdf (cited SAC ¶ 92 n.87).

[5] Kali Robinson, What is Hamas?, Council on Foreign Relations (last updated Oct. 17, 2024), https://www.cfr.org/backgrounder/what-hamas (cited at SAC ¶ 40 n.32).

*Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 258 (S.D.N.Y. 2005) ("[T]hat a particular fact can give rise to conflicting inferences does not justify dismissing a complaint at this stage of the proceedings, provided the facts can give rise to an inference of wrongful conduct."); *Baum v. Harman Int'l Indus., Inc.*, 575 F. Supp. 3d 289, 295 (D. Conn. 2021) ("At this stage of the litigation, documents are construed in the light most favorable to plaintiff and all doubts are resolved in its favor." (quoting *USHA Holdings, LLC v. Franchise India Holdings Ltd.*, 11 F. Supp. 3d 244, 270 (E.D.N.Y. 2014)) (bracket and ellipsis omitted)).[6]

## II.    Plaintiffs State an Antiterrorism Act Claim

### A.    Statutory Framework

U.S. Plaintiffs[7] assert their claim under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d), which extends liability under the Antiterrorism Act to aiders and abettors. "Congress's stated purpose in enacting JASTA was 'to provide civil litigants with *the broadest possible basis*, consistent with the Constitution of the United States, to seek relief *against persons and entities that have provided material support* to foreign organizations or persons that engage in terrorist activities against the United States,' whether '*directly or indirectly*.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (quoting JASTA, Pub. L. No. 114-222, § 2(b)) (emphases in original) (ellipses and brackets omitted). A JASTA claim has three elements: (i) the plaintiff suffers an "injury arising from an act of international terrorism"; (ii) the attack is "committed, planned, or authorized" by an organization designated as a foreign terrorist

---

[6] Defendants' protests about citations to publicly reported information about Defendants' conduct must likewise be rejected. *E.g.*, Khalil Mem. 13 n.3, 22 n.6. The standard of review dictates that the Court must accept the allegations in the Complaint as true. *See Long*, 146 F.4th at 290.

[7] U.S. Plaintiffs are Iris Weinstein Haggai, individually and on behalf on Judith Lynne Weinstein Haggai and Gad Haggai, John Doe, Richard Roe, and Jane Moe. SAC ¶¶ 13–16.

organization at the time of the attack; and (iii) the defendant "aids and abets, by knowingly providing substantial assistance." 18 U.S.C. § 2333(d)(2); *see also Twitter, Inc. v. Taamneh*, 598 U.S. 471, 483–84 (2023) (discussing JASTA's requirements); *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 436–37 (2d Cir. 2025) (discussing *Twitter*).

The aiding-and-abetting inquiry has three elements of its own: (i) "the party whom the defendant aids must perform a wrongful act that causes an injury"; (ii) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance"; and (iii) "the defendant must knowingly and substantially assist the principal violation." *Twitter*, 598 U.S. at 486 (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). Finally, six factors are relevant to whether the assistance was substantial:

> (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance.

*Ashley*, 144 F.4th at 435–36 (quoting *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018)). These considerations are not "inflexible codes," however, and the core inquiry is whether the defendant has engaged "conscious, voluntary, and culpable participation in another's wrongdoing." *Twitter*, 598 U.S. at 497, 493.

### B.    Plaintiffs Allege Injuries Caused by Hamas' Acts of International Terrorism

Plaintiffs allege that Hamas committed acts of international terrorism that caused their injuries, satisfying the first *Halberstam* element. *See, e.g.*, *Ashley*, 144 F. 4th at 439 (characterizing the first element as whether "the terrorists whom the Banks purportedly indirectly aided—the Syndicate—committed the attacks that caused Plaintiffs' injuries"); *Raanan v. Binance Holdings Ltd.*, No. 24-CV-697, 2025 WL 605594, at *19 (S.D.N.Y. Feb. 25, 2025) ("[T]he parties do not

dispute that the first *Halberstam* aiding-and-abetting liability element—that Hamas and PIJ committed an act of international terrorism that allegedly injured the plaintiffs—is satisfied.").

The Antiterrorism Act provides defines "international terrorism" as "activities that"

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—
>
>> (i) to intimidate or coerce a civilian population;
>>
>> (ii) to influence the policy of a government by intimidation or coercion; or
>>
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1). Each U.S. Plaintiff alleges conduct satisfying this definition.

Hamas terrorists kidnapped Plaintiff Iris Weinstein Haggai's parents, Judith Lynne Weinstein Haggai and Gad Haggai, on October 7. SAC ¶ 13. Eighty-three days into the ordeal, Iris learned that Hamas had likely murdered her parents and was keeping their bodies hostage to use as bargaining chips. *Id.* On June 5, 2025—while this action was pending—the Israel Defense Forces ("IDF") finally recovered her parents' bodies. *Id.* This entire course of heinous conduct constitutes a single act of international terrorism that spanned nearly two years. Kidnapping and murder are by definition violent, dangerous, and criminal acts; indeed, the Antiterrorism Act expressly provides that kidnapping is a form of international terrorism. *See* 18 U.S.C. § 2331(1)(B)(iii) (defining "international terrorism" to include "activities that . . . appear to be

intended . . . to affect the conduct of a government by mass destruction, assassination, or kidnapping"). Hamas' conduct was intended to influence government policy and conduct by preventing Israel from normalizing relations with its neighbors. SAC ¶¶ 81, 90. And the conduct occurred outside the territorial jurisdiction of the United States. *Id.* ¶ 13.

Consistent with the plain terms of the Antiterrorism Act, courts have held that similar crimes constitute international terror acts. *See, e.g.*, *Tribin v. Herrera*, No. 21-CV-24198, 2023 WL 5625615, at *1, *3 (S.D. Fla. July 18, 2023) (holding that kidnapping an individual and holding him hostage for six-and-a-half years "constitute[d] acts of international terrorism"); *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 18-CV-25337, 2020 WL 7481302, at *3 (S.D. Fla. May 20, 2020) (kidnapping, six months of torture, and murder); *Pescatore v. Palmera Pineda*, No. 08-CV-2245, 2010 WL 11748172, at *3 (D.D.C. Nov. 4, 2010) (kidnapping and murder); *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 690 F. Supp. 2d 1296, 1301–02, 1308–09 (S.D. Fla. 2010) (kidnapping, hostage-holding, and murder), *on reconsideration in part*, No. 08-01916-MD, 2015 WL 71562 (S.D. Fla. Jan. 6, 2015); *see also United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (kidnapping meets the definition of "international terrorism" for purposes of sentencing enhancement that follows the Antiterrorism Act's definition). By its nature, a kidnapping is an ongoing terror attack that persists as long as the victim is held. *Cf. Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27 (D.D.C. 2001) (awarding damages for the kidnapping, six-and-a-half year detention, and torture of an American by Hizbollah terrorists under common-law theories).

Plaintiffs John Doe and Richard Roe, both IDF reservists, fought Hamas in and around Gaza beginning shortly after October 7, as did the brother of plaintiff Jane Moe. SAC ¶¶ 14–16. Doe spent 100 consecutive days fighting Hamas and was involved in gunfights and attacks by

Hamas terrorists. *Id.* ¶¶ 14, 86. Roe participated in operations to dismantle Hamas leadership and infrastructure during his months-long deployment and was repeatedly shot at by Hamas terrorists. *Id.* ¶¶ 15, 87. And Moe's brother was deployed to Gaza on October 7 and fought against Hamas for over a year, sustaining injuries in battle. *Id.* ¶¶ 16, 88. Every time Hamas bears arms against the IDF, it is committing an act of international terrorism. The encounters are definitionally violent and dangerous to human life, they were intended to influence or affect government policy or conduct, and they occurred outside U.S. territory. *Id.* ¶¶ 14–16, ¶ 90. And although Hamas' terror attacks began on October 7, 2023, the actionable attacks extended at least until October 2024, a year into Moe's brother's deployment.

Defendants' arguments under this element require little discussion.

*First*, Khalil is wrong to argue that *Ashley* forecloses relief in this case. Khalil Mem. 15, 18–19. That decision considered a claim that the defendants aided and abetted a general terror "campaign" intended to "expel Americans from Afghanistan through crime and anti-American violence." *Ashley*, 144 F.4th at 448. The Second Circuit rejected this claim, holding that "JASTA does not provide relief where a 'campaign' is alleged to be the 'act of international terrorism.'" *Id.* Rather, "the defendant must aid and abet a specific attack." *Id.* (citing *Twitter*, 598 U.S. at 494). Kidnapping *is* a particular terrorist attack, not a nebulous terror campaign. Kidnapping is also, by its nature, an ongoing terror attack that lasts so long as the terrorists keep the hostage for political reasons. Every military encounter with Hamas is likewise a terror attack, not a terror campaign. *Cf. Twitter*, 598 U.S. at 497 (accepting "the Reina attack" as an act of international terrorism). Hamas' crimes against the U.S. Plaintiffs are therefore actionable under *Ashley*.

*Second*, although Alwan correctly concedes that "the October 7 attacks and Hamas' military operations in Gaza thereafter" qualify as acts of international terrorism (Alwan Mem. 16),

she is wrong to omit kidnapping, hostage-holding, and Hamas military operations in the Gaza envelope, *i.e.*, just outside Gaza (as alleged by Moe). That conduct is also actionable. And although Alwan takes pains to argue that the domestic disturbances that the Defendants fomented are not themselves acts of international terrorism organized by Hamas (*id.* at 16–19), she is attacking a strawman. The acts of international terror are expressly identified in the Complaint and are attributed to Hamas. SAC ¶ 235.

*Third*, although Columbia JVP urges that Plaintiffs "uniformly fail to satisfy any of *Halberstam*'s pleading requirements," it does not develop any argument under the first *Halberstam* element. Columbia JVP Mem. 11. Nor could it. For the reasons shown, Plaintiffs plainly allege that they were injured by Hamas terror attacks.

### C.    The Complaint Sufficiently Allege General Awareness

The Complaint also sufficiently alleges general awareness, the second *Halberstam* element. "The 'general awareness' requirement is not an exacting one." *Raanan*, 2025 WL 605594, at *19. A plaintiff need only allege that a defendant knew it was "playing some sort of role in [the terrorist organization's] enterprise." *Twitter*, 598 U.S. at 497; *accord Ashley*, 144 F.4th at 438 ("Under the *Halberstam* framework, to hold a defendant liable as an aider and abettor, the defendant also must be 'generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance.'" (quoting *Twitter*, 598 U.S. at 486)). "The phrase 'generally aware' connotes 'something less than full, or fully focused, recognition.'" *Ashley*, 144 F.4th at 438 (quoting *Kaplan*, 999 F.3d at 863). "The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable." *Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 337 (E.D.N.Y. 2023) (quoting *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496 (2d Cir. 2021)) (emphasis omitted). "A

complaint is allowed to contain general allegations as to a defendant's knowledge, because 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'" *Kaplan*, 999 F.3d at 864 (quoting *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)) (citation omitted).

The Complaint satisfies this test. Five sets of allegations show that Defendants knew they were playing some sort of role in Hamas' enterprise as Hamas was committing its crimes against the Plaintiffs: (1) Defendants were told Hamas valued their efforts; (2) Defendants repeatedly answered Hamas' calls for disruptions abroad; (3) Defendants' statements and actions directly align them with Hamas and October 7; (4) Defendants have close ties to AMP/NSJP, Hamas' domestic propaganda operation; and (5) Defendants' membership includes Bazrouk, an open Hamas sympathizer with deep Hamas connections.

## 1. Defendants Were Informed That Their "Work" Was Important to Hamas

Defendants' general awareness is shown by allegations that Defendants were told that Hamas viewed their "work" as important and by allegations that Hamas publicly expressed gratitude for their efforts. *See Kaplan*, 999 F.3d at 864 (holding that general awareness was satisfied where Hizbollah had publicly stated that three customers of the defendant banks were "integral parts" of the terror group); *Ashley*, 144 F.4th at 439 (same, where U.S. authorities informed the defendant bank that its client's fertilizer product was the key source of a foreign terrorist organization's explosives).

A particularly stark example occurred during the "Resistance 101" event, which took place on Columbia campus in March 2024. The event was hosted by CUAD, Within Our Lifetime, and non-party Samidoun, which was designated as a foreign terrorist organization about six months after the event. SAC ¶ 131. The speakers included Khaled Barakat, a member of a Hamas-affiliated

foreign terrorist organization called Popular Front for the Liberation of Palestine. *Id.* ¶ 132. During the event, Barakat stated that when he speaks with his "friends and brothers in Hamas" and other terror groups, they stress the importance of the American support for the "resistance." *Id.* ¶ 134. Referring to his terrorist "friends and brothers," Barakat expressly linked the student's disruptive activities to Hamas' ability to "defeat Israel":

> What they're focused on is to actually stop the Israeli aggression and defeat Israel. And so when they see students organizing outside Palestine, they really feel that they are being backed as a resistance and they're being supported. *Every demonstration in New York matters for Gaza way more than all these nonsense debates that happen in mainstream media. So your work is so important to the resistance in Gaza more than ever.*[8]

These remarks could not be clearer. According to Barakat's colleagues in Hamas, the students' "work"—the challenged activities in this case—is "so important to the resistance in Gaza," *i.e.*, to Hamas itself.

Anyone who hears these pronouncements is generally aware of her role in Hamas' terror organization. In this posture, each Defendant is properly charged with knowledge of these statements. Within Our Lifetime hosted the event, which was attended by its leader Nerdeen Kiswani. SAC ¶ 132. CUAD co-hosted the event, and it is reasonable to infer that its de facto leader Mahmoud Khalil was aware of the content of the presentation, particularly because Khalil began publicly acting as the face of CUAD at the "Encampment" just a few weeks later. *Id.* ¶¶ 132, 139, 143. Because Columbia reportedly suspended Maryam Alwan and Cameron Jones for their

---

[8] SAC ¶ 134; *see* x.com, @thestustustudio, https://x.com/thestustustudio/status/1772064333251449067 (Mar. 24, 2024), embedded video at 1:16:56–1:17:32 (emphasis added).

involvement with the event (*id.* ¶ 136), it is reasonable to infer that they and the organizations they represent (Columbia SJP and Columbia JVP) likewise were aware of the content of the event.[9]

Hamas and its allies expressed similar sentiments publicly in only slightly more coded language. *See Raanan*, 2025 WL 605594, at *20 (general awareness satisfied where Hamas "publicized its use of Binance [defendant's cryptocurrency platform]"); *Zobay*, 695 F. Supp. 3d at 338 (relying on public reporting regarding a foreign terrorist organization's activity to support general awareness; no requirement that plaintiff allege defendant "knew or should have known of the public sources"). At least two calls by Hamas and its allies for disruptions abroad were accompanied by expressions of gratitude for prior efforts. On October 29, 2023, Hamas applauded and celebrated "the masses who demonstrated in American cities and Western capitals in solidarity with Gaza." SAC ¶ 115. In November 2023, a Hamas-affiliated terror group stated that the "mass mobilizations in the capitals and cites of the world, especially in the United States" had "proven their effectiveness and strong impact." *Id.* ¶ 118. And in January 2024, a senior Hamas leader drew parallels between Hamas' goals and the work of American student groups like Columbia SJP, Columbia JVP, and CUAD. *Id.* ¶ 130. He stated that "the position of Hamas, and the position of the vast majority of the Palestinian people, especially following October 7" is to have "Palestine from the River to the Sea." *Id.* The Hamas leader added that that is also "the slogan of American students." *Id.* Thus, Hamas explained that its goals and the American students' goals are aligned.

In March 2024, a few days after Resistance 101, Barakat publicly echoed the same sentiments he had privately shared with the Defendants. *Id.* ¶ 137. In an interview on a Hezbollah-

---

[9] Alwan's factual submission that she did not plan or attend "Resistance 101" (Alwan Mem. 26 n.21) cannot be credited. *See, e.g.*, *Amadei v. Nielsen*, 348 F. Supp. 3d 145, 164 n.12 (E.D.N.Y. 2018) ("On a Rule 12(b)(6) motion this court cannot consider an affidavit submitted by Defendants.").

affiliated television station, Barakat explained that protestors in the West, with their chants of "Palestine will be free from the River to the Sea" are providing popular, political, and media support for the armed resistance—*i.e.*, for Hamas. *Id.* ¶ 137 & n.139. At this stage of the litigation, it is reasonable to infer that Barakat's statements (like his statements at Resistance 101) were based on his conversations with his "friends and brothers in Hamas."

The "Encampment" was also widely praised by Hamas and other terror groups. In May 2024, after Columbia dismantled the "Encampment," a leader of a Hamas-affiliated terror group praised the "university intifada" and called it a "model to be emulated in order to triumph for Palestine and its people." *Id.* ¶ 156. Around the same time, other terror groups and their backers, including al-Qaeda, Hezbollah, and the Islamic Republic of Iran, also praised student efforts. *Id.* ¶¶ 154, 157. And in January 2025, Hamas publicly expressed gratitude for the Encampment. *Id.* ¶ 158. In particular, a senior Hamas leader said in a speech, "We thank everyone **who supported us** with words, pens, voices, images, marches, demonstrations . . . ."; that language was quoted in a post in a terror-affiliated Telegram channel, with the word "demonstrations" linked to another post about the Encampment. *Id.* (emphasis added).

### 2.  Defendants Repeatedly Heeded Hamas' Calls for Action

Defendants' general awareness is further shown by the fact that they repeatedly answered the calls of Hamas and its allies to engage in domestic disruptions. The Complaint alleges a clear pattern: time and again, Hamas or an ally would publicly call for disruption, and Defendants would promptly organize the event—sometimes on the terror group's proposed date or using the terror group's proposed name for the event.

This conduct began shortly after the October 7 attack started. Hamas publicly called for the "resistance abroad" to "join the battle any way they can," including by participating in a "Day of Rage" on October 12. *Id.* ¶¶ 91, 109. The following day, AMP/NSJP distributed the Toolkit to

Columbia SJP, Columbia JVP, Within Our Lifetime, and others. *Id.* ¶ 94; Ex. 3. The Toolkit amplified Hamas' call. It stated that "the Palestinian resistance"—*i.e.*, Hamas—"has called for collective action by the Palestinian masses" and "has called for mass protests in every Palestinian city." Ex. 3 at 2. The Toolkit exhorted its followers to heed these calls, declaring: "As the Palestinian student movement, we have an unshakeable responsibility to join the call for mass mobilization." *Id.*; *see also id.* at 4–5. And it called for a "national day of resistance" on October 12, the same day Hamas asked for supporters to join in a "Day of Rage." *Id.* at 2; SAC ¶ 109. The Defendants answered the call. Columbia SJP and Columbia JVP promoted and held a "Day of Resistance" on October 12, which Khalil led and which Alwan attended. SAC ¶¶ 110, 113–14. Within Our Lifetime did the same, using Hamas' suggested "Day of Rage" name. *Id.* ¶¶ 110, 113.

On October 29 and 30, Hamas issued renewed calls for disruptions abroad. *Id.* ¶¶ 115–116. On October 31, AMP/NSJP advertised a "Week of Action for Gaza," and Columbia SJP and Columbia JVP both participated. *Id.* ¶ 117. A week later, the same thing. On November 5, a Hamas-affiliated terror group called for further "mass mobilizations" in the United States and elsewhere, and AMP/NSJP announced a "Shut it Down for Palestine" campaign. *Id.* ¶¶ 118–19. Columbia SJP, Columbia JVP, and CUAD dutifully organized and held a "Shut it Down for Palestine" event, which both Alwan and Jones attended. *Id.* ¶¶ 119–123.

And so on. The pattern repeated, with or without AMP/NSJP's amplification, in December 2023, SAC ¶¶ 128 (Columbia SJP and Columbia JVP); April 2024, SAC ¶¶ 201–08 (Within Our Lifetime); January 2025, SAC ¶¶180–81 (CUAD); February 2025, SAC ¶ 184 (CUAD); and March 2025, SAC ¶¶ 187–89 (Within Our Lifetime, CUAD, Khalil).

Thus, each Associational Defendant heeded multiple public calls by Hamas or an ally for domestic disruption, and Alwan, Jones, and Khalil each led or attended at least one of the events.

Discovery will surely uncover more. Given the Individual Defendants' statures in their organizations, it is reasonable to infer that each one knew of, approved, and attended the other Hamas-inspired events discussed above. Defendants' repeated responses to public calls from terror groups for domestic disruptions strongly evidences their general awareness of their role in Hamas' enterprise.

The Court should reject Alwan's arguments that this is "specious *post hoc ergo propter hoc* reasoning," Alwan Mem. 18, and that it is supposedly "more plausible" that Defendants were independently responding to public events, "not following foreign directives." *Id.* at 24. The Complaint is supported by far more than a generalized timeline of Defendants' events occurring after Hamas' calls. Defendants organized two of the rallies on the very day Hamas called for, October 12, 2023. SAC ¶¶ 109–10, 113–14. These events also adopted Hamas' name for the event ("Day of Rage") or a close euphemism ("Day of Resistance"). *Id.* ¶¶ 109–10. The "Strike4Gaza" episode in April 2024 shows Within Our Lifetime secretly coordinating with a Hamas ally to create an "economic blockade" of New York infrastructure on April 15, 2024. *Id.* ¶¶ 201–11. And the sheer number of events that Defendants organized right after Hamas or an ally called for them supports the inference that Defendants were *responding* to Hamas' calls. These allegations— particularly when viewed in the context of Defendants' pro-Hamas statements, connections to Hamas, and close association with AMP/NSJP—support "an inference of wrongful conduct" that must be taken in Plaintiffs' favor. *Winnick*, 406 F. Supp. 2d at 258.[10]

---

[10] Alwan's cases are nothing like this one. *See Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (refusing to infer that an immigration policy implemented in 2012 triggered migrations two year later); *Ong v. Chipotle Mexican Grill, Inc.*, No. 16-CV-141, 2017 WL 933108, at *11 (S.D.N.Y. Mar. 8, 2017) (in a securities fraud case, refusing to find that a statement was false when made based on the events that happened seven months later); *In re DNTW Chtd. Accountants Sec. Litig.*, 96 F. Supp. 3d 155, 166 (S.D.N.Y. 2015) (in a securities fraud case, explaining that "fraud by hindsight" allegations are insufficient to show scienter); *Cenedella v. Metro. Museum of Art*, 348

### 3. Defendants Have Consciously Aligned Themselves with Hamas

Defendant's general awareness is also shown by Defendants' words and actions that consciously align themselves with Hamas and the October 7 attack.

*The Toolkit*. The Toolkit is an unabashedly pro-Hamas and pro-October 7 document. Although the Toolkit might not have been authored by the Defendants, it was distributed to Columbia SJP, Columbia JVP, and Within Our Lifetime, and they closely followed its guidance and instructions. SAC ¶¶ 94, 96–97, 100–04, 106–14. It is therefore reasonable to infer that these Defendants and their leaders (Alwan, Jones, and Kiswani) agreed with it. It also reasonable to infer that Khalil, who led the Hamas-inspired "Day of Resistance" organized by Columbia SJP, endorsed its content. And although CUAD did not emerge as a force in the pro-Hamas disruptions until after the Toolkit was distributed, it is equally reasonable to infer that CUAD also endorsed its content, as CUAD is little more than a tool of Columbia SJP and Columbia JVP.

Here is the content the Defendants endorse. The Toolkit's description of October 7 is highly sanitized and delivered with an extraordinary pro-Hamas slant. Its statement that "the resistance [*i.e.*, Hamas] has taken occupation soldiers hostage, fired thousands of rockets, taken over Israel military vehicles, and gained control over illegal Israeli settlements" bears little resemblance to the horrors of October 7. Ex. 3 at 2. To take just two examples from the Complaint, the so-called "illegal Israeli settlements" that "the resistance" "gained control over" include Kibbutz Nir Or, a community that Hamas ransacked and destroyed on October 7. SAC ¶ 13. That is where Hamas terrorists kidnapped Iris's parents, murdered her friends, and burnt children alive. *Id.* The so-called

---

F. Supp. 3d 346, 358 (S.D.N.Y. 2018) (dismissing artist's antitrust claim premised on "conclusory" allegations of conspiracy and identifying the "obvious alternative explanation" that defendants each deemed other artists' work as "worthy of collecting and showing" than the plaintiff's).

"occupation soldiers" that Hamas kidnapped include Ran Gvili, who was murdered while defending Kibbutz Alumim, and whose body Hamas has held hostage ever since. *Id.* ¶ 19.

Further evidence of the Toolkit's pro-Hamas slant can be found in its treatment of Israel. Although it was Hamas that attacked and inflicted countless atrocities on Israel on October 7, the Toolkit accuses *Israel* of "murder[ing] 320 Palestinians" and injuring more than 2,200 others—the only hard numbers that appear in the document. Ex. 3 at 2. Shockingly, the Toolkit declares that "[r]esponsibility for every single death falls solely on the zionist entity [*i.e.*, Israel]." *Id.* at 4. The Toolkit thus lays the blame for the murders of Iris's parents and others on Israel, not the Hamas terrorists who committed the crimes.

While the Toolkit's description of October 7 is highly distorted, its praise and defense of Hamas and its terror crimes is clear. The Toolkit disgracefully touts October 7 as a "historic win for the Palestinian resistance." *Id.* at 2. It states that "[t]hese events are the natural and justified response to decades of oppression and dehumanization." *Id.* at 4.  It calls the conduct "morally just and politically necessary." *Id.* It argues that "Settlers are not 'civilians'" and are "military assets." (*Id.*) And it states that "[r]esistance comes in all forms—armed struggle, general strikes, and popular demonstrations" and that "[a]ll of it is legitimate, and all of it is necessary." *Id.* at 5. The Toolkit thus defends Hamas' crimes—including the kidnapping and murder of Iris's parents and every other horror committed that day and afterward—as morally just, legitimate, and necessary.

The Toolkit also makes clear that its authors and followers see themselves as part of Hamas—or, at a minimum, as serving Hamas' goals. This is not an exaggeration. Under a heading titled "Unity Intifada," the Toolkit states that "[a]ll Palestinian factions in Gaza appear to be participating under unified command." *Id.* at 5. Just so: Hamas' command. SAC ¶ 98. And regarding this "Unity Intifada" operating under Hamas' command, the Toolkit declares: "***We as***

*Palestinian students in exile are PART of this movement, not in solidarity with this movement*. This is a moment of mobilization for all Palestinians. We must act as part of this movement. *All our efforts continue the work and resistance of Palestinians on the ground*." Ex. 3 at 5 (bullet points and original emphases omitted; new emphasis added). The "resistance of Palestinians on the ground," of course, means Hamas. That is what the Defendants believe. And people who believe that understand they are playing a role in Hamas' criminal activities.

Beyond demonstrating their agreement with the Toolkit, the Defendants have through other words and actions aligned themselves with Hamas and October 7.

*CUAD and Khalil*. During a March 2025 disruption, CUAD distributed the Hamas document "Our Narrative… Operation Al-Aqsa Flood" SAC ¶ 191.[11] This document is stamped with the name "Hamas Media Office," and it is filled with pro-Hamas and pro-October 7 lies and apologia. Like the Toolkit, the document argues that "Operation Al-Aqsa Flood on Oct. 7 was a "necessary step and a normal response." [12] It simultaneously claims that any "targeting" of civilians was "accident[al]" even as it admits that Hamas is holding civilians hostages.[13] And it outrageously asserts that Hamas terrorists "dealt in a positive and kind manner with all civilians who have been held in Gaza."[14] Obviously, anyone handing out literal Hamas propaganda is generally aware of her role in Hamas' enterprise.  Khalil is the *de facto* leader of CUAD, and it is reasonable to infer that he knew about and approved CUAD's distribution of "Our Narrative." This is particularly true

---

[11] *See* Our Narrative … Operation Al-Aqsa Flood, Hamas Media Office, as published by the Palestine Chronicle:  https://www.palestinechronicle.com/wp-content/uploads/2024/01/PDF.pdf (cited SAC ¶ 92 n.87).

[12] "Our Narrative" at 6.

[13] *Id.* at 7, 8.

[14] *Id.* at 8.

because Khalil has recently echoed the abhorrent pro-Hamas argument that October 7 was "necessary." Asked about October 7 in a recent interview, Khalil repeatedly stated: "***We had to reach this moment***" and "***We couldn't avoid such a moment***."[15] Khalil's repeated use of "we" when describing the October 7 attack further signals his alignment with Hamas and October 7 and his knowledge of his role in Hamas' terror enterprise. At another recent appearance, echoing Hamas' language, Khalil declared that "our work" is to "expose[] Israel as pariah state, until the Zionist genocidal project and the ideology of supremacy that it's built on collapses completely."[16]

*Columbia SJP and Alwan.* While the October 7 attack was ongoing, Columbia SJP signed the Towfan Al-Aqsa Statement. SAC ¶¶ 101–04; Ex. 3 at 3. The statement is crystal clear in its support of Hamas and October 7, declaring: (1) "We display our unwavering support of ***the resistance*** in Gaza and the broader occupied Palestinian lands," (2) "We support ***the resistance***, we support the liberation movement, and we indisputably support ***the Uprising***," and (3) "Glory to Palestine, glory to ***the resistance***, and glory to our martyrs." Ex. 3 at 2, 3 (emphasis added). Two days later, Columbia SJP issued a similar pro-"resistance" statement of its own. SAC ¶ 112. And while the precise timing is uncertain, a short time before the October 7 attack began, Columbia SJP posted "We are back!!" in a since-deleted Instagram post. *Id.* ¶ 105. Alwan is the de facto leader of Columbia SJP and maintained access to its social media accounts, and it is reasonable to infer that she was aware of and approved her organization signing the Towfan Al-Aqsa Statement on October 7, issuing the group's October 9 statement, and publishing the Instagram post. Additionally, because Columbia SJP jointly operates through CUAD (along with Columbia JVP),

---

[15] x.com, @FreeBeacon https://x.com/FreeBeacon/status/1953143360098541600 (Aug. 6, 2025).

[16] x.com, @thestustusudio, https://x.com/thestustustudio/status/1961836245547385316 (Aug. 30, 2025).

it is reasonable to infer that Columbia SJP and Alwan knew of and approved CUAD's distribution of "Our Narrative." *Id.* ¶¶ 35, 72, 125.

*Columbia JVP and Jones*. Like Columbia SJP, Columbia JVP jointly operates through CUAD, and it is reasonable to infer that it, too, knew of and approved CUAD's distribution of "Our Narrative." *Id.* ¶¶ 35, 72, 125. And because Jones is the de facto leader of Columbia JVP, it is reasonable to infer his knowledge and approval as well.

*Within Our Lifetime and Kiswani*. On October 7, Within Our Lifetime issued a statement declaring that it "support[s] Palestinian resistance in all its forms. By any means necessary. With no exceptions and no fine print." *Id.* ¶ 106. Kiswani is the leader of Within Our Lifetime, and it is reasonable to infer that she was aware of and approved the organization's October 7 statement. But more than that, Kiswani has long personally glorified "the resistance" and "martyrs," euphemisms for Hamas and Hamas terrorists. *Id.* ¶ 194. She has declared that "We are 100% behind the resistance." *Id.* ¶ 195. She has insisted that "We should never undermine the role of the resistance or hyperfocus on, you know, this human rights discourse that just places us as passive victims because we are not that, we are fighters, we are resisting." *Id.* ¶ 196. A few months after October 7, she stated: "If you stand with Palestinians, you stand with Palestinian resistance." *Id.* ¶ 200. Kiswani of all people can scarcely argue she is unaware of her role in Hamas' terror organization. And, in fact, it does not appear that she *does* challenge her or Within Our Lifetime's general knowledge, as her submission did not join the other Defendants' general awareness arguments. *See* Kiswani Decl. ¶ 3(d).

### 4. Defendants Are Closely Associated with Hamas' Domestic Propaganda Organization

Defendant's general awareness of their role in Hamas is further shown by their associations with AMP/NSJP and with one another.

Propagandizing Western audiences is a core part of Hamas' strategy, and Hamas has long relied on a network of U.S.-based organizations to spread its message. SAC ¶¶ 43–45, 47–50. Hamas' first support enterprise began to be exposed in the 2000s, when one entity was found liable for funneling money to Hamas and another entity and its leaders were convicted of providing material support to Hamas. *Id.* ¶¶ 51–52. Hamas' current domestic propaganda organization is AMP/NSJP. *Id.* ¶ 66. AMP was founded in 2006 by several key members of the original enterprise, and the two groups have extensive overlap and significant Hamas connections. *Id.* ¶¶ 54–57. Although Defendants deride this as conspiracy theorizing (*e.g.*, Columbia JVP Mem. 38), one federal court has found the overlap so substantial that it sustained a claim against AMP premised on the theory that it is the alter ego of one of the predecessor organizations and responsible for paying its judgment. *See Boim v. Am. Muslims for Palestine*, No. 17-CV-3591, 2022 WL 1556085, at *1–*2 (N.D. Ill. May 17, 2022). In 2010, AMP created NSJP as its campus brand name, and it uses its NSJP name to control the management, financing, and messaging of different chapters of Students for Justice in Palestine across the country. SAC ¶¶ 58–62. AMP/NSJP uses individual SJP chapters to spread Hamas' propaganda around college campuses. *Id.* ¶ 60. AMP/NSJP also has at least some significant control of national JVP's messaging and operations. *Id.* ¶ 70.

As alleged in the Complaint, a web of connections ties each of the Defendants to each other, to AMP/NSJP, and ultimately to Hamas. These connections support an inference of Defendants' general knowledge of their role in Hamas' organization.

*First*, as discussed above, Hamas and its allies repeatedly called for disruptions abroad, AMP/NSJP amplified many of Hamas' calls, and the Defendants responded by organizing disruptions. *See supra* Part II.C.2.

*Second*, senior members of AMP/NSJP attended the so-called "Encampment" in April 2024. SAC ¶ 151. This includes Osama Abuirshaid, who was on the Board of one of AMP's terror-supporting predecessors and who is currently AMP's Executive Director and National Board Member. *Id.* ¶¶ 57, 151. The Encampment was launched by the Associational Defendants, and each Individual Defendant was active at the Encampment. Khalil was a leader; Alwan was arrested; Kiswani celebrated her wedding; and Jones referred to it as "our Encampment" and stated he had spent 13 days there. *Id.* ¶¶ 139, 143, 144, 151, 155.

*Third*, Columbia SJP is a chapter of AMP/NSJP. With AMP/NSJP's direction and support, Columbia SJP has for years been one of the most active and aggressive NSJP affiliates in the country. *Id.* ¶ 69. AMP even announced the creation of NSJP at an SJP conference at Columbia University in 2010. *Id.* ¶ 58.

*Fourth*, Columbia SJP is closely related to Columbia JVP, as are their national organizations. *Id.* ¶ 64. Columbia SJP and Columbia JVP partner on most, if not all, of their significant events. *Id.* ¶¶ 31, 71. An important example is the November 9, 2023 "Shut It Down For Palestine" event that was jointly organized by the two groups and that led to their suspension by Columbia. *Id.* ¶¶ 119, 124. The groups jointly challenged their suspension in litigation against Columbia. *Id.* ¶¶ 25, 33. Alwan and Jones, the leaders of Columbia SJP and Columbia JVP, exemplify the coordination of their organizations. They both attended "Shut It Down For Palestine." *Id.* ¶ 121. They both elected to serve as the Associational Defendants' representatives in their litigation against Columbia. *Id.* ¶¶ 25, 33. They both attended some of the same meetings with Columbia administrators regarding their organizations' suspension. *Id.* ¶¶ 27–28, 33. Additionally, both Alwan and Jones attended at least one event organized by AMP and another organized by Within Our Lifetime. *Id.* ¶¶ 67, 76.

*Fifth*, CUAD and Khalil also act under the AMP/NSJP umbrella. Following their suspension, Columbia SJP and Columbia JVP jointly began operating through the CUAD name, and Khalil rose to prominence as the organization's spokesman and de facto leader. *Id.* ¶¶ 35, 72–73. When Khalil was arrested in March 2025, Alwan published an op-ed describing him as her "dear friend" for "over a year and a half"—*i.e.*, throughout the entirety of the post-October 7 disruption at Columbia.[17]

*Sixth*, Within Our Lifetime and Kiswani are also part of the AMP/NSJP umbrella and are closely connected to the other Defendants. In 2015, while Kiswani was a law student, she participated in founding the predecessor to Within Our Lifetime in 2015 as New York City Students for Justice in Palestine. *Id.* ¶ 74. In 2018, she changed the organization's name to Within Our Lifetime in a bid to expand its reach beyond students. *Id.* In fall 2023, Within Our Lifetime called for an "emergency protest" when Columbia suspended Columbia SJP and Columbia JVP. *Id.* ¶ 124. In March 2024, after the suspended organizations began operating through the CUAD name, Within Our Lifetime and CUAD cohosted the "Resistance 101" event at Columbia, where Kiswani was a speaker. *Id.* ¶¶ 131–36. In April 2024, Within Our Lifetime directed non-students to attend the "Encampment" at Columbia, which Kiswani personally attended. *Id.* ¶ 144. In November 2024, CUAD and Within Our Lifetime cohosted another event at Columbia (again attended by Kiswani), where materials urged attendees to "join and follow" CUAD, Columbia SJP, and Columbia JVP. *Id.* ¶ 174. CUAD and Within Our Lifetime also both promoted an event

---

[17] Maryam Alwan, *Mahmoud Khali is my friend. Columbia targeted him, then the U.S. government abducted him.*, Columbia Spectator (Mar. 13, 2025), https://www.columbiaspectator.com/opinion/2025/03/13/mahmoud-khalil-is-my-friend-columbia-targeted-him-then-the-us-government-abducted-him/.

on March 5, 2025. *Id.* ¶ 188. When Khalil was arrested, CUAD and Within Our Lifetime jointly organized a protest in his honor at Columbia. *Id.* ¶ 192.

In sum, the Defendants travel in the same circles, go to the same events, and know the same people. Their close interconnections, and their connections to Hamas' propaganda group AMP/NSJP, further support their general awareness of their role in Hamas' enterprise.

### 5. Defendants' Members Include a Violent Criminal With Hamas Connections

Finally, Defendants' general awareness of their role in Hamas' terror organization is further shown by the fact that their membership includes Tarek Bazrouk, an admitted violent antisemitic felon with deep Hamas ties. SAC ¶¶ 212–27. Bazrouk's longtime membership in Within Our Lifetime, his attendance at Defendants' events around New York and near Columbia, and his Hamas connections support an inference of Defendants' general awareness on their own.

More than that, the Court should also accept Plaintiffs' information-and-belief allegations that Defendants coordinate with Hamas through Bazrouk and others like him. *Id.* ¶¶ 225–27. A plaintiff may make allegations on information and belief when "the facts are peculiarly within the possession and control of the defendant" or "where the belief is based on factual information that makes the inference of culpability plausible." *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). The allegations that Defendants coordinate through Bazrouk satisfy either prong.

Whether and to what extent each Defendant coordinates with Bazrouk and others like him—and through them, with Hamas—is plainly within Defendants' peculiar knowledge. *See, e.g.*, *Haley v. Tchrs. Ins. & Annuity Assoc. of Am.*, 377 F. Supp. 3d 250, 269 (S.D.N.Y. 2019) (crediting allegations regarding "[t]he investment income that [defendant] earns on its general account" as "information uniquely within [defendant's] possession"); *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 432 (S.D.N.Y. 2014) ("Information about how much a coworker is paid would

seem to be precisely the type of information Plaintiffs would not have access to until discovery."). Brazen as they are, Defendants have not publicly explained the mechanisms of their coordination with a foreign terror organization. The details must be learned in discovery. Any contention by the Defendants that they did not coordinate "will be ripe at summary judgment" and can be addressed then. *United States v. Daugerdas*, No. 09-CR-581, 2020 WL 346601, at *5 n.9 (S.D.N.Y. Jan. 22, 2020).

Moreover, the facts Plaintiffs have identified make the inference of culpability plausible. Bazrouk has pleaded guilty in federal court to participating in a violent antisemitic conspiracy with "others known and unknown" to the government. SAC ¶ 223. Bazrouk has boasted of having family in Hamas (it makes him "mad happy"), has traveled to the area, received Hamas propaganda directly to his phone, and had a vast and unexplained trove of cash when he was arrested. *Id.* ¶¶ 220–22. As a longtime member of Within Our Lifetime and a frequent attendee of events organized and promoted by the Associational Defendants, he is also firmly ensconced within Defendants' network. *Id.* ¶¶ 212–19. Although Bazrouk is most closely identified with Within Our Lifetime, he has attended events near Columbia, where one of his violent attacks occurred and where Bazrouk came close to lighting someone on fire (*id.* ¶¶ 215, 217), and he has attended events organized or promoted by each Associational Defendant (*id.* ¶¶ 218). Incredibly, after Bazrouk pleaded guilty, Within Our Lifetime called for Bazrouk to be "freed," claiming that the admitted violent felon was "unjustly" targeted. *Id.* ¶ 224.

These facts, combined with the other allegations in the Complaint, amply support the culpable inference that every Defendants coordinated with Hamas through to Bazrouk and others like him—such as his unnamed co-conspirators. Indeed, courts have credited allegations far less robust than these. *Compare, e.g.*, *Rothstein v. Mahne*, No. 15-CV-3236, 2015 WL 6828061, at *6

(S.D.N.Y. Nov. 5, 2015) (sustaining alter ego claim based on information-and-belief allegations), *with* Amended Complaint ¶¶ 32, 48, 51–52, 55, *Rothstein v. Mahne*, No. 15-civ-3236 (VEC) (S.D.N.Y. filed July 8, 2015); *accord Daugerdas*, 2020 WL 364601, at *4 (crediting information-and-belief allegations that tainted and untainted funds had been "commingled" based on allegations that commingler had a "gap in collections" that allegedly would have necessitated using tainting money, then replacing it with untainted money). This is powerful evidence of Defendants' general awareness of their role in Hamas' enterprise.

Defendants' unsupported efforts to separate themselves from Bazrouk (as to the general awareness element and others) uniformly fail. No Defendant even identifies the correct standard for evaluating information-and-belief allegations, much less attempts to show it is not satisfied here. Defendants' bare contentions that the Complaint does not connect them to Bazrouk and that the Bazrouk allegations do not support an inference of coordination simply ignore the allegations discussed above. Columbia JVP Mem. 9–10, 14, 18, 25; Alwan Mem. 2–3, 6, 9–10, 24 n. 20; Khalil Mem. 7; Jones Letter 2; Kiswani Decl. ¶ 3(f). The Complaint readily supports the inference of culpable conduct. And Defendants' coordination with Hamas through Bazrouk and others like him conclusively establishes their general awareness of their role in Hamas' enterprise.

### 6. Defendants' Contrary Arguments Fail

Defendants' contrary arguments lack merit.

The Court should reject Columbia JVP's contention that general awareness requires that Defendants knew "of their alleged role in the underlying torts" or "in the conduct that harmed Plaintiffs"—in other words, in the specific terror attacks themselves. Columbia JVP Mem. 12; *see also id.* at 15 ("the specific conduct Plaintiffs claim harm them," "the *specific acts* that caused Plaintiffs' injuries"). The law is clear that a defendant "need not be aware of its role in the specific terrorist attack that caused the plaintiff's injury"; rather, it "must be generally aware of its role in

some illegal activity from which the terrorist attack was foreseeable." *Ashley*, 144 F.4th at 438. Columbia JVP's reliance on *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225–26 (2d Cir. 2019) is therefore misplaced. *Siegel*'s finding that the defendant did not "knowingly assume[] a role in AQI's terrorist activities or otherwise knowingly or intentionally support[] AQI" did not relate to general awareness (the second *Halberstam* element), but to state of mind, which is one of several considerations relevant to knowing and substantial assistance (the third *Halberstam* element). 933 F.3d at 225. But "whether the defendant rendered *knowing* assistance is distinct from a defendant's general awareness of its role in a terrorist scheme," and it is "inappropriate" to conflate them. *Ashley*, 144 F.4th at 438, 438 n.12. Alwan's related contention that the Complaint does not allege general awareness because Defendants supposedly did not "provide[] any assistance" fails for the same reason. Alwan Mem. 19. General awareness and knowing and substantial assistance are distinct elements, and the Complaint's allegations of general awareness are sufficient.

Defendants' other efforts to raise the standard for general awareness likewise fail. Columbia JVP selectively quotes *Linde v. Arab Bank*, a pre-*Twitter* case, for the proposition that the defendant must be "aware that, by assisting the principal, it is itself assuming a role in terrorist activities." Columbia JVP Mem. 13 (quoting *Linde*, 882 F.3d at 329–30). But as *Linde* explains elsewhere, the proper standard is that a defendant is "'*generally* aware' that it was . . . playing a 'role' in [the terror group's] violent or life-endangering activities." *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 477) (emphasis added). And to the extent that standard can be read as stricter than the one articulated in *Ashley* ("generally aware of its role in some illegal activity from which the terrorist attack was foreseeable"), it is the post-*Twitter* decision that controls. *Ashley*, 144 F.4th at 438. Finally, although Defendants observe that the D.C. Circuit held that "actual

awareness" is required (Columbia JVP Mem. 13; Alwan Mem. 19), the cited decision merely rejected an argument that recklessness sufficed and did not purport to raise the level of knowledge above *general* knowledge. *See Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 867, n. 11 (D.C. Cir. 2022).

Columbia JVP's argument that the Complaint insufficiently alleges that Defendants had prior knowledge of the attack on October 7 is similarly unavailing. Columbia JVP Mem. 13–14. The terror acts in this case began on October 7 but persisted (and will continue to persist) for so long as Hamas holds its hostages for political leverage. Hamas' hostage-holding was and is open and notorious, and the vast majority of Defendants' challenged conduct took place while these terror attacks were ongoing. Although the Complaint's allegations of foreknowledge strengthen the Complaint, they are not required to show general awareness or any other element. Relatedly, Columbia JVP's contention that Plaintiffs have only alleged "vague, temporal proximity" between Defendants' conduct and Hamas' words of praise for pro-Hamas protests abroad (Columbia JVP Mem. 13) overlooks the detailed allegations discussed above.

Finally, Defendants' cited authorities, all of which arose in the banking context, are readily distinguishable. Among other differences, in none of these cases were the defendant banks expressly told by a terrorist that their banking activities were important to a designated foreign terror organization; in none of them did the banks consciously align themselves with a terror organization; in none of them did the banks repeatedly heed a terror organization's public calls for support; and in none of them did the banks' employees or associates include open sympathizers with a terror organization. *See Siegel*, 933 F.3d at 224–25 (no general awareness where defendant bank provided banking services, not to a terror organization, but to a major bank that had been linked to terrorist organizations, and where defendant bank ceased providing any services ten

months before the terror attack); *Bernhardt*, 47 F.4th at 867–70 (no general awareness where defendant bank provided services to intermediary banks linked to terror groups but defendant was not alleged to be aware of the links); *Linde*, 882 F.3d at 330 (post-trial; general awareness not satisfied as a matter of law, but could be satisfied by record evidence that "could have alerted the bank that the transfers being requested therein were payments for suicide bombings"); *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 166–67 (2d Cir. 2021) (on summary judgment; deeming proposed JASTA claim futile where bank transferred money to entities that provided charitable work and where bank was not told the transfers were for terror purposes).

Finally, as noted, it does not appear that Kiswani or Within Our Lifetime challenges this element. *See* Kiswani Decl. ¶ 3(d).

\* \* \*

Accordingly, the Complaint adequately pleads that Defendants were generally aware of their role in Hamas' overall illegal activity.

### D.    The Complaint Alleges Knowing and Substantial Assistance

Plaintiffs also sufficiently allege knowing and substantial assistance, the final *Halberstam* element. "The 'twin requirements' of 'knowing and substantial assistance' are 'part of a single inquiry designed to capture conscious and culpable conduct.'" *Ashley*, 144 F.4th at 438 (quoting *Twitter*, 498 U.S. at 491). "Both considerations work 'in tandem'—'a lesser showing of one' demands 'a greater showing of the other.'" *Id.* (quoting *Twitter*, 498 U.S. at 491–92).[18] Although "the defendants must have 'aided and abetted the act of international terrorism that injured the plaintiffs,'" "'that requirement does not always demand a strict nexus between the alleged

---

[18] Contrary to Columbia JVP's argument (Columbia JVP Mem. 16), a "strong showing of assistance and scienter" is required only if the challenged conduct is "mere passive nonfeasance." *Twitter*, 498 U.S. at 500. Although Plaintiffs make that showing, this case is about Defendants' actions, not their inaction, so the ordinary sliding-scale approach applies.

assistance and the terrorist act,'" and "the defendant need not have known 'all particulars of the primary actor's plan.'" *Raanan*, 2025 WL 605594, at *18 (quoting *Twitter*, 498 U.S. at 497, 495). "[W]hile a 'close nexus' between the assistance and the tort might present a more straightforward case of aiding-and-abetting liability, 'even more remote support can still constitute aiding and abetting in the right case.'" *Id.* (quoting *Twitter*, 598 U.S. at 496).

Defendants' liability follows from established principles of secondary liability. As numerous authorities confirm, the aider and abettor's assistance can take the form of services. These can include banking services, such as wire transfers and cash deposits; *see Kaplan*, 999 F.3d at 850, 866–67; "cryptocurrency transaction services," *Raanan*, 2025 WL 605594, at *22; "logistical support," *Zobay*, 695 F. Supp. 3d at 349; and even after-the-fact "secretarial work," including typing letters, record-keeping, and depositing money in a bank account, *Halberstam*, 702 F.2d at 475.

Despite Defendants' protests, the aider and abettor's assistance may also take the form of speech, advice, and encouragement. Aiding and abetting "come[s] in many forms, including inducing encouraging, soliciting, or advising the commission of the offense, such as through words of encouragement or driving the getaway car." *Twitter*, 598 U.S. at 490; *accord Rosemond v. United States*, 572 U.S. 65, 73 (2014) (stating that the term "aiding and abetting . . . 'comprehends all assistance rendered by words, acts, encouragement, support, or presence'" (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993)). In other words, "moral support" counts. Restatement (Second) of Torts § 876, comment *d* ("Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance.") (cited by *Twitter*, 498 U.S. at 492). For that reason, simply "giving verbal encouragement (such as yelling 'Kill him!') could be

substantial assistance." *Twitter*, 598 U.S. at 492 (citing *Halberstam*, 705 F.2d at 481). And the Supreme Court specified that liability might well lie under JASTA if a defendant "consciously and selectively chose to promote content provided by a particular terrorist group." *Id.* at 502.

Defendants' conduct supports liability under each of these rationales. Their acts are particularly useful to Hamas because they are intentionally designed to shift pressure away from Hamas and onto Israel to assist Hamas' goal of prolonging their terrorist act of holding hostages and evading consequences for October 7. Because the acts that assisted Hamas' terror attacks also demonstrate scienter, the analysis proceeds first by showing the substantial nature of the assistance and then by showing the high degree of scienter.

### 1. Defendants Provided Substantial Assistance

Each of the six substantiality factors synthesized by *Halberstam* supports liability. *See Ashley*, 144 F.4th at 435–36.

### (A)    Nature of the act assisted

Courts begin their analysis with this factor because "[t]he nature of the act involved dictates what aid might matter." *Halberstam*, 705 F.2d at 484. The more blameworthy the act aided, the less substantial the assistance needs to be. *See Zobay*, 695 F. Supp. 3d at 349. Here, the acts assisted are Hamas' kidnapping and murder of Iris's parents, terror acts spanning October 7, 2023 to June 5, 2025, and the military engagements between Hamas and Doe, Roe, and Moe's brother between October 7, 2023 and at least October 7, 2024. SAC ¶¶ 13–16, 86–88. As these crimes are "extraordinarily blameworthy, even relatively trivial aid could count as substantial." *Zobay*, 695 F. Supp. 3d at 349.

### (B)    Amount and kind of assistance

Defendants' assistance took the form of extensive pro-Hamas propaganda services. These services included public statements of support that encouraged and advised Hamas to commit and

continue its terror acts; the distribution of Hamas content designed to sway public opinion in favor of Hamas committing and continuing its terror acts; and organizing and hosting rallies and disruptions designed to increase public support for Hamas' acts of international terrorism. In effect, Defendants "consciously and selectively chose to promote content provided by a particular terrorist group." *Twitter*, 598 U.S. at 490. Defendants not only amplified Hamas' message on social media, as contemplated by *Twitter*, but they also did so on Columbia's campus and in the streets of New York.

*Encouragement and advice*. Defendants' propaganda services included publicly providing Hamas with advice and encouragement to commit and continue their terror acts. The Complaint identifies five clear examples: two by Columbia SJP, one by Within Our Lifetime, one by Kiswani, and one by CUAD.

On October 7, Columbia SJP signed a statement reading, "We support the resistance, we support the liberation movement, and we indisputably support the Uprising. . . . Glory to Palestine, glory to the resistance, and glory to our martyrs." SAC ¶ 102; *see id.* ¶ 104. The same day, Within Our Lifetime declared that it "support[s] Palestinian resistance in all forms. By any means necessary. With no exceptions and no fine print." *Id.* ¶ 106. Two days later, Columbia SJP issued a separate statement of "full solidarity" with the "Resistance." *Id.* ¶ 112. On September 2, 2024, Kiswani said: "A ceasefire is not enough. Hundreds of thousands of Palestinians will not have died in vain. They died in pursuit of liberating our homeland. And we will liberate it, by any means necessary. By any means necessary. . . . If you stand with Palestinians, you stand with Palestinian resistance." SAC ¶ 200. And on October 8, 2024, CUAD stated: "We support liberation by any means necessary, including armed resistance . . . violence is the only path forward . . . Long live Palestine, long live the Intifada, and long live the Resistance." SAC ¶ 173.

37

Although these statements are couched in Defendants' typical euphemisms, their true meaning is transparent. The "resistance," the "Palestinian resistance," and the "armed resistance" are Hamas, and the "Uprising" is the attack that began on October 7. *See supra* Part I.B. So understood, these are statements telling Hamas that its heinous crimes against the Plaintiffs (and countless others) are right, just, and necessary and that it should continue committing crimes to "liberate [our homeland]" "[b]y any means necessary." SAC ¶ 200. They advised and encouraged Hamas to keep Iris's parents hostage and to try to kill or capture Moe, Doe, and Roe's brother. What else could supporting "the resistance," "the Palestinian resistance," "the armed resistance," and "the Uprising" mean except that the speakers believe in Hamas' heinous atrocities and want Hamas to keep at it? And what else can "[b]y any means necessary," "[w]ith no exceptions and no fine print," and "violence is the only path forward" mean except that *all* of Hamas' tactics are legitimate and should be continued?

*Distributing and promoting Hamas content.* Defendants' propaganda services also included consciously and selectively promoting Hamas content. The Complaint identifies numerous examples of Defendants distributing pro-Hamas propaganda material that contains Hamas' own words, Hamas imagery, or both.

The most shocking example is the most recent one alleged in the Complaint. In March 2025, CUAD organized a mob that occupied a library at Barnard, with Khalil serving as the primary spokesperson and negotiator for the mob. *Id.* ¶ 189. During the occupation, CUAD disseminated the "Our Narrative" pamphlet bearing the logo "Hamas Media Office." *Id.* ¶ 191. This is literal Hamas propaganda, and it was not an isolated occurrence.

Another example occurred in September 2024 at an event hosted by CUAD and promoted by CUAD and Columbia JVP. At the event, individuals passed out documents containing a

message from "Islamic Resistance Movement – Hamas" and a quote from Hamas' Al-Aqsa Martyrs' Brigades. *Id.* ¶¶ 168–69. The document explained that "[t]his booklet is part of a ***coordinated*** and ***intentional*** effort to uphold the principles of the Thawabit and the Palestinian Resistance movement overall. By transmitting the words of the Resistance directly, this material aims to build popular support for the Palestinian war of national liberation, a war which is waged through armed struggle." *Id.* ¶ 169 (emphasis added). Like the materials discussed above, *see supra* Part I.B, this document further shows that terms like "the Resistance" mean Hamas, as it was Hamas' words that the document "transmit[ted] . . . directly." The Associational Defendants have repeatedly distributed this same pro-Hamas propaganda document. *Id.* ¶ 168.

Other examples of consciously and selectively promoting Hamas material include Columbia SJP posting a propaganda video of Hamas terrorists with the message "These men will never be defeated," *id.* ¶ 162; CUAD distributing a newspaper with the headline "One Year Since Al-Aqsa Flood, Revolution Until Victory" above an image of Hamas terrorists breaching the security fence into Israel, *id.* ¶ 171; Columbia SJP distributing talking points from a deceased senior Hamas official, Ismael Haniyeh, that valorized October 7 as a "moral, military, and political victory," *id.* ¶ 172; Kiswani giving a speech where she read from the will of another former senior Hamas official, Yahya Sinwar, *id.* ¶ 175; and CUAD publishing a "A Tribute to Yahya Sinwar" that lionized the former terror leader and called upon CUAD's members to treat him as a role model, *id.* ¶ 176.

*Rallying support for Hamas.* Defendants' conduct also included organizing numerous demonstrations and protests that rallied support for Hamas and provided cover to commit and continue its terror attacks. As explained, the Complaint alleges an unmistakable pattern of call-and-response between Hamas and its affiliates and the Defendants. The conduct began on October

7, when Hamas called for a "Day of Rage" on October 12, which Defendants organized and attended. *Id.* ¶¶ 91, 109–14 (Columbia SJP, Columbia JVP, Within Our Lifetime, Alwan, Khalil). The pattern continued numerous times, including in late October 2023, *id.* ¶¶ 115–17 (Columbia SJP and Columbia JVP); November 2023, *id.* ¶¶ 118–19 (CUAD, Columbia SJP, Columbia JVP, Alwan, Jones); December 2023, *id.* ¶ 128 (Columbia SJP and Columbia JVP); March 2024, *id.* ¶¶ 201–08 (Within Our Lifetime); January 2025, *id.* ¶¶ 180–81 (CUAD); February 2025, *id.* ¶ 184 (CUAD); and March 2025, *id.* ¶¶ 187–88 (CUAD, Khalil).

Defendants also organized and promoted numerous other events that rallied support for Hamas, including a rally in October 2023, *id.* ¶ 114 (Columbia SJP, Alwan); a rally November 2023, *id.* ¶ 124 (Within Our Lifetime); "Resistance 101" in March 2024, *id.* ¶¶ 131–36 (CUAD, Within Our Lifetime, Kiswani, Alwan, Jones); the "Encampment" in April 2024, *id.* ¶¶ 138–55 (all Defendants); "Strike4Gaza" in April 2024, *id.* ¶¶ 201–208 (Within Our Lifetime); another "Day of Rage" in June 2024, *id.* ¶¶ 209–11 (Within Our Lifetime, Columbia JVP); a press conference in June 2024, *id.* ¶ 165 (CUAD); "Study In4Palestine" in September 2024, *id.* ¶¶ 168–69 (CUAD, Columbia JVP); an exhibition in November 2024, *id.* ¶¶ 174–75 (CUAD, Within Our Lifetime, Kiswani); occupying a building in February 2025, *id.* ¶¶ 185–86 (CUAD, Columbia SJP); and a rally in March 2025, *id.* ¶¶ 188–91 (CUAD, Within Our Lifetime, Khalil).

These events were characterized by pro-Hamas, pro-October 7, and antisemitic sentiments. For example, rallygoers at "Shut It Down For Palestine" in October 2023 chanted a slogan associated with Hamas, "From the river to the sea, Palestine will be free"; others yelled "Death to Jews" and other hateful slogans. *Id.* ¶¶ 121, 120. Alwan has described how the university administration "resist[ed]" their so-called "advocacy efforts" at this event—her example was that an administrator stood next to individuals holding a poster saying "no ceasefire until the hostages

are returned and hamas is destroyed." *Id.* ¶ 122. Put differently, Alwan apparently believes that advocating for the release of hostages like Iris's parents and the destruction of an infamous terrorist organization is a bad thing.

As another example, at the Resistance 101 event in March 2024, one speaker told the audience that it was important to support Hamas because Hamas took the necessary actions to liberate Palestine. *Id.* ¶ 135. The speaker stated: "There is nothing wrong with being a member of Hamas, being a leader of Hamas, being a fighter in Hamas, these are the people that are on the front lines defending Palestine and fighting for its liberation." *Id.*

At the Encampment in April 2024, leaders lauded the "Al-Aqsa Flood"—*i.e.*, October 7—"that put the Global Intifada back on the table again," one rallygoer yelled, "Never forget the 7th of October!" and "7th of October is going to be every day for you!," and others declared that that Jewish Columbia students were "Al-Qassam's Next Target." *Id.* ¶¶ 148, 145. Similarly, during the June 2024 Day of Rage, rioters waved Hamas Al-Qassam Brigade flags and shouted, "Long live October 7" and "Long live the intifada." *Id.* ¶ 210.

As a final example, the leader of the June 2024 press conference demanded the freedom of individuals convicted of materially supporting Hamas and exhorted the audience to "continue escalating in our tactics. *Id.* ¶ 165.

### (C)  Presence at the time of the tort

Consistent with the Supreme Court's guidance not to treat the *Halberstam* factors as "inflexible codes," the "presence at the time of the tort" factor is properly analyzed in a practical sense. *Twitter*, 598 U.S. at 497; *cf. Zobay*, 695 F. Supp. 2d at 350 (noting that presence can be understood "in a transactional sense"). Here, the correct question is whether Hamas heard Defendants' encouragement or received the benefit of its propaganda services in the commission

of its crimes against the Plaintiffs—the kidnapping and murder of Iris's parents and the armed engagements with Doe, Roe, and Moe's brother.

Hamas heard loud and clear. As explained, at the Resistance 101 event, a Hamas surrogate told Defendants that their "work" was "so important" to Hamas' efforts to "defeat Israel."[19] The surrogate publicly echoed those sentiments a week later. SAC ¶ 137. Hamas and its allies also repeatedly expressed gratitude to Americans for fomenting domestic disruptions. *Id.* ¶¶ 115, 118. One senior Hamas leader "thank[ed] everyone who supported us with words, pens, voices, images, marches, demonstrations," which is some of the very conduct Plaintiffs challenge in this case. *Id.* ¶ 158. Another Hamas leader was enthused that "the slogan of American students" was Hamas' own slogan, "Palestine from the River to the Sea." *Id.* ¶ 130. And the "Encampment" episode, in which all Defendants played an important role, drew extensive public praise from Hamas and its allies. *Id.* ¶¶ 154, 156–58.

Hamas terrorists echoed those sentiments to their own victims, utilizing these sentiments to wage further psychological warfare against them. While Plaintiff Shlomi Ziv was held hostage, his Hamas captors showed him a news report with stories and pictures of the Columbia protests and the Encampment and boasted, "You see we have our own people everywhere." *Id.* ¶ 141. Shlomi's captors also told him that Hamas has an "army" operating out of Gaza that focuses specifically on media and sending Hamas propaganda and messaging throughout America and all around the world. *Id.*

---

[19] SAC ¶ 134; *see see* x.com, @thestustustudio, https://x.com/thestustustudio/status/1772064333251449067 (Mar. 24, 2024), embedded video at 1:16:56–1:17:32.

### (D)     Defendants' relationship to Hamas

For all the reasons explained above, Defendants have a close relationship to Hamas. They have repeatedly heeded Hamas' calls for disruptions abroad; they are closely associated with Hamas' domestic propaganda firm, AMP/NSJP; they have handed out Hamas propaganda; they have advocated for Hamas' goals; they have issued statements in support of Hamas and October 7; and they count among their ranks a violent criminal with significant Hamas connections.

### (E)     Defendants' state of mind

Defendants acted with a highly culpable state of mind: intending to support Hamas in the commission of its crimes against Iris's parents and Doe, Roe, and Moe's brother. Yelling "Kill him!" to an assailant poised to attack is both an act of assistance and ironclad evidence of a blameworthy state of mind. The same is true here. Defendants publicly declared their support for Hamas and advised and encouraged Hamas to proceed "by any means necessary," which includes continuing and committing further terror acts against Iris's parents and Doe, Roe, and Moe's brother. SAC ¶¶ 102, 104, 112, 200, 173. Defendants' culpable state of mind is further shown by their implementation of the Toolkit, an unabashedly pro-Hamas and pro-October 7 document. *See supra* Part II.C.3.

### (F)     Duration of assistance

Defendants rendered their assistance for an extraordinary length of time. Their assistance began no later than October 7, 2023 (and possibly a short time before) and continued for the entire period that Iris's parents were held hostage (through June 5, 2025) and for the time that Doe, Roe, and Moe's brother were engaged with Hamas (as late as October 7, 2024, in the case of Moe's brother).

* * *

Defendants thus rendered substantial assistance to the terror crimes alleged in this case.

## 2. Defendants' Assistance Was Knowing

Finally, for all the reasons previously explained, Defendants' assistance was knowing. Although it is not required for liability under the Antiterrorism Act, the allegations in the Complaint support the inference that Defendants' intended to assist Hamas' crimes. For the entire period Defendants rendered their aid, Hamas' terror crimes were open and notorious. Reports of Hamas' brutal crimes and kidnappings emerged as the attacks proceeded,[20] and the Toolkit itself announced that Hamas had taken hostages and was fighting Israeli soldiers. SAC ¶ 95. The Toolkit also amplified Hamas' call for public demonstrations on October 12, which Defendants willingly provided. *Id.* ¶ 109. With full knowledge of Hamas' atrocities, the Defendants declared their complete support for Hamas to commit and continue its acts. *E.g.*, *id.* ¶¶ 101–06, 128. Month after month, Defendants repeatedly responded to public calls for disruptions from Hamas and its allies. *E.g.*, *id.* ¶¶ 109, 115–19, 201–08. Defendants were told in public and in private that Hamas valued Defendants' aid, and Defendants continued to provide it. *E.g.*, *id.* ¶¶ 128, 130, 134, 137. There is no doubt that Defendants knowingly (in fact, intentionally) aided Hamas in committing its crimes.

\* \* \*

In short, Defendants consciously, voluntarily, and culpably participated in Hamas' kidnapping and murder of Iris's parents and the military engagements between Hamas and Doe, Roe, and Moe's brother. Defendants are therefore liable for aiding and abetting Hamas' crimes. *See Twitter*, 598 U.S. at 493. To the extent that finding Defendants liable here would also support their liability for Hamas' crimes against other victims, Plaintiffs satisfy the requirements of the

---

[20] *See, e.g.*, The Guardian, "Hundreds die and hostages held as Hamas assault shocks Israel," https://www.theguardian.com/world/2023/oct/07/israel-strikes-back-after-massive-palestinian-attack (Oct. 7, 2023); NBC News, "'We are in a war,' Netanyahu says after Hamas launches surprise attack," https://www.nbcnews.com/news/world/israel-says-palestinian-militants-are-infiltrating-gaza-rcna119315 (Oct. 7, 2023).

"near-common enterprise" principle discussed in *Twitter*. 598 U.S. at 502, 496. Defendants' role in Hamas' enterprise was so systemic that they can properly be held liable for all of Hamas' foreseeable terror crimes, which includes the crimes against the U.S. Plaintiffs. *See id.*

### 3. Defendants' Contentions Lack Merit

Defendants' arguments that they did not provide knowing and substantial assistance fail.

Columbia JVP's unsupported contentions that Plaintiffs allege neither substantial assistance nor knowing assistance merit little attention. Columbia JVP Mem. 16–17. These considerations are correctly analyzed above and support liability under established aiding-and-abetting principles.

To the extent Defendants argue that their assistance must be somehow "tangible," or must have an "impact . . . on Hamas' ability or willingness to use military force," they are wrong. Columbia JVP Mem. 17, 18; Alwan Mem. 20. Despite Defendants' insistence that *Twitter* precludes liability, the decision expressly recognizes that services, speech, and encouragement can aid and abet a terror act, *see supra* Part II.D, and the Supreme Court's considered observation that JASTA could encompass "consciously and selectively ch[oosing] to promote content provided by a particular terrorist group" fairly captures the sweep of the statute. *Twitter*, 598 U.S. at 490. Under these principles, encouraging Hamas to proceed by "any means necessary," promoting Hamas content, and rallying support for Hamas is actionable conduct. Alwan's observation that New York City is physically removed from Gaza is beside the point. Alwan Mem. 20. Hamas has repeatedly asked for mass mobilization services and has publicly and privately explained to Defendants how valuable those services are. *E.g.*, SAC ¶¶ 134, 137. Even if there were some requirement that Defendants' conduct have an impact on Hamas' willingness to continue holding hostages or

continue to fight Israeli soldiers, Hamas' expressions of gratitude permit the reasonable inference that Defendants' conduct had that exact impact.[21]

Alwan's scienter arguments also fail. *First*, contrary to her argument that Defendants must have the "specific intent of furthering Hamas' terrorist acts abroad," Alwan Mem. 21, *Twitter* establishes a sliding-scale approach to scienter and assistance under which that intent is not always required. *See Ashley*, 144 F.4th at 438. Although Plaintiffs' allegations of scienter do show intent, that is not required to state a claim. *Second*, it would be error to accept Alwan's contention that Defendants were motivated to protest an "unfolding humanitarian crisis." Alwan Mem. 21. Defendants have publicly declared their support for Hamas, handed out Hamas propaganda, engaged in a public and private interchange with Hamas and its allies, and repeatedly answered Hamas' calls for rallies. At this juncture, Plaintiffs are entitled to reasonable inferences, and the allegations in the Complaint, considered together, support an "inference of wrongful conduct." *Winnick*, 406 F. at 258. *Third*, allegations that Defendants sought to sway public opinion against Israel in no way undermine their intent to further Hamas' terror crimes. As the Complaint explains, those goals work together. Hamas intentionally commits terror acts to provoke a response from Israel that, Hamas hopes, it can misrepresent so that the public will blame Israel, not Hamas. SAC ¶¶ 3–4. *Fourth*, Plaintiffs have sufficiently alleged that Defendants aided and abetted the specific crimes at issue and not merely aided Hamas writ large. *See supra* Part II.D.

---

[21] Defendants' cases are not to the contrary. *See Siegel*, 993 F.3d at 225 (banking case; no knowing and substantial assistance where defendant bank transferred funds to an intermediary bank, there were plausible allegations the terror organization received the funds or that the defendant knew or intended that the funds would reach the terror organization, and the bank ceased transacting business with the intermediary ten months prior to the terror attack); *United States v. Delgado*, 972 F.3d 63, 75, 77 (2d Cir. 2020) (acknowledging that encouraging a crime is itself a criminal act and overturning a conviction because the defendant was merely present during the planning and commission of a crime); *Heldman on Behalf of T.H. v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992) (discussing requirements for Article III standing and finding them satisfied).

Alwan's remaining arguments under this element (Alwan Mem. 22–25) sound in the First Amendment and are discussed below. *See infra* Part V.

Khalil's arguments under this element are similarly meritless. Khalil Mem. 15–19. Khalil's role in Defendants' conduct is detailed above and supports liability. Khalil led Columbia SJP's October 12 "Day of Resistance," which was held on the day Hamas requested and given a name closely paralleling Hamas' proposed "Day of Rage" name. SAC ¶¶ 109–10, 113. Khalil led the March 2025 CUAD event at which CUAD handed out the Hamas "Our Narrative" document. *Id.* ¶¶ 189–91. He served as the public face of the Encampment, an event characterized by pro-Hamas rhetoric and a visit from a senior AMP/NSJP official with Hamas connections, and a propaganda affair that Hamas and its allies later praised. *Id.* ¶¶ 138–58. And Khalil was the leader of CUAD (*id.* ¶ 35), an organization that publicly announced its support of Hamas and encouraged and advised Hamas to commit and continue terror acts against Plaintiffs (*id.* ¶ 173); that handed out Hamas propaganda (*id.* ¶ 168–69, 189–91); that held rallies at Hamas' behest (*e.g.*, *id.* ¶¶ 118–19, 180–81, 184, 187–88); and that hosted a Hamas surrogate that told Defendants their "work" was important to Hamas (*id.* ¶ 134).

Additionally, contrary to Khalil's assertion (Khalil Mem. 18), the Court should accept the Complaint's allegation that Khalil operated CUAD's social media account. Whether Khalil operated CUAD's social media account is information peculiarly within Defendants' control, and Plaintiffs' belief that Khalil did so is based on information that makes the "inference of culpability plausible." *Arista Recs.*, 604 F.3d at 120. Khalil led a pro-Hamas organization in its highest-profile efforts; he also personally led a rally on October 12 after Hamas called for a rally on that very day. It is reasonable to infer that Khalil also had a hand in the pro-Hamas propaganda on CUAD's social media account.

Khalil's arguments arising from the merits of habeas petition are futile attempts to distract the Court. Khalil Mem. 16. Another court's determinations regarding Khalil's actions and their impact on U.S. foreign policy are wholly irrelevant to this Court's analysis of whether Khalil aided and abetted the terror crimes that injured the Plaintiffs. This action and the habeas action are completely distinct, and Khalil's attempts to inject the facts of his ongoing habeas litigation here should be rejected.

Finally, Kiswani's challenges to knowing and substantial assistance fail for all the reasons given above. Kiswani Decl. ¶ 3(d).

### E.        No Separate Showing of Causation is Required

Contrary to Defendants' arguments, JASTA does not impose a separate requirement that the aider and abettor cause or proximately cause the plaintiff's injury. Khalil Mem. 20–22; *see* Columbia JVP Mem. 11, 13; Kiswani Decl. ¶ 3(d). Although the statute requires an injury "by reason of" an international terror attack, 18 U.S.C. § 2333(a), the Plaintiffs' injuries in Hamas terror attacks satisfy that requirement. *See supra* Part II.B. An aider and abettor's liability is addressed through the analysis set forth in *Twitter*, which does not require proximate cause. *See Twitter*, 598 U.S. at 597; *see also, e.g.*, *Raanan*, 2025 WL 605594, at *18–*24 (sustaining JASTA claim because *Halberstam* elements were satisfied without requiring proximate cause). The abettor's connection to the attack is principally measured through the requirement of knowing and substantial assistance, which is satisfied for the reasons discussed above.

As Defendants' authorities show, proximate cause is required only for claims that a defendant is directly liability for a terror attack. Khalil's lead authority, *Owens v. BNP Paribas, S.A.*, involved claims of direct and secondary liability, and its proximate cause discussion solely applied to direct liability claims. 897 F.3d 266, 276 (D.C. Cir. 2018). Although the secondary liability claim failed under the pre-JASTA rule that categorically precluded it, *Owens* explained

48

that if a JASTA claim had been available, then the plaintiff would not need to satisfy the elements of a direct liability claim. *See id.* at 276–77 ("If aiding and abetting liability were available under the ATA, BNPP would not need to satisfy any of the ATA's elements to be held liable for Plaintiffs' injuries. Instead, BNPP would be liable for al Qaeda's acts of international terrorism, so long as BNPP 'knowingly and substantially assisted the principal violation' of the ATA by al Qaeda and was 'generally aware' of its role as part of al Qaeda's illegal activities when providing that assistance."). *Owens* thus shows that the aider and abettor need not proximately cause plaintiff's injuries.

Khalil's other authority is consistent with *Owens*. Most of his cases involve only direct liability claims and are therefore inapposite.[22] In the handful of decisions that involve both direct and aiding-and-abetting liability, the court required proximate cause only for the former. For example, in *Crosby v. Twitter, Inc.*, the plaintiffs sought to hold a social media platform liable for a mass shooting in Florida committed by a "self-radicalized" individual who saw terrorist material online, and the court's causation discussion applied only to the direct liability claim. 921 F.3d 617, 619, 622–26 (6th Cir. 2019). The aiding-and-abetting claim failed because there was no act of international terrorism (it was domestic) and because a foreign terror organization did not commit

---

[22] *See Fields v. Twitter, Inc.*, 881 F.3d 739, 743–44 (9th Cir. 2018) (standards for direct liability claims); *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 389, 396 (7th Cir. 2018) (direct liability case where "ordinary tort requirements of fault, state of mind, causation, and foreseeability must be satisfied," and where even plaintiff's "theory of conspiracy liability" was "premise[d] on . . . primary liability" (internal quotation marks omitted)); *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1307 (S.D. Fla. 2018) (direct liability case decided under the pre-JASTA rule that "secondary liability is not supported under the ATA"); *In re Terrorists Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 516 (S.D.N.Y. 2010) (pre-JASTA claim where "only primary liability is available"), *aff'd sub nom. In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 548 (E.D.N.Y. 2012) (noting that the aiding and abetting claim had been dismissed on the pleadings); *see also Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 497 (E.D.N.Y. 2012) (applying the rule that "the ATA does not allow for secondary-liability claims").

the attack (it was a "lone wolf"). *See id.* at 626–27. The Plaintiffs in this case, by contrast, were injured in Hamas' acts of international terrorism. *Cain v. Twitter Inc.* is much the same: the case involved both direct liability and aiding-and-abetting claims, and the proximate cause discussion cited by Khalil applies only to the direct liability claim. *See* No. 17-CV-2506, 2018 WL 4657275, at *2 (N.D. Cal. Sept. 24, 2018). The aiding-and-abetting claim failed because the defendant social media platform (unlike the Defendants here) did not "encourage[] [the foreign terror group] to carry out these attacks or even kn[o]w about them before they occurred."

Finally, Khalil's reliance on *Ashley* is misplaced. The sentence Khalil quotes ("Plaintiffs do not allege that [the defendant bank] directly aided the [terrorist group] in carrying out the bombings," Khalil Mem. 22) comes from the court's discussion of knowing and substantial assistance, underscoring the fact that there is no proximate cause requirement. *Ashley*, 144 F.4th at 440. Moreover, *Ashley* is plainly distinguishable on its facts. The defendant bank did not provide services to the terror organization, but rather to an intermediary manufacturer whose products were used by the terror group to make bombs, and there was no showing that the bank was consciously trying to assist the terror group's bomb attacks. *See id.* Here, Defendants' encouragement and services were provided directly to Hamas, and Defendants' words and conduct show that they were trying to assist Hamas in its attacks on the Plaintiffs.

### F.    The Individual Defendants Are Personally Liable

The Individual Defendants are personally liable under the Antiterrorism Act. *See* Alwan Mem. 25–27; Jones Letter 1–2. As Alwan acknowledges (Alwan Mem. 25), "a corporate officer who commits or participates in a tort, even if it is in the course of his duties on behalf of the corporation, may be held individually liable." *In re A.N. Frieda Diamonds, Inc.*, 633 B.R. 190, 204 (S.D.N.Y. 2021) (quoting *Bano v. Union Carbide Corp.*, 273 F.3d 120, 133 (2d Cir. 2001)) (internal quotation marks omitted). Numerous cases sustain claims against individuals for wrongs

they committed as leaders of their organizations. *See, e.g.*, *Trans-Radial Sols., LLC v. Burlington Med., LLC*, No. 18-CV-656, 2019 WL 3557879, at *5 (E.D. Va. Aug. 5, 2019) (sustaining claims against defendant corporation's CEO, who, among other things, "formed" the corporation and "personally directed and/or engaged" in the corporation's tortious conduct); *Revolon Monterey Energy LLV v. Operator*, No. 13-CV-7048, 2014 WL 12576644, at *5 (C.D. Cal. Sept. 18, 2014) (plaintiff "adequately plead[ed] that [individual defendant] is individually liable for the actions he took while acting as manager/president" of the defendant corporations because "[a]s manager, president, and owner of the [corporate defendants], it is plausible that [he] occupied a prominent position in the companies and had extensive control and knowledge over their affairs" (citing *Iqbal*, 566 U.S. at 678 (2009)).

Alwan's conduct meets this test. Contrary to Alwan's arguments, Plaintiffs do not seek to hold Alwan liable merely because she led Columbia SJP as a general matter. Rather, Alwan was a leader in the conduct alleged in the Complaint—indeed, she has been publicly recognized for her leadership. SAC ¶ 24. She is therefore properly charged with the misconduct alleged as against Columbia SJP. Beyond that, the Complaint alleges several examples of Alwan's individual conduct. On October 7, Hamas publicly called for its supporters abroad to participate in a "Day of Rage" support on October 12, and Alwan duly attended a protest on October 12. *Id.* ¶ 114. In March 2024, Alwan was reportedly suspended for her involvement in the Resistance 101 event where a Hamas surrogate told the attendees how important their "work" was to Hamas. *Id.* ¶¶ 131–36. Shortly after that event, Alwan participated in the "Encampment" and was arrested for her efforts. *Id.* ¶¶ 138–155. Afterward, Hamas and its allies publicly lauded the Encampment. *Id.* ¶¶ 156–58. As explained above, these are actionable, pro-Hamas services.

To the extent the other Individual Defendants join Alwan's argument, their contentions fail for the same reasons. Each had a leadership role in the conduct alleged, not merely in their organizations. *Id.* ¶¶ 22, 75, 106, 132, 175 (Kiswani); *id.* ¶¶ 32–33, 155 (Jones); *id.* ¶¶ 35, 113, 143, 173, 189–90 (Khalil). It is therefore permissible to hold each responsible for the conduct of their organizations. The Complaint also alleges misconduct in ways other than leading their organizations, further supporting individual culpability. *Id.* ¶¶ 151, 194–200 (Kiswani); *id.* ¶¶ 67, 76, 121, 136, 155 (Jones).

## III.    The Alien Tort Statute Claims Withstand Defendants' Arguments

The Complaint withstands Defendants' challenges to Plaintiffs' claims under the Alien Tort Statute. *See* Columbia JVP Mem. 29–31; Alwan Mem. 27; Khalil Mem. 23–24; Kiswani Decl. ¶ 3(e).

Plaintiffs properly pled that Defendants aided and abetted Hamas' crimes against humanity in violation of the law of nations. This is sufficient to confer this Court with subject matter jurisdiction over Plaintiffs' claims under the Alien Tort Statute. To state a claim, a plaintiff must plead that: (1) he is an alien; (2) the claimed damages stem from a tort only; and (3) the defendant committed the tort in violation of the law of nations or of a treaty of the United States. 28 U.S.C. § 1350; *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 242–43 (2d Cir. 2003). Defendants do not dispute that Plaintiffs have properly pled they are aliens who suffered damages in tort. Rather, Defendants (1) suggest, without actually arguing, that aiding and abetting crimes against humanity might not be an actionable norm, (2) argue that Plaintiffs fail to sufficiently allege aiding and abetting liability, and (3) argue that Plaintiffs' allegations fail to allege sufficient conduct that touches and concerns the United States. Each of these arguments fail.

### A.    Aiding and Abetting Crimes Against Humanity Is an Actionable Norm

The Complaint alleges that Defendants aided and abetted Hamas' crimes against humanity. The Defendants do not meaningfully dispute that this is an actionable norm. Nor could they. The Second Circuit has recognized both crimes against humanity and aiding and abetting liability as actionable norms. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.* (*Talisman II*), 582 F.3d 244, 256 (2d Cir. 2009) (crimes against humanity); *Khulumani v. Barclay Nat'l Bank, Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) (per curiam) (aiding and abetting). Crimes against humanity include "murder, enslavement, deportation or forcible transfer, torture, rape or other inhumane acts, committed as part of a widespread or systemic attack directed against a civilian population." *Talisman II*, 582 F.3d at 257. "To be a crime against humanity, the emphasis must not be on the individual but rather on the collective—the individual is victimized not because of his or her individual attributes but because of membership in a targeted civilian population." *Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 275 (E.D.N.Y. 2007) (citing Article 7 of the Rome Statute of the International Criminal Court). The kidnapping and detention of civilians as hostages violates the laws of war and is likewise an independent, universal norm that is actionable. *See Kadic v. Karadzic*, 70 F.3d 232, 242 (2d Cir. 1995) (holding "murder, rape, torture, and arbitrary detention of civilians, committed in the course of hostilities . . . have long been recognized in international law as violations of the law of war").

Plaintiffs have sufficiently pled Hamas' actions on and after October 7 constitute crimes against humanity. On October 7, Hamas terrorists attacked southern Israel, murdering, brutalizing, and raping hundreds of Israeli civilians. SAC ¶ 78. They kidnapped and took more than 200 hostages, and tortured, raped, maimed, and subjected them to inhumane conditions. *Id.* ¶ 80. Hamas has used hostages and their bodies as bargaining chips to coerce Israel and its allies into acceding to Hamas' political demands. *Id.* ¶ 81. Since October 7, Hamas has waged continuous

and ongoing acts of terrorism against Israeli civilians, primarily by launching rocket attacks at their homes and communities. *Id.* ¶ 85. Hamas' indiscriminate slaughter and broader terroristic purpose show that its focus was on the collective, not on the individual attributes of the victims. *Id.* ¶¶ 78–80, 90. The Israeli Plaintiffs and their family members were all victims of Hamas' crimes against humanity. *Id.* ¶¶ 17–21.

These are the exact kinds of acts courts routinely recognize as crimes against humanity. No Defendant even attempts to argue otherwise. Indeed, the Second Circuit has held that "attempts to physically exterminate or expel the Jewish residents of Israel" and the "intentional and systemic use of violence against civilians" to do so, including through sustained rocket attacks, "adequately plead acts of genocide and crimes against humanity" that are actionable under the Alien Tort Statute. *Licci v. Lebanese Canadian Bank SAL*, 834 F.3d 201, 213 (2d Cir. 2016). Plaintiffs lost family and friends and have suffered immeasurable pain and suffering as a result of these acts.

Plaintiffs therefore assert an actionable norm.[23]

## B.    Plaintiffs State a Claim Under the Alien Tort Statute

Contrary to Defendants' limited arguments, Plaintiffs sufficiently allege aiding and abetting liability. Columbia JVP Mem. 29–31; Alwan Mem. 27; Khalil Mem. 23; Kiswani Decl. ¶ 3(e). "[A] defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the preparation of the crime, and (2) does so with the purpose of facilitating the commission of that crime." *Talisman II*, 582 F.3d at 259. Plaintiffs

---

[23] Khalil purports to incorporate by reference a challenge made by Columbia JVP to "subject matter jurisdiction." Khalil Mem. 23 (citing Columbia JVP Mem. 29–30). Under no fair reading of Columbia JVP's brief does it challenge subject matter jurisdiction. Rather, in the portion Khalil cites, Columbia JVP assumes that Plaintiffs have identified an actionable norm and argues that Plaintiffs fail to state a claim. To the extent any Defendant challenges whether Plaintiffs have identified an actionable norm, the argument fails for the reasons given above.

sufficiently allege Defendants' domestic conduct provided practical assistance to Hamas and that Defendants acted with the purpose of facilitating Hamas' violations of international law.

### 1. Plaintiffs Satisfy the Conduct Requirement

The Complaint sufficiently alleges practical assistance and a substantial effect on Hamas' crimes against the Plaintiffs. Although no single rationale commanded a majority in *Khulumani*, a majority of the Second Circuit agreed that the conduct requirement can be satisfied, not only through tangible assistance, but also through encouragement and moral support. *See* 504 F.3d at 289 (Hall, J., concurring) (explaining that liability extends to "encouraging, advising, contracting with, or otherwise soliciting a principal tortfeasor to commit an act while having actual or constructive knowledge that the principal tortfeasor will violate a clearly established customary international law norm in the process of completing that act"); *id.* at 277 (Katzmann, J., concurring) (explaining that international law permits liability based on "practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime" (emphasis omitted)). "While the assistance must be substantial, it need not constitute an indispensable element, that is, a *conditio sine qua non* for the acts of the principal." *Presbyterian Church of Sudan v. Talisman Energy, Inc. (Talisman I)*, 244 F. Supp. 2d 289, 324 (S.D.N.Y. 2003) (internal quotations and citation omitted). Conduct that "enable[s]" or "facilitate[s]" the principal's violations suffices. *Licci*, 834 F.3d at 218.

These principles are consistent with aiding-and-abetting liability under the Antiterrorism Act. Indeed, courts properly look to *Twitter* and *Halberstam*, discussed above, for guidance under the Alien Tort Statute. *See, e.g.*, *id.* at 287–88 (Hall, J., concurring) (relying on *Halberstam* to formulate the standard under the Alien Tort Statute); *Jan v. People Media Proj.*, No. 24-CV-05553, 2025 WL 359009, at *6 (W.D. Wash. Jan. 31, 2025) (relying on *Twitter*'s discussion of liability under the Antiterrorism Act to analyze aiding and abetting liability under the Alien Tort Statute).

The Complaint sufficiently alleges conduct under the Alien Tort Statute for the same reasons it does so under the Antiterrorism Act. *See supra* Part II.D.1. Defendants support Hamas by encouraging and advising Hamas to commit its crimes against the Platintiffs and others and by providing propaganda and recruiting services throughout New York City, which provides cover for Hamas to commit and continue its criminal acts. By offering encouragement and moral support, and by swaying public opinion and major academic and economic institutions in the United States against Israel and in Hamas' favor, these acts substantially impacted Hamas' ability to carry out the international law violations that harmed Plaintiffs.

### 2. Plaintiffs Satisfy the Mental State Requirement

Plaintiffs also sufficiently allege that Defendants acted with the purpose of facilitating Hamas' violations of international law. The Second Circuit's decision in *Licci*, 834 F.3d 201, is illustrative. In that case, the court held that the plaintiffs' allegations that the defendant "acted intentionally, and pursuant to its official policy, in assisting Hezbollah in carrying out the rocket attacks by carrying out the wire transfers," combined with allegations that the defendant knew Hezbollah was a violent terrorist organization that carried out terrorist attacks against Israeli civilians and that Hezbollah controlled bank accounts between which the defendant facilitated wire transfers, were sufficient to allege that the defendant acted with the purpose to facilitate Hezbollah's attacks on Israeli civilians. 834 F.3d at 218–19.

Here, Plaintiffs' allegations that Defendants' assistance was "knowing" for purposes of the Antiterrorism Act equally demonstrate that Defendants' purpose was to facilitate Hamas' violations of international law. *See supra* Part II.D.2, II.D.1. In short, with full knowledge of Hama's atrocities on October 7, Defendants declared their complete support for Hamas and advised and encouraged it to commit and continue its attacks. Defendants repeatedly responded to Hamas' public calls for disruptions abroad and handed out literal Hamas propaganda. And Hamas

repeatedly expressed, in public and in private, how much it valued Defendants' services. These

allegations readily demonstrate Defendants' purpose.[24]

### C.    Plaintiffs Allege Sufficient Domestic Conduct

Contrary to Khalil's argument, this case involves a permissible domestic application of the

Alien Tort Statute. Khalil Mem. 23. To avoid the extraterritoriality bar, the plaintiff must establish

that the defendant "took substantial actions domestically that aided and abetted violations of

international law." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013); *accord Doe*

*v. Cisco Sys.* ("*Doe v. Cisco*"), 73 F.4th 700, 736 (9th Cir. 2023), *reh'g and reh'g en banc denied*,

No. 15-16909 (9th Cir. Sept. 3, 2024), *cert. filed*, No. 24-856 (U.S. Jan. 31, 2025). In other words,

the claim under the Alien Tort Statute must "touch and concern the territory of the United States."

*Kiobel*, 569 U.S. at 124–25.

The Second Circuit employs a two-step test for extraterritoriality. "The first step is to

determine whether the 'relevant' conduct—conduct which constitutes a violation of the law of

nations *or aiding and abetting such a violation*—sufficiently 'touches and concerns' the territory

of the United States." *Mastafa v. Chevron Corp.*, 770 F.3d 170, 186 (2d Cir. 2014) (emphasis

added); *accord Doe v. Cisco*, 73 F.4th at 737 (explaining that "conduct within the United States

that constitutes aiding and abetting a violation of international law" supports jurisdiction even if

"the principal's acts occurred abroad" (cleaned up)); *Salim v. Mitchell*, 268 F. Supp. 3d 1132, 1153

(E.D. Wash. 2017) (finding a domestic application where plaintiffs were injured abroad but the

conduct that constituted aiding and abetting occurred in the United States) Thus, in an aiding-and-

---

[24] Defendants' cases are distinguishable. *See, e.g.*, *Talisman II*, 582 F.3d at 264 (on summary judgment, rejecting inference of intent based on "knowledge of [government] abuses coupled only with such commercial activities such as resource development"); *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 401 (4th Cir. 2011) (deeming purpose insufficiently alleged where plaintiffs made only a "cursory allegation" that was "untethered from any supporting facts").

abetting case, only the abettor's conduct need be domestic, and there is no requirement that the plaintiff's injury be sustained within the United States.

"The second step is to make a preliminary determination that the relevant conduct—which the court has determined sufficiently 'touches and concerns' the United States . . . —may in fact be relied upon in establishing jurisdiction." *Mastafa*, 770 F.3d at 186. At step two, a court need only make "a preliminary determination that the complaint adequately states a claim that the defendant . . . aided and abetted another's violation of the law of nations." *Id.* In taking this initial "glimpse" at the merits, the court must apply the same plausibility pleading standard that applies to a court's review of a Rule 12(b)(6) motion to dismiss. *Id.* (citing *Iqbal*, 556 U.S. at 679). Where (as here) the defendant asserts a merits challenge alongside an extraterritoriality challenge, the second step of the extraterritoriality analysis is duplicative.

The Complaint satisfies these standards. As to the first step, Defendants' conduct that abetted Hamas' crimes occurred (and continues to occur) entirely in the United States. Defendants have attacked and disrupted critical academic, economic, and infrastructure centers in New York City, including Columbia University, Barnard College, the Brooklyn Bridge, and the New York Stock Exchange. *E.g.*, SAC ¶¶ 110–11, 119–20, 139, 207. Plaintiffs also allege Defendants have distributed Hamas-created and affiliated propaganda to New York City students and residents. *Id.* ¶¶ 168–69. By doing so, Defendants effectively operate as Hamas' New York City-based public relations arm. SAC ¶ 68. And that conduct was carried out in New York City by Defendants, who are all New York-based organizations and New York residents. Defendants' conduct thus plainly touches and concerns the United States. *See Mastafa*, 770 F.3d at 191 (holding "numerous New York-based payments and 'financing arrangements' conducted exclusively through a New York

bank account" to be sufficient "specific and domestic" allegations that touch and concern the United States).

For the reasons discussed above, step two is also satisfied here. The conduct alleged in the Complaint states a claim against the Defendants for violating the law of nations. *See supra* Part III.B. Khalil's extraterritoriality challenge therefore fails.

## IV.    The *Parizer* Decision Is Distinguishable

The Eastern District of Virginia's recent dismissal without prejudice of claims arising out of October 7 is distinguishable. *See Parizer v. AJP Educ. Found., Inc.*, No. 24-cv-724, 2025 WL 2382933 (E.D. Va. Aug. 15, 2025). In that case, victims of October 7 sued AMP, NSJP, AMP officials and employees, and a New York-based not-for-profit under the Antiterrorism Act and Alien Tort Statute, challenging their provision of propaganda services and cash to Hamas. *See id.* at *1, *9. The court dismissed the Alien Tort Statute claims on extraterritoriality grounds and the Antiterrorism Act claims for failing to allege knowing and substantial assistance, deeming the connection between the plaintiffs' injuries (which occurred on October 7) and the defendants' conduct (which mainly occurred afterward) insufficient. *See id.* at *14–*20 (Alien Tort Statute), *20–*23 (Antiterrorism Act).

*Parizer*'s reasoning is not applicable to this case. *Parizer* found that the plaintiffs were primarily injured in discrete terror attacks that began and ended on October 7, and the court deemed the complaint's allegations that defendants had foreknowledge of the attack insufficient to support jurisdiction or liability. Here, the Plaintiffs include hostages of Hamas and soldiers who fought Hamas after October 7, all of whom who were injured in Hamas terror attacks after October 7. *See supra* Part II.B; *see also* SAC ¶¶ 13–21. The attacks on the hostage Plaintiffs continued for their entire periods of forced captivity and persist to this day for Leo Poe, Ran Gvili, Uriel Baruch, and their families. *Id.* ¶¶ 19–21. There is no question that Defendants knew of Hamas' crimes by

October 8 (if not earlier), yet Defendants have continued to engage in their pro-Hamas propaganda campaigns to this day.[25] The Complaint alleges in detail that Defendants advised, encouraged, and provided cover for Hamas to commit and continue those crimes.[26]

## V.    Defendants' First Amendment Challenges Fail

The Complaint withstands Defendants' First Amendment contentions. Columbia JVP Mem. 17–25, Alwan Mem. 21–23, 27; Khalil Mem. 4–14; Jones Letter 2; Kiswani Decl. ¶ 3(g). Although the Constitution protects wholly independent speech and advocacy in favor of terrorists, it does not protect speech, advocacy, and services addressed to or coordinated with a terror group. The Complaint alleges the latter.

### A.    Defendants Coordinated Their Activities with Hamas

The Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), provides the starting point for the analysis. *Holder* considered pre-enforcement constitutional challenges to a provision of the Antiterrorism Act barring provision of material support to designated foreign terrorist organizations in the form of "training," "expert advice or assistance," "service," and "personnel." *Id.* at 1, 14 (citing 18 U.S.C. § 2339B(a)(1)). By its plain terms, "[t]he statute does not prohibit independent advocacy or expression of any kind." *Id.* at 26. Rather, it "is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *Id.* at 26.

---

[25] *See, e.g.*, City Journal, *This Pro-Palestinian Group Is Defacing New York* (Aug. 26, 2025), https://www.city-journal.org/article/within-our-lifetime-columbia-palestinian-protest (reporting on recent disruptions by Within Our Lifetime, including vandalism, waving a Hezbollah flag, and "implicit[ly] call[ing] for the conquest of Israel").

[26] Additionally, although no pre-October 7 activity is needed in these circumstances, the allegations here are stronger than in *Parizer* as to Columbia SJP, which published a highly suggestive post shortly before October 7, and Kiswani, who repeatedly urged Hamas terror attacks for several years beforehand. SAC ¶¶ 105, 194–99.

The question was whether that prohibition of speech and related services, when coordinated with a foreign terror group, was consistent with the First Amendment.

The Supreme Court held that it was. The crux of its analysis was that any support to a terrorist organization—including to its supposedly legitimate activities—can ultimately advance terrorism by "free[ing] up other resources within the organization that may be put to violent ends." *Id.* at 30; *see also id.* at 32 n.6 (explaining that speech-related services "facilitate[] the group's ability to attract 'funds,' 'financing,' and 'goods' that will further its terrorist acts"). In other words, the "taint" of the organizations' "violent activities is so great that working in coordination with or at the command of the [organizations] serves to legitimize and further their terrorist means." *Id.* at 30. The line drawn in the material support statute was thus deemed constitutional.

Although *Holder* did not answer every speech-and-terrorism question, *see id.* at 39, it established that there is a First Amendment limit to pro-terror speech. As the Second Circuit put it, *Holder* stands for the proposition that "constitutional protection does not extend to . . . advice to foreign terrorist organizations." *Friend v. Gasparino*, 61 F.4th 77, 89 n.4 (2d Cir. 2023) (citing *Holder*, 561 U.S. at 39); *accord United States v. Mehanna*, 735 F.3d 32, 49 (1st Cir. 2013) ("'[A]dvocacy performed in coordination with, or at the direction of,' an FTO is not shielded by the First Amendment." (quoting *Holder*, 561 U.S. at 24)).

 Following *Holder*, several courts have held that providing propaganda and speech services addressed to or coordinated with a terror group are not protected by the First Amendment. In *United States. v. Osadzinski*, the defendant raised a First Amendment challenge to his conviction for creating a computer application that could "rapidly duplicate terrorist propaganda videos online" and sharing it with people he believed to be in ISIS. 97 F.4th 484, 487 (7th Cir. 2024). The Seven Circuit explained that although *Holder* "in no way questioned the right to independently

express personal views . . . about terrorist organizations," "it was equally clear that the right has limits." *Id.* at 492. And one limit is that the First Amendment does not protect "expressive activity that amounts to the provision of material support to a foreign terrorist organization where the support is either addressed to, directed by, or coordinated with that organization." *Id.* (citing *Holder*, 561 U.S. at 26). Because the defendant had coordinated with ISIS, his First Amendment challenge failed. *See id.* at 492–93.

In *Untied States v. Rahim*, the Fifth Circuit considered a First Amendment challenge to the defendant's conviction for serving as an administrator on the "State of Islamic Caliphate" channel on the internet-based Zello application, which was "devoted to disseminating ISIS propaganda and recruiting followers." 860 F. App'x 47, 50 (5th Cir. 2021). The defendant's activities on the channel included recruiting fighters, inciting and counseling others to commit terror attacks, and celebrating ISIS attacks. *Id.* at 50–51. The court rejected the argument that the defendant was "nothing more than a morally corrupt cheerleader" engaging in "idle banter" and "independent advocacy," concluding that that a jury could find that the defendant was attempting to provide himself and others as "personnel" to ISIS. *Id.* at 52–53.

In another case, a defendant was accused of violating the material support statute by posting pro-ISIS propaganda on social media, including an "ISIS video titled 'Jihad Goes on Till the End of Time.'" *United States v. Al Safoo*, No. 18-CR-696, 2025 WL 1331682, at *3, *6 n.4 (N.D. Ill. May 7, 2025). The court rejected the defendant's argument that this conduct was protected by the First Amendment because the defendant was accused of providing these services "to" ISIS, or "in coordination with or at the direction of" ISIS. *Id.* at *20, *21. "The allegations that Defendant engaged in such conduct as a service 'to ISIS' transforms protected 'independent advocacy' into criminal activity under § 2339B." *Id.* at *20; *see also United States v. Mustafa*, 406 F. App'x 526,

530 (2d Cir. 2011) (summary order) (rejecting constitutional challenges to conviction for "creating and maintaining websites that host training manuals and propaganda for jihadist organizations and provide instructions for making explosive devices and other weapons").

Here, even assuming Defendants' conduct qualifies as speech, it is not protected because it was addressed to and coordinated with Hamas and its terror allies. Coordination need not be shown with "direct evidence" of contact with a foreign terror organization. *United States v. Hendricks*, 950 F.3d 348, 354 (6th Cir. 2020). Rather, it is sufficient that the allegations show that the Defendants "acted in a manner consistent with someone who was operating or seeking to operate on behalf of [the terror group]." *Id.* at 353; *see also id.* (stating that this inference, "whether considered individually or in combination" with other evidence, "support[d] the jury's finding that [defendant] and his group operated under the direction or for the benefit of ISIS"). Here, many of the allegations that show misconduct and scienter also show Defendants coordinating with Hamas.

*First*, Defendants repeatedly answered Hamas' calls for disruptions abroad. Three examples are especially clear, two shortly after October 7 and one in April 2024. On October 7, 2023, Hamas called for its supporters abroad to host a "Day of Rage" on October 12. SAC ¶¶ 100, 109–10. The next day, AMP/NSJP amplified Hamas' call, urging Columbia SJP, Columbia JVP, and Within Our Lifetime to participate in a "day of resistance" on October 12, and expressly referring to a call for action by "the Palestinian resistance"—*i.e.*, Hamas. Ex. 3 at 2; SAC ¶ 95. On October 12, Columbia SJP and Columbia SJP held a "Day of Resistance," which Alwan attended and Khalil led. SAC ¶¶ 113–14. Within Our Lifetime dropped the pretense of tweaking Hamas' proposed name and simply called its October 12 event a "Day of Rage." *Id.* ¶ 110. The "Strike4Gaza" episode in in April 2024 was more brazen still: Within Our Lifetime secretly coordinated with another foreign terror organization to establish an "economic blockade" of New

York City infrastructure. *Id.* ¶¶ 201–08. Although these are the clearest examples of addressing activities to and coordinating activities with terror groups, the Complaint alleges numerous other events and disruptions that *all* Defendants organized or attended right after Hamas or an ally called for them. *E.g.*, *id.* ¶¶ 116–19, 128, 130–31, 180–81. These events support a strong inference of coordination. It is irrelevant that the coordination largely happened in the open. The First Amendment does not protect advocacy coordinated with or addressed to a terror group in any form.

*Second*, Hamas indirectly communicated with Defendants outside the public eye through at least one intermediary known to the Plaintiffs. During the Resistance 101 event, a Hamas surrogate informed attendees that his "friends and brothers in Hamas" and other terror groups greatly prized the Defendants' disruptions in New York.[27] *Id.* ¶¶ 132–34. The Defendants' "work," Barakat said, is "so important to the resistance in Gaza"—*i.e.*, to Hamas.[28] This message from Hamas supports a strong inference of coordination. What else could Barakat have meant to convey but that Hamas liked what it saw from the Defendants and wanted more?

*Third*, Defendants are all part of the AMP/NSJP network. AMP/NSJP is the successor organization to former Hamas propaganda and support organizations that were adjudicated in federal court as material supporters of Hamas. SAC ¶¶ 47–54. AMP/NSJP shares leaders and members with its predecessors; some of its leaders maintain close terror connections to this day. *Id.* ¶¶ 55–57. Based on those connections, another court has sustained claims against AMP/NSJP premised on the theory that it is the alter ego of its predecessor organizations. *See Boim*, 2022 WL

---

[27] SAC ¶ 134; *see* x.com, @thestustustudio, https://x.com/thestustustudio/status/1772064333251449067 (Mar. 24, 2024), embedded video at 1:16:56–1:17:32.

[28] SAC ¶ 134; *see see* x.com, @thestustustudio, https://x.com/thestustustudio/status/1772064333251449067 (Mar. 24, 2024), embedded video at 1:16:56–1:17:32.

1556085, at *1–*2. As explained, AMP/NSJP repeatedly amplified Hamas' calls for disruptions, including by sending the Toolkit to the Associational Defendants. *E.g.*, SAC ¶¶ 94, 115–23. It is reasonable to infer that other coordination with Hamas happens through AMP/NSJP as well.

*Fourth*, at least one Defendant (Columbia SJP) has shared content from Telegram channels affiliated with foreign terror organizations, including the "Resistance News Network" and "Resistance Archives." *Id.* ¶¶ 161–62. Another Defendant (CUAD) has amplified calls to action issued through similar pro-terror channels. *Id.* ¶¶ 184, 187–88.

*Fifth*, the Court should credit Plaintiffs' allegations that Defendants coordinated with Hamas through Bazrouk and others like him. *See supra* Part II.C.5. As explained, Bazrouk is a member of Within Our Lifetime and was active in Defendants' events around Columbia and elsewhere in New York. SAC ¶¶ 213–218. He has pleaded guilty to participating in an antisemitic conspiracy with conspirators presently unknown to the Plaintiffs. *Id.* ¶ 223. Bazrouk is also a major consumer of Hamas propaganda, has boasted about having family members in Hamas, has traveled to the region, and had a huge quantity of unexplained cash upon his arrest. *Id.* ¶¶ 220–22. After Bazrouk pleaded guilty, Within Our Lifetime claimed he was "unjustly" targeted and advocated for his freedom. *Id.* ¶ 224. These allegations support the inference that Defendants coordinated with Hamas through Bazrouk and others like him (such as his unnamed co-conspirators).

At this stage, it need only be plausible that Defendants coordinated with or addressed their activities to Hamas and other terror groups. These allegations easily satisfy that standard.

## B.    Defendants' Contrary Arguments Fail

Defendants' contrary arguments should be rejected.

### 1.    First Amendment Protections Are Not Absolute

The Court should reject Defendants' contentions that their activities are automatically protected because they are a form of creative expression (Columbia JVP Mem. 21), speech on

matters of public concern (Alwan Mem. 22–23), or political speech (Khalil Mem. 4–8). These arguments all fail for the same reason. While freedom of speech and association are indeed bedrock values in a democratic society, even where First Amendment interests are at their apex, the First Amendment is not absolute. Defendants' conduct falls well outside its protection.

As to Columbia JVP's contention that Defendants were engaged in expressive activity, "[t]o say that [defendants] engaged in expressive activity is not the same as concluding that the First Amendment protect[s] the activity without qualification." *Osadzinski*, 97 F.4th, at 491. Even assuming Defendants' conduct qualifies as creative expression, the First Amendment does not protect this activity when it is addressed to and coordinated with terror groups *See id.*; *Rahim*, 860 F. App'x at 50; *Al Safoo*, 2025 WL 1331682, at *20. None of Columbia JVP's many "creative expression" cases involve terrorism or coordinating activities with terror groups. In fact, none is remotely like this case.[29]

---

[29] *See Packingham v. North Carolina*, 582 U.S. 98, 108 (2017) (deeming unconstitutional law that "foreclose[d]" convicted criminals' "access to social media"); *Boos v. Barry*, 485 U.S. 312, 316, 321–29 (1988) (deeming unconstitutional statute barring certain displays of "signs tending to bring a foreign government into public odium or public disrepute"); *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006) (retaliation; deeming a government employee's letter and lawsuits "protected activity" because they are "on a matter of public concern"); *Moore v. Hadestown Broadway Ltd. Liab. Co*., 722 F. Supp. 3d 229, 259 (S.D.N.Y. 2024) (employment discrimination; rejecting claims of racial discrimination in casting decisions because "creative decisions about what story to tell when it stages the Musical fall squarely within the protection of the First Amendment"); *Doe v. Intel. Corp.*, No. 24-CV-6117, 2024 WL 4553985, at *4, (S.D.N.Y. Oct. 22, 2024) (employment discrimination; rejecting motion to proceed anonymously premised, in part, on a "dataset of antisemitic incidents" that included protected activity), *appeal dismissed*, No. 24-3330, 2025 WL 919026 (2d Cir. Feb. 24, 2025); *Volokh v. James*, 656 F. Supp. 3d 431, 436 (S.D.N.Y. 2023) (deeming unconstitutional law that compelled social media networks to adopt policies about hate speech); *Young Am.'s Found. v. Stenger*, No. 20-CV-822, 2025 WL 874840, at *17 (N.D.N.Y. Mar. 20, 2025) (retaliation; stating it was not disputed that a college lecture and defendant's promotion of the lecture were protected speech); *Ctr. for Bio-Ethical Reform, Inc. v. Black*, 234 F. Supp. 3d 423, 435 (W.D.N.Y. 2017) (retaliation; anti-abortion exhibition is protected speech).

Similarly, Alwan's argument (Alwan Mem. 23) that the First Amendment protects coordinating speech-related activities and services with terror groups is contradicted by *Holder*, *see* 561 U.S. at 39, as elaborated on by decisions like *Osadzinski*, *Rahim*, and *Al Safoo*. The Second Circuit has located *Holder*'s doctrinal roots in the principle that speech "integral to criminal conduct" may be restricted, *Gasparino*, 61 F.4th at 89 & 89 n.4, which Alwan concedes is a category of unprotected speech. Alwan Mem. 23. Irrespective of whether *Holder* created a new category of unprotected speech or elaborated on an existing principle, this Court would break no new ground in rejecting a First Amendment defense here.[30]

For much the same reason, the Court should reject Khalil's argument that political speech "loses its First Protection . . . only when 'such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'" Khalil Mem. 6 (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969) (per curiam)). *Brandenburg* provides one limit to political speech; *Holder* establishes another. Even if Khalil is correct that his conduct does not amount to incitement, his activities are not protected because he coordinated them with Hamas. Khalil's reliance on decisions from his habeas litigation is misplaced because the government did not assert that Khalil coordinated with Hamas.[31] And Khalil's citations to numerous decisions

---

[30] *Jan v. People Media Project*, No. 3:24-cv-05553-TMC, 2025 WL 359009 (W.D. Wash. Jan. 31, 2025), cited by Alwan in her brief Alien Tort Statute discussion (Alwan Mem. 27), is distinguishable. That case rejects the argument publishing Hamas propaganda constituted incitement; it did not consider Plaintiffs' coordination argument or cite *Holder*. *See Jan*, 2025 WL 359009, at *9–*11.

[31] *See Khalil v. Trump*, No. 25-CV-01963 (MEF)(MAH), 2025 WL 1649197, at *3 n.5 (D.N.J. June 11, 2025); *Khalil v. Joyce*, 780 F. Supp. 3d 476, 531 (D.N.J. 2025), No. 25-CV-01963 (MEF)(MAH), 2025 WL 1262349 (D.N.J. May 1, 2025).

upholding First Amendment defenses to crimes and torts uniformly arose in non-terrorism contexts and are wholly inapposite.[32]

### 2. Plaintiffs' Coordination Allegations Are Sufficient

Defendants' contentions that the Complaint does not show coordination fail.

Defendants' claims that Plaintiffs allege only "independent advocacy," Columbia JVP Mem. 22; Khalil Mem. 12, or that the Complaint offers no factual support for coordination, Alwan Mem. 24, simply ignore the allegations in the Complaint. Among other activities, the Defendants publicly coordinated with Hamas in organizing events, hosted a Hamas surrogate at a Columbia event who told them Hamas loved their work, number among their ranks a violent criminal with serious Hamas connections, and are closely associated with AMP/NSJP. The single "independent advocacy" case Columbia JVP cites rejects a First Amendment defense for reasons that also apply here. *See In re Terrorists Attacks on Sept. 11, 2001*, 740 F. Supp. 2d 494, 519–20 (S.D.N.Y. 2010), *aff'd* 714 F.3d 118 (2d Cir. 2013). In that case, the district court considered a direct liability claim against a charity that, among other things, "disseminate[d] literature worldwide calculated to promote global jihadist agenda" and "use[d] its publications, youth camps, Islamic Centers, and mosque conferences and other sponsored events[] to provide ideological foundation for the al Qaeda movement." 740 F. Supp. 2d at 519. Applying *Holder*, the court explained that "[e]stablishing meeting places, holding public forums, or issuing publications to disseminate virulent rhetoric is not actionable, under § 2333, *unless such services are being provided as support*

---

[32] *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 447 (2011) (IIED claim for picketing near a soldier's funeral); *Cox v. Louisiana*, 379 U.S. 536 (1965) (criminal convictions for peaceful civil rights demonstrations).

*to a foreign terrorist organizations*," and sustained the claim. *Id.* (emphasis added). *See id.* As that

is precisely what Plaintiffs allege, this Court should do the same.[33]

The Court should reject Khalil's argument that the Complaint alleges that his conduct is

"the very antithesis of terroristic violence" because he was supposedly focused on "parochial

matters" relating to events on campus. Khalil Mem. 13. Once again, "that a particular fact can give

rise to conflicting inferences does not justify dismissing a complaint at this stage of the

proceedings, provided the facts can give rise to an inference of wrongful conduct." *Winnick*, 406

F. Supp. 2d at 258. The specific allegations against Khalil are recounted above and need not be

repeated again. *See supra* Part II.D.3. At this stage of the litigation, these allegations support an

inference of wrongful conduct—coordination with Hamas—and overcome Khalil's First

Amendment argument.[34]

For much the same reason, the Court should reject Alwan's contention that it is "far more

plausible" that Defendants were independently responding to public events, "not following foreign

directives." Alwan Mem. 24. The allegations in the Complaint firmly support the "inference of

wrongful conduct" that Defendants coordinated their activities with Hamas. *Winnick*, 406 F. Supp.

---

[33] Although *In re Terrorist Attacks* also accepted a First Amendment defense as to another defendant, that holding is inapposite because the plaintiffs affirmatively alleged independent advocacy. *See* 740 F. Supp. 2d at 522 (stating that challenged statements were alleged to be "a means of achieving [defendant's] own goal"). Here, Plaintiffs allege coordination.

[34] Khalil's citation to a decision dismissing "factually frivolous" claims as "fanciful," "fantastic," or "delusional" has no bearing here. *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011). *Gallop* involved allegations that senior United States officials caused the September 11 attacks, an obviously unsupportable assertion. *See id.* at 366. The detailed allegations in the Complaint are nothing like that.

2d at 258. At this stage, the Court must therefore take that inference in Plaintiffs' favor and cannot credit Alwan's proposed alternative explanation.[35]

Alwan's contentions that there is no allegation of contact between any student Defendant and Hamas, or that the student Defendants were aware of Hamas' calls to protest, miss the mark. Alwan Mem. 24. As explained, coordination need not be shown with "direct evidence" and can be shown with allegations that the Defendants "acted in a manner consistent with someone who was operating or seeking to operate on behalf of [the terror group]." *Hendricks*, 950 F.3d at 353, 354. The Complaint meets this standard: Defendants acted consistently with someone operating or seeking to operate on behalf of Hamas. At this stage of the litigation, moreover, the Court should accept that Defendants were aware of Hamas' calls for protests. The calls were public, and it defies credulity to believe that these Defendants were not listening. More than that, the Toolkit expressly amplified Hamas' call for action on October 12, and Alwan and her organization (along with Columbia JVP and Within Our Lifetime) heeded that call. The Resistance 101 event, moreover, shows a Hamas surrogate privately communicating Hamas' gratitude for Defendants' conduct. Based on these episodes, and Defendants' extensive connections with AMP/NSJP, it is reasonable to infer they knew of Hamas' other calls as well.[36]

---

[35] Defendants' "obvious alternative explanation" case is distinguishable. *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358 (S.D.N.Y. 2018) (dismissing artist's antitrust claim premised on "conclusory" allegations of conspiracy and identifying the "obvious alternative explanation" that defendants each deemed other artists' work as "worthy of collecting and showing" than the plaintiff's).

[36] Alwan's conspiracy decision is inapposite. *Palisades Ests. EOM, LLC v. Cty. of Rockland*, No. 23-CV-4215, 2025 WL 1295333, at *51–52 (S.D.N.Y. May 5, 2025) (rejecting conspiracy claim for insufficiently alleging an agreement). The claim in this case is aiding and abetting, not conspiracy, and the signal difference between them is that aiding and abetting does not require any agreement. *See Halberstam*, 705 F.2d at 477. Notably, even under the conspiracy rule Alwan cites, "[b]ecause conspiracies are inherently secretive, circumstantial, rather than direct, evidence may be considered." *Palisades Ests. EOM, LLC*, 2025 WL 1295333, at *51.

Finally, Alwan's argument that coordination alone does not establish aiding-and-abetting liability misses the mark. Alwan Mem. 25. Defendants knowingly and substantially assisted the terror attacks against Plaintiffs for the reasons explained in detail above. *See supra* Part II.D. The Defendants' coordination of their activities with Hamas is not an independent basis of liability; rather, it provides a basis to conclude that the First Amendment does not protect their activities.

### 3.  Defendants' Freedom of Association Arguments Fail

Defendants' reliance on *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), and related decisions sounding in freedom of association are misplaced. Columbia JVP Mem. 23–27; Alwan Mem. 22; Khalil Mem. 7–8, 19–20. *Claiborne Hardware* "stands for the well-known prohibition against 'guilt by association,' namely that one cannot be found guilty (or civilly liable) simply because he associated with others who engaged in illegal conduct." *United States v. Masel*, 54 F. Supp. 2d 903, 916 (W.D. Wis. 1999). The decision does not discuss, much less immunize, expressive activities coordinated with a designated foreign terrorist organization. "[T]his is simply not a case like *Claiborne Hardware*" because Plaintiffs do not seek recovery against Defendants for the "'reason of association alone.'" *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 80–81 (D.D.C. 2002) (quoting *Claiborne Hardware*, 458 U.S. at 920), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). Rather, Defendants are liable for aiding and abetting terror attacks that harmed the Plaintiffs. And as the Seventh Circuit put it, "[i]f the [plaintiffs] are able to prove the defendants aided and abetted terrorist acts, liability would not offend the principles announced in *Claiborne Hardware*." *Boim v. Quranic Literacy Inst. & Holy Land Found. For Relief And Dev.*, 291 F.3d 1000, 1023 (7th Cir. 2002); *United States v. Nagi*, 254 F. Supp. 3d 548, 559 (W.D.N.Y. 2017) ("At bottom, '[t]he First Amendment's guarantee of associational freedom is no license to supply terrorist organizations with resources or material support in any form . . . .'" (quoting *United States v. Lindh*, 212 F. Supp. 2d 541, 570 (E.D. Va. 2002)); *United States v. Taleb-Jedi*,

566 F. Supp. 2d 157, 175 (E.D.N.Y. 2008) (rejecting *Claiborne Hardware* argument in material support case and collecting cases).

Even if this were a case about Defendants' association with Hamas without more, and the rule in *Claiborne Hardware* applied, Defendants fall on the wrong side of it. "For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Claiborne Hardware*, 458 U.S. at 920. As the discussion above shows, Defendants had that intent. *See supra* at Part II.D.2. And the Court should emphatically reject Columbia JVP's attempt to claim the protection of *Claiborne Hardware* by asserting that that Defendants did not "ratif[y]" or "even [have] specific knowledge" of Hamas' crimes. Columbia JVP Mem. 25 (quoting *Claiborne Hardware*, 458 U.S. at 930–31). Hamas' holding of hostages and its illegal operations against Israeli soldiers following October 7 were open and notorious. The Toolkit itself referred to these activities, and counter-protestors at Defendants' events advocated for the release of Hamas's hostages. Ex. 3 at 2; *see* SAC ¶ 122. It is specious for Defendants to deny knowledge of these acts. And Defendants did more than simply "ratify" Hamas' crimes—they encouraged and advised in their commission. *E.g.*, *id.* ¶¶ 102, 104, 106, 112, 173, 200. And they rallied support for others to do the same. *E.g.*, *id.* ¶¶ 115, 119–20, 126, 139, 144, 168, 174.[37]

To the extent Defendants rely on *Claiborne Hardware* to insulate themselves from Bazrouk's violent crimes (and not Hamas'), their arguments do not support dismissing the

---

[37] Defendants' decisions (Columbia JVP Mem. 24–25) that invalidate statutes requiring government contractors not to boycott Israel are inapposite on their face. *See Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018); *A & R Eng'g & Testing, Inc. v. City of Hous.*, 582 F. Supp. 3d 415 (S.D. Tex. 2022), *rev'd on other grounds sub nom. A & R Eng'g & Testing, Inc. v. Scott*, 72 F.4th 685 (5th Cir. 2023). Neither involves any allegation or claim that the plaintiffs were coordinating with terror groups and aiding and abetting terror attacks.

Complaint. *See, e.g.*, Columbia JVP Mem. 22–23, 25, Khalil Mem. 19–20; Kiswani Decl. ¶ 3(f). The First Amendment does not protect Defendants' conduct because they coordinated their activities with Hamas (including through Bazrouk). Whether the Defendants also knew about or participated in Bazrouk's hate crimes as co-conspirators is irrelevant to that inquiry—although it will certainly be a topic of discovery.

Finally, the District of Nevada's decision in *Gerwaski v. Nevada ex rel. Bd. of Regents of the NV Sys. of Higher Educ.*, No. 24-CV-985, 2025 WL 1294107 (D. Nev. May 5, 2025), is readily distinguishable. The plaintiff there was a university student whose injury was losing his library job and being the target of hateful remarks on campus; he had no connection whatsoever to the attack on October 7 or to Hamas' crimes afterward. *See id.* at *1, *2. His JASTA claim thus failed at the outset for not alleging an injury arising out of an international terror attack. *See id.* at *5. Although the court also accepted the defendants' First Amendment defenses, the conclusory allegations of coordination were far less robust than the detailed allegations in this case. *See* First Amended Complaint, *Gerwaski v. State of Nevada et al.* ¶¶ 107–08, 110–114, No. 2:24-cv-000985 (D. Nev. filed Aug. 9, 2024.).

### 4. Khalil's Strict Scrutiny Argument Fails

Khalil's strict scrutiny argument should be rejected. Khalil Mem. 8–10, 14. According to Khalil, under the "speech tort" doctrine, Plaintiffs must show that liability in this case "furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* at 10 (quoting *FEC v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 451 (2007)). But as the Supreme Court explained in the decision Khalil cites, "[t]he strict scrutiny analysis is, of course, informed by our precedents." *Wisconsin Right to Life, Inc.*, 551 U.S. at 465. When a speech limitation has survived strict scrutiny in one context, the analysis need not be redone from scratch. Rather, when the issue is raised, the plaintiff need only "point to [the prior decision] and explain why it applies here." *Id.* Here, *Holder*

applied strict scrutiny to hold that the First Amendment does not protect providing speech-related services to or in coordination with terror groups. *See* 561 U.S. at 28–39. Cases evaluating First Amendment challenges to that category of activity generally ask only if the conduct is adequately alleged and do not determine anew whether liability is consistent with strict scrutiny. *See, e.g.*, *Osadzinski*, 97 F.4th at 491–93; *In re Terrorists Attacks on Sept. 11, 2001*, 740 F. Supp. 2d at 519–20. As explained, the conduct is sufficiently alleged here.

*Holder* applies to the conduct here in any event. The Supreme Court held that the First Amendment does not protect "providing material support in the form of training, expert advice, personnel, and services to foreign terrorist groups, even if the supporters meant to promote only the groups' nonviolent ends." *Holder*, 561 U.S. at 36. *Holder* specifically ruled that the First Amendment did not shield training members of a terror group "on how to use humanitarian and international law to peacefully resolve disputes" because it is "wholly foreseeable" that the terror group could use those skills "as part of a broader strategy to promote terrorism." *Id.* at 36. It further held that teaching a terror group how to petition the United Nations and other bodies for relief was not protected because relief could include money—and, because money is fungible, it could be "redirected to funding the group's violent activities." *Id.* at 37. The same logic applies here. Defendants provided valuable public relations services to the Defendants. Hamas has publicly stated that propaganda is a core part of its broader political strategy. Hamas has also specifically stated that the specific services Defendants provide are valuable. Hamas has said so publicly, and a Hamas surrogate told many of the Defendants as much to their faces at the Resistance 101 event. It is wholly foreseeable that Defendants' services will result in more terrorism and that Defendants' volunteer provision of propaganda services frees up Hamas' abilities to focus on its terror crimes. Because the logic of *Holder* easily covers this case, strict scrutiny is satisfied.

In fact, it follows *a fortiori* from *Holder* that the First Amendment is no bar to liability here. *Holder* held that the First Amendment did not protect services given to or coordinated with a terror group when the petitioners only sought to support the terror organization's non-violent ends. *See* 561 U.S. at 36. The Defendants here aided and abetted Hamas' violent terror crimes. And according to Defendants, liability under JASTA has a higher scienter standard than the material support statute at issue in *Holder*. *See* Khalil Mem. 11; Alwan Mem. 25. If the First Amendment does not protect the knowing provision of speech-related services to a terror group, it certainly cannot protect the "conscious, voluntary, and culpable participation" in Hamas' terror attacks. *Twitter*, 598 U.S. at 497, 493.

* * *

Accordingly, Defendants' conduct is not protected by the First Amendment.

## VI.    Plaintiffs Have Standing

Contrary to Defendants' contentions (Columbia JVP Mem. 27–29; Kiwani Decl. ¶ 3(a), (b)), Plaintiffs have standing to assert their claims. "The irreducible constitutional minimum of standing consists of three elements: the individual initiating the suit must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019) (internal quotation marks omitted) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Columbia JVP contests only the traceability requirement, arguing that Plaintiffs' injuries "are not fairly traceable to Defendants' alleged conduct in any way." Columbia JVP Mem. 27. Columbia JVP is wrong.

"Standing is gauged by the specific common-law, statutory or constitutional claims that a party presents." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). "Typically, the standing inquiry requires careful judicial examination of a complaint's

allegations to ascertain whether the particular plaintiff is entitled to an adjudication *of the particular claims asserted*." *Id.* (emphasis in original); *accord Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1514 (9th Cir. 1992) ("Where, as here, Congress is the source of the purportedly violated legal obligation, we look to the statute to define the injury."). And because JASTA extends liability in the "broadest possible" way to aiders and abettors, Pub. L. No. 114-222, 130 Stat. 852, § 2(b) (2016), the statutory injury is the aiding and abetting of a terror attack causing an injury. Traceability in these circumstances is easily satisfied: as aiders and abettors, Defendants are directly responsible for the injury defined by JASTA and asserted in this case.

A decision by then-District Judge Lynch is instructive. *See Mustafa v. Australian Wheat Bd.,* No. 07-CV-7955, 2008 WL 4378443 (S.D.N.Y. Sept. 25, 2008) (Lynch, J.). In that case, victims of Saddam Hussein's regime claimed that defendants aided and abetted the regime's violations of the Alien Tort Statute by paying kickbacks. *Id.* at *1. The defendants challenged traceability, urging that plaintiffs' injuries were caused by "the Hussein regime, a third party not before the court." *Id.* at *2. Judge Lynch rejected this argument, which would "significantly undermine aiding and abetting liability in the federal courts." *Id.* at *3. He reasoned:

> Aiding and abetting liability is not itself a tort but instead a generally applicable means of identifying who should be held responsible for a particular act. . . . If plaintiffs aided and abetted the Hussein regime in the commission of human rights abuses that injured plaintiffs, then defendants are responsible for those acts, not because they caused them, but because the law holds the person who aids and abets liable for the tort itself. The injuries resulting from the Hussein regime's acts are thus fairly traceable to any who aided and abetted their commission. Similarly, the injuries are not the result of the independent action of some third party not before the court because the acts of the Hussein regime are not independent of steps taken to aid and abet those acts.

*Id.* at *2. The same reasoning applies here. Plaintiffs have alleged injuries caused by Hamas and that Defendants are derivatively liable for those injuries. Thus, they have standing.

Other cases confirm that traceability in secondary liability cases is satisfied by alleging that the defendant bears legal responsibility for the injury. *See, e.g.*, *Merriam v. Demoulas*, No. 11-CV-10577, 2013 WL 2422789, at \*4 (D. Mass. June 3, 2013) (explaining that "Article III is satisfied" when "the plaintiff's injury is fairly traceable to acts for which the defendant may be held liable, even if the defendant did not directly cause or commit those acts" because "Article III's causation requirement does not eliminate all forms of vicarious liability"); *Al-Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 872 (N.D. Cal. 2022) (finding injuries fairly traceable to corporate defendant alleged to be vicariously liable for wrongs caused by its employees), *appeal dismissed*, 2022 WL 4352712 (9th Cir. July 7, 2022); *cf. Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 647–48 (S.D. Tex. 2010) ("It would be anomalous for the causal connection element of standing to be more onerous than the causation showing required to prevail on the merits.").

Even assuming *arguendo* Plaintiffs' aiding-and-abetting claims required traditional proof of causation (they do not), the Complaint would adequately allege standing. The fair traceability requirement "does not create an onerous burden" and "is a standard lower than that of proximate causation." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016). In a pre-JASTA direct liability case, the Second Circuit deemed fair traceability satisfied based on the defendant's indirect provision of funds to a terror group based on several inferential jumps. *Rothstein v. UBS AG*, 708 F.3d 82, 92–93 (2d Cir. 2013). The defendant's transfers to Iran generally increased Iran's "ability to amass U.S. currency"; that gave Iran more U.S. dollars; that increased Iran's ability to fund terror groups; and the terror groups could thus conduct more attacks. *See id.* at 93. Finding standing in this case is more direct. Defendants provided valuable propaganda services to Hamas before and as Hamas committed its terror crimes, which freed up resources for Hamas to commit those attacks and encouraged Hamas to do so.

Columbia JVP's cases are inapposite. None arose in the terrorism context or addresses standing to assert aiding-and-abetting claims. *See, e.g.*, *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42–43 (1976) (finding that indigents who had been denied services by hospitals lacked standing to challenge a revenue ruling that gave tax benefits to those hospitals; no allegation that government aided and abetted the denials of service). Other decisions either find standing or do not address standing at all. *See, e.g.*, *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) (finding standing in a contract case; no discussion of fair traceability or causation); *Carter*, 822 F.3d at 59 (finding standing and rejecting fair traceability argument as "border[ing] on the frivolous"); *J. S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107 (2d Cir 2004) (analyzing exhaustion of administrative remedies; no discussion of standing or causation).

Plaintiffs therefore have standing.

## VII.    Defendants' Service and Capacity Arguments Fail

### A.    Alwan Was Properly Served

Contrary to Alwan's argument, she was properly served in her individual capacity. Alwan Mem. 12. Rule 4 allows for service by leaving the summons and complaint "at individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." Fed. R. Civ. P. 4(e)(2)(B). "Our highly mobile and affluent society has relegated to history the days when an individual had but a single residence." *Jaffe & Asher v. Van Brunt*, 158 F.R.D. 278, 280 (S.D.N.Y. 1994) (Sotomayor, J.) (citing *Nat'l Dev. Co. v. Triad Holding Corp.*, 930 F.2d 253, 257 (2d Cir. 1991)). "A strictly literal interpretation of the rule may thwart the purpose of Fed. R. Civ. P. 4(e)—to insure that service is reasonably calculated to provide a defendant with actual notice of the action." *Id.* "[A] person can have two or more 'dwelling houses or usual places of abode,' provided each contains sufficient indicia of permanence." *Nat'l Dev. Co.*, 930 F.2d at 257.

Even assuming Alwan's untested factual submissions are accurate, service on Alwan at her father's Virginia home was proper. At the time of service, Alwan was a college student who visited her father at his home during school breaks around two to three times a year for up to two weeks at a time. Declaration of Maryam Alwan ¶¶ 3–4, ECF No. 72-1. In other words, by Alwan's own admission, she regularly spends upwards of a month per year at the residence of service. Courts have deemed service proper in similar circumstances. *See, e.g.*, *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1524 (S.D.N.Y. 1995) (finding sufficient permanence where defendant stayed in apartment owned by nephew despite visits being "episodic rather than constant"); *Jaffe & Asher*, 158 F.R.D. at 280 (defendant's parent's house where he stayed occasionally was "dwelling" or "usual place of abode," even though he actually resided out-of-state); *Karlin v. Avis*, 326 F. Supp. 1325, 1330 (E.D.N.Y. 1971) (concluding that although defendant "is not a resident of New York" and "spends a considerable amount of time elsewhere," that "does not mean that the apartment is not his dwelling place"); *Wolfe v. Enochian BioSciences Den. ApS*, No. 21-CV-00053, 2022 WL 656747, at *4 (D. Vt. Mar. 3, 2022) (noting that defendant "periodically resides at the Miami Beach Property, and Plaintiffs' service was reasonably calculated to provide him with notice of the action and in fact did so"). This Court should do the same.

Deeming service proper is especially appropriate here because the purposes of Rule 4 have been met and because Alwan cannot claim any prejudice. *See In re Stillwater Cap. Partners Inc. Litig.*, 853 F. Supp. 2d 441, 456 (S.D.N.Y. 2012) (rejecting service argument where defendant "has clearly been apprised of this action as indicated by his filing a motion to dismiss"); *Strategic Funding Source v. Hendon*, No. 10-CV-5935, 2011 WL 13383679, at *7 (S.D.N.Y. July 7, 2011)

(same, where defendant "has not argued that he suffered any prejudice as a result of any defects in service").[38]

In the end, the question is whether a college student can be served at her parent's home. Common experience teaches that the answer is yes, and Alwan gives no reason to hold otherwise.[39]

## B.    Columbia SJP and CUAD Were Properly Served

The Court should further conclude that Columbia SJP and CUAD were properly served through their leaders. *See* Alwan Mem. 13–14; Khalil Mem. 24–26. Defendants do not challenge service on Within Our Lifetime or Columbia JVP.

Service of process on an unincorporated association is effectuated by (i) "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process," or (ii) by serving in accordance with state law. Fed. R. Civ. P. 4(h)(1)(B), (A); *see* Fed. R. Civ. P. 4(e)(1). "Rule 4(h)(1) does not require rigid formalism." *The Haskell Co. v. Radiant Energy Corp.*, No. 05-CV-0440, 2007 WL 2746903, at *5 (E.D.N.Y. Sept. 19, 2007) (quotations and citations omitted). Under federal law, the rule "does not require that service be made solely on a restricted class of formally

---

[38] Alwan's decisions are distinguishable because none involves a defendant with a significant and continuing connection to the address of service. *See Allianz Ins. Co. v. Otero*, No. 01-CV-2598, 2003 WL 262335, at *2 (S.D.N.Y. Jan. 29, 2003) (service at former residence improper); *Mourtil v. Chi Ming Peng*, 295 A.D.2d 582, 583 (2nd Dep't 2002) (service at wrong address improper where "mere reference to the local telephone directory" would have shown correct address); *New York State Higher Educ. Servs. Corp. v. Perchik*, 207 A.D.2d 1040 (4th Dep't 1994) (service made at defendant's former residence improper).

[39] In the alternative, the Court should extend the service deadline and permit alternative service on Alwan through her counsel. Public records searches conducted in March 2025 identified the address of service as Alwan's only address. Declaration of Richard A. Edlin ¶ 2, filed contemporaneously herewith. The searches yielded the same results when performed earlier this month, and Plaintiffs' diligence has not found any other evidence of Alwan's residence. *Id.* ¶¶ 3–4. The Court should therefore permit alternative service. *See, e.g., Windward Bora LLC v. Edinboro*, 719 F. Supp. 3d 238, 242 (E.D.N.Y. 2024); *Ferrarese v. Shaw*, 164 F. Supp. 3d 361, 365 (E.D.N.Y. 2016).

titled officials, but rather permits it to be made upon a representative so integrated with the organization that he will know what to do with the papers." *Ins. Co. of N. Am. v. S/S "Hellenic Challenger"*, 88 F.R.D. 545, 547 (S.D.N.Y. 1980) (quotations and citations omitted); *see id.* at 548 (service on claims adjuster proper). "Generally, service is sufficient when made upon an individual who stands in such a position as to render it fair, reasonable and just to imply the authority on his part to receive services." *Id.* at 547 (citation omitted).

Under New York law, a plaintiff may serve the unincorporated association by serving the association's president or treasurer or their "functional equivalents within the association." *Irizarry v. The Balton LLC*, No. 155520/2017, 2023 WL 3034722, at *3 (Sup. Ct. N.Y. Cty. Apr. 21, 2023); *accord* Alexander, Practice Commentaries, CPLR C1025:2, at 257 (if an unincorporated association lacks a president or treasurer, action may be brought against the association's "most closely analogous officer"). As *Irizarry* shows, New York courts approach the service question in a practical manner. There, an unincorporated association was deemed served where two Board members were served in their representative capacities, and those defendants and the Board filed a motion to dismiss. *See Irizarry*, 2023 WL 3034722, at *3; *RKJW1 Doe v. Watchtower Bible & Tract Soc. of N.Y., Inc.*, 232 A.D.3d 637, 640 (2d Dep't 2024) (service on unincorporated association proper though its "coordinator," a position that rotated alphabetically).

Columbia SJP was properly served through Alwan under the federal and state rules. Alwan has publicly identified herself as an active member and organizer of Columbia SJP and she has taken actions consistent with being the organization's leader. SAC ¶ 24. Alwan appeared in a documentary that described her as a "leader" of the organization and has been described by a well-known television host as a "Lead Organizer." *Id.* Most significantly, Alwan acted as the organization's leader when interacting with the Columbia administration. On behalf of her

organization, Alwan met with Columbia administrators on at least four occasions. *Id.* ¶¶ 25–28. For three of those, Alwan was Columbia SJP's sole reported representative. *Id.* ¶¶ 26–27. And when Columbia SJP sued Columbia to overturn its suspension, it was Alwan who appeared in the litigation with the organization. *Id.* ¶ 25. Alwan also "maintains access" to Columbia SJP's official email and Instagram accounts, received an email from Columbia addressed to "Student Group Leaders," and has identified one instance at a meeting where she acted like a leader by "asking"— *i.e.*, directing—the assembled students to remove their keffiyehs. *Id.* ¶¶ 29, 30. In sum, Alwan is plainly well-integrated into Columbia SJP and served as its functional leader. "Clearly, [Columbia SJP] is represented, aware of plaintiff's claim and can respond accordingly." *Irizarry*, 2023 WL 3034722, at *3. At this stage of the litigation, Alwan's challenge must be rejected.

For similar reasons, CUAD was properly served through Khalil, its de facto president. Khalil was the public face and lead negotiator for CUAD during Defendants' highest-profile event, the Encampment, which spanned thirteen days in April 2024. SAC ¶¶ 35, 143. He served in the same leadership role at another high-profile event in March 2025, when CUAD stormed and occupied a library at Barnard College and handed out Hamas propaganda. *Id.* ¶¶ 189–90. Khalil cannot disclaim leadership of CUAD merely because that fact has become inconvenient. Similarly, Khalil is sufficiently well-integrated in CUAD that he knew how to handle the papers.

Defendants' contrary arguments should be rejected.

*First*, the Court should reject the arguments that Alwan and Khalil cannot lead their organizations because they are supposedly "horizontal" organizations that lack "structure or hierarchy." Alwan Mem. 13; Khalil Mem. 25. Those claims are at most aspirational, and they are contradicted by the allegations in the Complaint and in Alwan's own affidavit: Alwan and Khalil led these groups in reality. That is sufficient for service. A contrary holding would mean that

unincorporated associations could avoid litigation by not formally appointing leadership. That cannot be the law. *Cf. N.Y. Bd. of Fire Underwriters v. Whipple*, 36 A.D. 49, 52 (1st Dep't 1898) (rejecting argument that "would simply enable an association . . . to prevent an action being commenced against it by failing and neglecting to elect a president and treasurer").

*Second*, to the extent Alwan and Khalil deny being leaders at the time of service, Plaintiffs are entitled to test that in discovery. Unlike the single decision they cite, Plaintiffs do not concede that either of them was an inappropriate person for service.[40] To the contrary, Plaintiffs have maintained that Columbia SJP continued to operate through the CUAD name after its suspension and that Khalil remained the leader of CUAD following the completion of his coursework. SAC ¶¶ 23, 125, 189. Nor does the fact that Khalil was temporarily in custody at the time of service necessarily mean that leadership passed to another individual. If discovery reveals that either organization now has a different leader, the proper procedure is to substitute that person. *See* N.Y. Gen. Ass'ns Law § 14 (providing procedures for substituting new member of an association).

Accordingly, Defendants were properly served.

### C.    CUAD Was Properly Sued Through Khalil

Khalil's bid to dismiss claims against him as the representative of CUAD should be denied.

Khalil first argues that he cannot be sued in a representative capacity because CUAD lacks independent legal existence. Khalil Mem. 26–28. This argument misses the mark. It is precisely *because* CUAD is not a formal entity that Plaintiffs have named Khalil, rather than CUAD, as the Defendant. That procedure is permitted by New York law, *see* N.Y. C.P.L.R. § 1025; N.Y. Gen. Ass'ns Law § 13, and it has been recognized by federal courts. *See, e.g., Doe v. Sigma Chi Int'l*

---

[40] *See MacGregor v. Milost Glob., Inc.*, No. 17-CV-6691, 2018 WL 4007642 (S.D.N.Y. Aug. 22, 2018). Even if service on CUAD or Columbia SJP is deemed insufficient, the Court should extend the time for service. *See id.* at *4 (citing Fed. R. Civ. P. 4(m)).

*Fraternity, Inc.*, No. 23-CV-1452, 2024 WL 4347799, at *12 (N.D.N.Y. Sept. 30, 2024) (sustaining claims against fraternity named through its president and treasurer); *Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany*, 250 F. Supp. 2d 48, 62 (N.D.N.Y. 2003) (permitting unincorporated association to amend its complaint "in the name of the appropriate officer"); *Markewich v. Adikes*, 422 F. Supp. 1144, 1148 (E.D.N.Y. 1976) (sustaining state-law claims against unincorporated association served through treasurer and chairman).

Khalil's authorities stand for the unremarkable proposition that a nonexistent entity cannot be sued in its *own* name. *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 383 (2d Cir. 2021) (dissolved entities that, under Cayman Islands law, no longer have legal personality, cannot take lawful action, and cannot be restored); *Young Am.'s Found. v. Stenger*, No. 20-CV-0822, 2023 WL 3559619, at *25 (N.D.N.Y. May 19, 2023) (dismissing claims brought directly against "College Progressives," a student organization); *Roby v. Corp. of Lloyd's*, 796 F. Supp. 103, 106 (S.D.N.Y. 1992) (dismissing claims brought directly against Lloyd's of London, insurance syndicates that "do not constitute legal entities"). These authorities do not call into question the accepted practice of naming an unincorporated association through its leader.

Khalil's argument that CUAD does not qualify as an unincorporated association because it lacks a president or treasurer likewise fails. Khalil Mem. 27–28. As explained, although the unincorporated association statutes refer to those officers by name, the case law applying it extends to their "functional equivalents." *Irizarry*, 2023 WL 3034722, at *3; *accord RKJW1 Doe*, 232 A.D.3d at 640 (eight-person association called the "Governing Body" properly served through its "coordinator"). Otherwise, an association could avoid liability by not naming officers or by calling them something else. As explained, Khalil is the functional equivalent for CUAD.

Finally, dismissal is not required by the "*Martin* rule" (Khail Mem. 28–29), which "bars all actions against an unincorporated voluntary membership association, and bars claims against the officers of such an association in their representative capacities where there is no allegation that the members of the association authorized or ratified the wrongful conduct complained of." *Sigma Chi*, 2024 WL 4347799, at *12 (quoting *Cruz v. United Auto. Workers Union Loc. 2300*, No. 18-CV-48, 2019 WL 3239843, at *16 (N.D.N.Y. July 18, 2019)). The Complaint alleges that CUAD's members authorized or ratified all the challenged conduct. SAC ¶¶ 241, 261. That is sufficient at this stage of the litigation. *See Edwards v. Ctr. Moriches Union Free Sch. Dist.*, No. 05-CV-2735, 2006 WL 8439627, at *7 (E.D.N.Y. Aug. 14, 2006) (denying *Martin* rule argument because "it is simply too early in the litigation for the Court to conclude as a matter of law that Plaintiffs will be unable to prove such an allegation").

## VIII.    The Complaint Withstands Defendants' Rule 8 Challenge

The Court should reject Defendants' arguments that the Complaint engages in impermissible "group pleading." Columbia JVP Mem. 25–26; Alwan Mem. 6 n.9; Kiswani Decl. ¶ 3(c). "Whether Plaintiffs have 'lumped all the defendants together in each claim and provided no factual basis to distinguish their conduct' is a group-pleading issue under Rule 8." *Han v. InterExchange, Inc.,* No. 23-CV-07786, 2024 WL 3990770, at *11 (S.D.N.Y. Aug. 28, 2024) (brackets and emphasis omitted) (quoting *Atuahene v. City of Hartford*, 10 F. App'xx 33, 34 (2d Cir. 2001) (summary order)). "Under Rule 8, a pleading must contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). The touchtone of Rule 8 is fair notice, and a Rule 8 dismissal "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* (quoting *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.*, No. 14-CV-09687, 2016 WL 4916969, at *5 (S.D.N.Y. Feb. 11, 2016)).

The Complaint satisfies Rule 8. The individual conduct by each Defendant is alleged throughout the Complaint. For example, the Complaint identifies which Defendants said or joined the actionable statements of advice and encouragement (SAC ¶¶ 102, 104, 106, 112, 173, 200); propagated or distributed pro-Hamas propaganda (*id.* ¶¶ 162, 171–72, 175–76, 168–69, 191); and hosted pro-Hamas rallies, both at the behest of Hamas and its allies and on their own (*e.g.*, *id.* ¶¶ 91, 109–10, 113–14, 115–17, 118–19, 180–81, 187–88, 201–08). That some allegations also apply to multiple Defendants—for example, that the Associational Defendants are among AMP/NSJP's most important partners and affiliates (*id.* ¶ 6) and that the Associational Defendants have repeatedly distributed certain pro-Hamas propaganda material (*id.* ¶ 168)—hardly deprives Defendants of fair notice of the claims against them.

Accordingly, Defendants' Rule 8 challenges fail.[41]

## IX.    Columbia JVP's Miscellaneous Arguments Fail

Part V of Columbia JVP's brief consists of several loosely related assertions that rehash defective arguments addressed above. Columbia JVP Mem. 31–34. Each fails for the reasons already given.

*First*, Columbia JVP briefly urges that the Complaint's allegations are either "purely speculative" or "clearly baseless." *Id.* at 31 (quoting *Simon*, 426 U.S. at 42–43 and *Gallop*, 642 F.3d 368). Columbia JVP is wrong on both counts. *Simon*, a standing case, has no bearing on the fair traceability requirement in the aiding-and-abetting context. *See supra* Part VI. The "clearly

---

[41] Defendants' cases are distinguishable. *See Atuahene*, 10 F. App'x at 34 (affirming Rule 8 dismissal where plaintiffs "provide[d] no factual basis to distinguish [defendants'] conduct"); *Farmer v. Cnty. of Westchester*, No. 18-CV-2691, 2021 WL 4199944, at *7 (S.D.N.Y. Sept. 15, 2021) (dismissing claims against single defendant where "the vast majority of allegations relating to [that defendant] are jointly alleged against most of the other Defendants without providing any factual basis to distinguish their conduct").

baseless" principle in *Gallop* only applies to a complaint that rests on delusional or fantastic allegations. *See supra* n.34. Neither principle applies here.

*Second*, Columbia JVP reiterates its meritless group pleading argument. Columbia JVP Mem. 31–32. As even its own slanted and incomplete summary of the Complaint reveals, however, Columbia JVP (and the other Defendants) understand the allegations against them and thus have the requisite fair notice. *See supra* Part VIII.

*Third*, Columbia JVP again argues that the SAC does not allege knowing and substantial assistance. Columbia JVP Mem. at 32–33. That is wrong. *See supra* Part II.D.1, II.D.2. To the extent Columbia JVP is arguing that aiding and abetting liability imposes a separate causation requirement on the aider and abettor (*see* Columbia JVP Mem. at 33), that argument is likewise meritless. *See supra* Part II.E.

*Fourth*, Columbia JVP again asserts that the Court should not credit allegations that Bazrouk serves as an intermediary between Defendants and Hamas. Columbia JVP Mem. 33. These allegations should be credited. *See supra* Part II.C.5

## X.    Leave to Amend Should Not Be Denied

For the reasons stated, the Complaint readily withstands Defendants' arguments and this case should proceed to discovery. Alternatively, and contrary to Columbia JVP's argument, leave to amend should be granted. Columbia JVP Mem. 34–35. The Second Circuit is "particularly skeptical of denials of requests to amend when a plaintiff did not previously have a district court's ruling on a relevant issue because without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies." *Barron v. Helbiz, Inc.*, No. 21-278, 2021 WL 4519887, at *3 (2d Cir. Oct. 4, 2021) (summary order) (cleaned up) (citing *Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 833 (2d Cir. 2019) and *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo*

*Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015)). Although Plaintiffs have made amendments, they have not had the benefit of the Court's guidance on the issues raised by the defense motions. Leave to amend should therefore be granted to address any pleading deficiencies the Court might identify.

## XI.    No Allegations Should be Stricken

Defendants' motion to strike paragraphs 1, 3–5, 12, and 47–66 of the Complaint should be denied. *See* Columbia JVP Mem. 35–41; Jones Letter 1; Kiswani Decl. ¶ 3(h). "Motions to strike are generally disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." *Slue v. NYU Med. Ctr.*, 409 F. Supp. 2d 349, 374 (S.D.N.Y. 2006) (quoting *Zinaman v. USTS N.Y. Inc.*, 798 F. Supp. 128, 135 (S.D.N.Y. 1992)); *accord Hunley v. BuzzFeed, Inc.*, No. 20-CV-08844, 2021 WL 4482101, at *5 (S.D.N.Y. Sept. 30, 2021). "[T]he party moving to strike bears a heavy burden to establish the basis for the motion." *Kumaran v. Northland Energy Trading, LLC*, 762 F. Supp. 3d 322, 330 (S.D.N.Y. 2025) (internal quotation marks omitted). JVP must show that "(1) no evidence in support of the allegations would be admissible; (2) the allegations have no bearing on the relevant issues; and (3) permitting the allegations to stand would result in prejudice to the movant." *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001). Allegedly scandalous material is stricken only if it "reflect[s] unnecessarily on the defendant's moral character" or uses "repulsive language that detracts from the dignity of the court." *Kumaran*, 762 F. Supp. 3d at 330 (citation omitted). Defendants fail to carry this burden.

Each of the challenged allegations is relevant and grounded in admissible evidence. For example, the allegations in paragraphs 1, 3–5, 12, and 47–66 describe how Hamas has maintained what is functionally a U.S.-based public relations arm, currently known as AMP/NSJP. The Complaint goes on to allege, based on their history, shared leadership, and similar messaging, that the Associational Defendants are the local, New York-based affiliates of Hamas' public relations arm. *See* SAC ¶¶ 64 (Columbia JVP), 68 (Columbia SJP and Columbia JVP), 72 (CUAD), 73–75

(Within Our Lifetime). These allegations are highly relevant to Plaintiffs' claims because they make it more likely than not that the Associational Defendants and their leaders are generally aware of their role in Hamas' terror organization and provided knowing and substantial assistance to Hamas' crimes against the Plaintiffs. *See* Fed. R. Evid. 401(a).

Columbia JVP's unsupported claim that "[e]very link in this concocted web has been directly refuted numerous times in other cases" is flatly wrong. Columbia JVP Mem. 38. It is a matter of historical record that AMP/NSJP's predecessors were adjudicated by federal courts as material supporters of Hamas. SAC ¶¶ 51–52. Three years ago, another court accepted the theory that AMP is the alter ago of those entities as plausibly alleged. *See Boim*, 2022 WL 1556085, at *1–*2. Only one more step is needed to connect the Defendants to this enterprise (and to each other), and the detailed allegations in the Complaint amply demonstrate the connections.

Defendants also suffer no cognizable prejudice from reasonable characterizations of their activities. Although Columbia JVP takes issue with the characterization in paragraph 1 of Defendants as "terror supporters," the Complaint alleges in detail how the Associational Defendants have issued public statements of support for "the resistance" (*i.e.*, Hamas) (SAC ¶¶ 102, 104, 106, 112, 173, 200) and have repeatedly responded in lockstep to Hamas' and its allies' calls to action for nearly two years (*e.g.*, *id.* ¶¶ 109–13, 116–20, 130–32, 201–08). Similarly, Defendants have effectively advertised themselves as Hamas' propaganda arm. Just take the Toolkit, which provided a set of pro-Hamas talking points as a "framework and important messaging which contextualize, frame, and above all normalize and support our fearless resistance" (*i.e.*, Hamas). Ex. 3 at 4. A person saying she is using "messaging" to "normalize and support" Hamas is saying she is part of Hamas' propaganda arm (at a minimum). By enacting the Toolkit, that is exactly what Defendants said.

Finally, none of the allegations in the Complaint impugns—or was intended to impugn—anyone's sincere religious beliefs. As an initial matter, Columbia JVP is a political organization, not a religious one. Its parent organization, A Jewish Voice for Peace, has described itself as "a ***political*** home for Jews on the left in this perilous moment"[42] and has said that members need not be Jewish.[43] Moreover, paragraphs 64 and 71 of the Complaint do not mention any specific religious beliefs of Columbia JVP's members. While Columbia JVP takes issue with the characterizations that Columbia JVP and JVP are "ostensibly" and "allegedly" Jewish organizations, these characterizations merely explain that the organizations were coopted to cloak pro-Hamas propaganda with a Jewish imprimatur. The Complaint alleges several facts in support of these characterizations, including that JVP has publicly identified itself as a "Partner" of AMP/NSJP. SAC ¶ 64. The characterization is also supported by the organization's own statements and certainly does not rise to the level of prejudice that would warrant removal of these characterizations from the Complaint.

## XII.    Judicial Notice of Disputed Facts Should Be Denied

Finally, for three reasons, the Court should reject Alwan's request for judicial notice to the extent it seeks consideration of six exhibits generally relating to conditions in Israel and Gaza. *See* Judicial Notice Mem. 1–4; ECF Nos. 73-1 to 73-6 (the "Alwan Exhibits").

*First*, the matters in the Alwan Exhibits are disputed. A court may "take judicial notice of a fact that 'is generally known within the trial court's territorial jurisdiction; or can be accurately

---

[42] *Who We Are*, JEWISH VOICE FOR PEACE, https://www.jewishvoiceforpeace.org/about/#mission (last accessed Aug. 20, 2025) (emphasis added).

[43]    *Frequently    Asked    Questions*, JEWISH    VOICE    FOR    PEACE, https://web.archive.org/web/20130629120000/https://jewishvoiceforpeace.org/content/jewish-voice-peace-faq#jvpjewish (archived June 29, 2013) ("[W]e welcome both Jews and allies who advocate for end to the Israeli occupation and oppose anti-Jewish hatred, anti-Arab racism, and Islamophobia.").

and readily determined from sources whose accuracy cannot reasonably be questioned.'" *United States ex rel. Hart v. McKesson Corp.*, 602 F. Supp. 3d 575, 590 (S.D.N.Y. 2022) (quoting Fed. R. Evid. 201(b)). This rule allows judicial notice of an "incontrovertible fact," not a "disputed fact." *Id.* at 591, 592. And "[b]ecause the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)." *Id.* at 590–91 (quoting *Finn v. Barney*, 471 F. App'x 30, 32 (2d Cir. 2012) (summary order)). Alwan's proffered "facts" do not meet this standard. The death toll and state of food security in Gaza, as well as whether Israel's operations in Gaza can be characterized as a "genocide," are hotly debated and have been since Hamas' attack on October 7.

*Second*, the Alwan Exhibits are irrelevant. *See, e.g.*, *Novartis Pharma AG v. Incyte Corp.*, 777 F. Supp. 3d 340, 354 (S.D.N.Y. 2025) ("Courts need not take judicial notice of irrelevant facts or documents."). Alwans mainly seeks to use the Alwan Exhibits to show that Defendants' challenged conduct was supposedly motivated by conditions in Gaza. *See, e.g.*, Alwan Mem. 24–25. In this posture, the Court must accept Plaintiffs' allegations as true and draw reasonable inferences in their favor. The Court cannot look to Alwan's materials for possible alternative motivations and draw inferences in Defendants' favor. The Alwan Exhibits are thus irrelevant.

*Third*, the Court cannot consider the Alwan Exhibits without converting Alwan's motion to dismiss to a motion for summary judgment and allowing discovery into Plaintiffs' claims. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) (explaining that a court "presented with matters outside the pleadings" can either "exclude[] the extrinsic documents" or "convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56").

91

## CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' motions.

Dated:  September 4, 2025
        New York, New York

                              Respectfully submitted,

*/s/ Scott J. Bornstein*           */s/ Richard A. Edlin*
SCOTT J. BORNSTEIN                 RICHARD A. EDLIN

**GREENBERG TRAURIG, LLP**         **HOLTZMAN VOGEL BARAN**
SCOTT J. BORNSTEIN                 **TORCHINSKY & JOSEFIAK, PLLC**
bornsteins@gtlaw.com               JASON TORCHINSKY (*pro hac vice*)
RICHARD A. EDLIN                   jtorchinsky@holtzmanvogel.com
edlinr@gtlaw.com                   SUSAN GREENE
One Vanderbilt Avenue              sgreene@holtzmanvogel.com
New York, New York 10017           N.Y. Bar No. 4687349
T. 212.801.9200                    2300 N. Street NW, Suite 643
                                   Washington D.C. 20037
**GREENBERG TRAURIG, P.A.**         T. 202.737.8808
ZACHARY NEEDELL*
zachary.needell@gtlaw.com          **NATIONAL JEWISH ADVOCACY**
401 East Las Olas                  **CENTER**
Boulevard, Suite 2000              MARK GOLDFEDER*
Fort Lauderdale, Florida           mark@njaclaw.org
33301                              BEN SCHLAGER*
T. 954.765.0500                    ben@njaclaw.org
                                   ANAT ALON-BECK*
**SCHOEN LAW FIRM, LLC**            Anat@njaclaw.org
DAVID SCHOEN                        ARIELLE F. KLEPACH*
N.Y. Bar No. 2700847               Arielle@njaclaw.org
schoenlawfirm@gmail.com            LAUREN ISRAELOVITCH
2800 Zelda Road, Suite 100-6       lauren@njaclaw.org
Montgomery, Alabama 36106          National Jewish Advocacy Center, Inc.
T. 334.395.6611                    International Legal Forum
F. 917.591.7586                    3 Times Square
                                   New York, NY 10036
                                   T. (800) 269-9895
                                   F: (800) 758-5232

*Pro Hac Vice Application Forthcoming*

92

**<u>WORD COUNT CERTIFICATION</u>**

I certify that the foregoing memorandum of law complies with the applicable word-count limitation because it contains 29,994 words, based on the word-processing program used to prepare this document and excluding the caption, table of contents, table of authorities, signature block, and this certification. This word count is in compliance with the Court's Order dated August 13, 2025 (ECF No. 89), which permits up to 30,000 words.

<u>/s/ Richard A. Edlin</u>
Richard A. Edlin