## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IRIS WEINSTEIN HAGGAI, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-02400-JAV |
| NERDEEN KISWANI, *et al.*, | |
| Defendants. | |

**BRIEF OF THE STATE OF IOWA AND 20 OTHER STATES AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Daniel J. Aaron, Esq.
Daniel J. Aaron, P.C.
125 Park Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 684-4466
danielaaron@djaaron.onmicrosoft.com
*Attorney for the State of Iowa*

Brenna Bird
   *Attorney General*

Eric Wessan
   *Solicitor General*

Office of the Attorney General
1305 E. Walnut St.
Des Moines, Iowa 50319
(515) 823-9117 – Telephone

eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION AND INTERESTS OF *AMICI CURIAE* ....................................... 1

BACKGROUND ............................................................................................................. 3

ARGUMENT ................................................................................................................... 5

    I.    States have an interest in ensuring supporters of terrorism are held accountable .............. 5

    II.   The ATA is the most effective tool for these Plaintiffs to attempt to receive compensation from Defendants......................................................................................... 8

    III.  Recent Supreme Court opinions highlight the need for flexibility and broad interpretation in ATA case. ................................................................................................. 11

CONCLUSION ................................................................................................................ 18

CERTIFICATE OF SERVICE ....................................................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Bay v. Commonwealth*,
  729 S.E.2d 768 (Va. App. 2012).................................................................... 6
*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*,
  291 F.3d 1000 (7th Cir. 2002) ...................................................................... 9
*Cook Cnty., Ill. v. United States ex rel. Chandler*,
  538 U.S. 119 (2003) ...................................................................................... 10
*Estates of Ungar ex rel. Strachman v. Palestinian Auth.*,
  304 F. Supp. 2d 232 (D.R.I. 2004)............................................................... 11
*Fuld v. Palestine Liberation Org.*,
  606 U.S. 1 (2025)..................................................................... 11, 16, 17
*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ......................................................... 12, 16
*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010)........................................................................... 16, 17
*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021)....................................................................... 16
*Knox v. Palestine Liberation Org.*,
  442 F. Supp. 2d 62 (S.D.N.Y. 2006)......................................................... 11
*Linde v. Arab Bank, PLC*,
  384 F. Supp. 2d 571 (E.D.N.Y. 2005) ....................................................... 11
*Linde v. Arab Bank, PLC*,
  706 F.3d 92 (2d Cir. 2013).......................................................................... 10
*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007)......................................................................... 3
*Osio v. Moros*,
  2023 WL 5019877 (S.D. Fla. July 19, 2023).............................................. 7
*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
  530 F. Supp. 2d 216 (D.D.C. 2008)............................................................ 11
*Stansell v. Revolutionary Armed Forces of Columbia*,
  2022 WL 17830551 (S.D.N.Y. Dec. 21, 2022) ............................... 10, 11
*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023)................................................ 11, 12, 13, 14, 15
*United States v. Morrison*,
  529 U.S. 598 (2000) ...................................................................................... 5

## Statutes

18 U.S.C. § 2333 ................................................................................................ 9, 12
18 U.S.C. § 2339B ........................................................................................... 2, 6
720 Ill. Comp. Stat. Ann. 5/29D-29.9............................................................... 7
AL Code § 13A-10-153 ...................................................................................... 7
Ariz. Rev. Stat. Ann. § 13-2308.01.................................................................. 7

Ark. Code Ann. § 5-54-202 ............................................................................... 7
Fla. Stat. Ann. § 775.33 .................................................................................. 7
Fla. Stat. § 775.30 ................................................................................... 7, 8, 9
Ind. Code § 35-46.5-2-5 ................................................................................. 7
La. Civ. Code Ann. art. 2315.9 ....................................................................... 7
Mich. Comp. Laws Ann. § 750.543k ............................................................... 7
Mo. Rev. Stat. Ann. § 576.080 ....................................................................... 7
N.J. Rev. Stat. 2C:38-5 .................................................................................. 7
N.Y. Penal Law § 490 ..................................................................................... 2
N.Y. Penal Law § 490.10 ................................................................................ 6
Nev. Rev. Stat. Ann. § 202.445 ...................................................................... 7
Ohio Rev. Code Ann. § 2909.22, 42 .............................................................. 7
Tennessee Code § 39-13-807 ......................................................................... 7
Va. Code § 18.2-46.5 ................................................................................... 2, 7

## INTRODUCTION AND INTERESTS OF *AMICI CURIAE*

On October 7, 2023, designated terrorist organization Hamas began a massive terror attack against Israel, culminating in the worst slaughter of Jews since the Holocaust. Since that day, Hamas terrorists have engaged in countless attacks against Israeli citizens and continue to hold both hostages and the bodies of the deceased. Such terrorism is, of course, illegal. But just as illegal is providing material support to the terrorists and terror organizations that perpetrated the attack.

Providing material support to designated terrorist organizations like Hamas violates federal law—as well as the laws of many States. Defendants here include the New York City branches of Hamas' American propaganda network ("Associational Defendants") with their leaders and one of their intermediaries to Hamas ("Individual Defendants") (collectively, "Defendants"). On October 8, 2023, Associational Defendants received—and distributed—a media toolkit identifying those Defendants as "PART of" a "Unity Intifada" under Hamas's "unified command." Second Amend. Compl. ("SAC"), Dkt. 66, ¶¶ 9, 97–99. That toolkit called on Associational Defendants to organize a "Day of Resistance" to support Hamas's terrorist actions and to sign what was effectively a loyalty pledge to Hamas. *Id.* ¶¶ 9, 109. Defendants followed these instructions to the letter, thereby substantially assisting Hamas in its ability to engage in its post-October 7 acts of international terrorism.

Defendants should be held accountable for their material support of terrorism. Dismissing the Anti-Terrorism Act ("ATA") claims before discovery and a chance to prove these incredibly disturbing allegations would be a disservice to the very purpose of the ATA.

Attorneys General, as their States' chief law enforcement officers, have a deep interest in holding terrorists and their supporters accountable. That accountability helps ensure that citizens of their States receive financial compensation from the individuals and organizations who supported the terrorists that engaged in the horrific attacks that harmed family members and loved

ones—fully acknowledging that no amount of financial compensation can ever make up for the tragic losses these citizens have experienced.

The Attorneys General of Iowa, Virginia, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Kansas, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, and West Virginia (collectively, "*Amici* States") thus submit this *amici curiae* brief in support of Plaintiffs as they seek to hold organizations and individuals that materially support Hamas accountable. Plaintiffs' Second Amended Complaint, brought by "victims of Hamas' heinous and ongoing acts of international terrorism, including October 7, 2023, the deadliest day for the Jewish people since the Holocaust," explains how Defendants support ongoing terror actions through pro-terror public relations operations, in coordination with Hamas and its affiliates. SAC ¶ 2. These egregious facts survive a motion to dismiss.

Material-support statutes recognize that organizations like Hamas "are so tainted by their criminal conduct that any contribution to such an organization facilitates that [criminal] conduct." Pub. L. 104-132, Title III, § 301(a)(7). Federal law has long made the knowing provision of material support to designated foreign terrorist organizations like Hamas illegal. See, *e.g.*, 18 U.S.C. § 2339B. Many States also prohibit providing material support for terrorism. See, *e.g.*, Iowa Code ch. 708A; Va. Code § 18.2-46.5; N.Y. Penal Law § 490. States thus have an important interest in making sure that violations of material support statutes can be enforced.

Defendants here are alleged to have provided material support for Hamas, the brutal terrorist regime that not only oppresses millions in Gaza but that also murdered more than a thousand innocents and kidnapped hundreds more. As recently as May 2025, American hostages were still held by Hamas following the October 7 massacre—acts of terror alleged here to have

been materially supported by Defendants. States have an interest in ensuring that valid claims brought under material support statutes are allowed to be litigated in court and that any violators are held accountable.

## BACKGROUND

As alleged,[1] Defendants willfully associated themselves with Hamas and knowingly took direction from a terrorist organization to spread propaganda in the United States. Within hours of the October 7 attack, Hamas called for the "resistance abroad" to join the battle. SAC ¶ 91. Hamas issued guidelines, including a manifesto titled "Our Narrative," which bore a logo reading "Hamas Media Office" and gave instructions for how to describe the October 7 attack. *Id.* ¶ 92. Defendants obtained and followed Hamas's media document, thereby "directly respond[ing] to, and follow[ing] orders from, Hamas, an FTO." *Id.* ¶ 93. Defendants Kiswani and Within Our Lifetime further coordinated with Hamas to launch "an economic blockade across four continents in solidarity with Palestinians." *Id.* ¶¶ 201–08. And Defendant Bazrouk, a member of Within Our Lifetime who recently pled guilty to conspiracy to commit hate crimes with "others known and unknown," acted as an additional intermediary between Defendants and Hamas. *Id.* ¶¶ 223, 226–27. Through their actions, Defendants provided material assistance to Hamas, contributing to the harms suffered by Plaintiffs. The assistance was especially valuable because New York City is an important urban center, unparalleled cultural hub, and home to the largest Jewish population outside of Israel. *Id.* ¶ 77.

International propaganda is a "central" part of Hamas's strategy. SAC ¶ 44. Hamas's charter calls on its supporters to engage in communication and propaganda campaigns on its

---

[1] For purposes of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the relevant facts are those alleged in Plaintiffs' complaint. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

behalf. *Id.* ¶ 44. Hamas has issued express guidelines detailing how its propagandists should "play their part in strengthening the home front and in properly conveying information worldwide." *Id.* ¶ 92. Hamas uses this propaganda to normalize their acts of terror, recruit, and promote violence against Jews on American college campuses. *Id.* ¶ 65. Hamas further used Defendants' actions to encourage their terrorists and to discourage at least one captive kidnapped on October 7. *See id.* ¶ 141.

The SAC describes how Hamas coordinates with its United States propaganda outlets, including with Defendants, through American Muslims for Palestine ("AMP"). AMP was founded after a predecessor organization and five of its board members were convicted of providing material support for Hamas. *See* SAC ¶¶ 47–57. AMP uses its on-campus brand National Students for Justice in Palestine ("NSJP") to disseminate pro-Hamas propaganda on college campuses throughout the country. *Id.* ¶¶ 58–62. NSJP operates as an "umbrella organization" for American Students for Justice in Palestine chapters, including Defendants Columbia-Barnard Jewish Voice for Peace, Columbia Students for Justice in Palestine, Within our Lifetime, and Columbia University Apartheid Divest. *Id.* ¶¶ 60, 64, 69, 72, 74–75. AMP/NSJP and its affiliates "provide Hamas a public relations and propaganda division" and further "recruit foot soldiers to engage in direct acts of violence, destroy property, disrupt critical academic and economic centers, and generally incite fear and chaos in support of Hamas." *Id.* ¶ 66. In coordination with Hamas through AMP, Defendants provide public relations and communications assistance for Hamas. For although Hamas, a designated foreign terror organization, cannot hire American public relations firms to advocate on their behalf, Defendants can act as one themselves. *Id.* ¶ 230. Indeed, when Hamas asked for aid, Defendants stepped up and followed their directions—and Hamas thanked them. *Id.* ¶¶ 115–16, 156–58.

Given Defendants role in encouraging and assisting Hamas's terrorist activities, Plaintiffs sued to hold Defendants liable for the harm they suffered on and after October 7. *Amici* States file this brief to express their interest in ensuring that Plaintiffs have their day in court.

## ARGUMENT

Plaintiffs have alleged that Defendants coordinated and materially supported Hamas in its acts of terror. This Court should allow the ATA claims to proceed against Defendants—each of whom is plausibly alleged to have materially supported terror. The States focus on four key aspects of the litigation for the Court: first, why States have an interest in ensuring this case proceeds; second, why this ATA suit may be the only method for these victims of terror to receive financial compensation for their losses at the hands of terrorists and their supporters; third, how *Twitter v. Taamneh* calls for a flexible application of the ATA, and fourth, why the ATA should be applied broadly to accomplish its purposes.

## I.    States have an interest in ensuring supporters of terrorism are held accountable

Terrorism is a crime in America—both at the federal level and in many States. So too is material support for terrorism. To combat terrorism, the federal government, state governments, and private citizens have various tools in their toolkits to hold terrorists and their supporters accountable. *Amici* States have a strong interest in ensuring that terrorists pay for their crimes.

The federal government and States often have complementary roles in the criminal prosecution of terrorism. The federal government can prosecute international terrorism based on its constitutionally enumerated powers to regulate commerce between states and with foreign nations, to define and punish "Offences against the Law of Nations," to declare war, and to make treaties. *See*, *e.g.*, Pub. L. No. 104-132, § 301(a).  As for States, they can prosecute domestic terrorism occurring within their borders based on their traditional police powers to suppress violent crime. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) (describing the power to suppress

violent crime as "denied [to] the National Government and reposed in the States"). "[D]ue in part to the uneven federalization of terrorism, federal prosecutors handle most international terrorism cases while local prosecutors frequently charge domestic terrorism under state law." Shirin Sinnar, *Separate and Unequal: The Law of "Domestic" and "International" Terrorism*, 117 Mich. L. Rev. 1333, 1339 (2019). States are not precluded from prosecuting international terrorism, however; rather, States "can exercise criminal jurisdiction over international terrorism committed or threatened within their borders where state law does not conflict with federal law." *Id.* at 1379.

And these laws are effective: for example, the Commonwealth of Virginia successfully prosecuted a would-be terrorist under its terrorism statute for considering a pipe bomb attack on a school. *See Bay v. Commonwealth*, 729 S.E.2d 768, 770 (Va. App. 2012). Virginia's antiterrorism statutes provided the basis for multiple charges that led to conviction. Authority to pursue terroristic threats is a necessary part of the States' police power and law enforcement authority.

Federal law has also long made the knowing provision of material support to designated foreign terrorist organizations like Hamas illegal. *See*, *e.g.*, 18 U.S.C. § 2339B. The federal statute defines material support to include "any property, tangible or intangible, or service, including currency or monetary instruments . . . expert advice or assistance . . . communications equipment, facilities . . . and transportation, except medicine or religious materials." *Id.* § 2339A. Many States similarly prohibit providing material support for terrorism. For example, Iowa criminalizes "provid[ing] material support or resources to a person who commits or attempts to commit terrorism." Iowa Code ch. 708A.4. And in New York, a person violates the law if he or she raises, solicits, collects or provides material support or resources with the intent that "material support . . . will be used . . . to plan, prepare, carry out or aid in . . . an act of terrorism." N.Y. Penal Law § 490.10. Iowa and New York are not the only States with such laws: Alabama, Arizona, Arkansas,

Florida, Illinois, Indiana, Michigan, Missouri, Nevada, New Jersey, Ohio, Pennsylvania, Tennessee, and Virginia all have their own material-support statutes.[2] States enforce these material support statutes to ensure that their citizens are protected from would-be terrorists and their supporters.

Combatting terrorism does not end with criminal prosecution. Federal law allows those affected by terrorist attacks to seek civil damages from supporters of terrorism. So too do certain States, where state anti-terrorism acts create a private right of action for those injured by terrorism—including by those providing material support for terrorists. *See*, *e.g.*, Fla. Stat. § 775.30; 42 Pa. Stat. and Consol. Stat. § 8318 (creating private right of action to pursue remedies against a "person who knowingly provided material support or resources to or aided a terrorist or terrorist organization"). In one prominent case under Florida's statute, for instance, plaintiffs sued to recover against defendants that knowingly provided material support for terrorism by selling drugs, the profits of which would be remitted to foreign terrorist organization Fuerzas Armadas Revolucionarias de Colombia (more commonly known as FARC). *Osio v. Moros*, 2023 WL 5019877, at *4 (S.D. Fla. July 19, 2023), *report and recommendation adopted*, 2023 WL 5015435 (S.D. Fla. Aug. 7, 2023) (citing Fla. Stat. § 775.30). Florida's law allowed the plaintiffs to pursue their claims alleging material support. This type of enforcement action complements the federal framework and shows how important it is to allow private rights of action—when authorized by statute—to enforce anti-terrorism laws.

---

[2] See AL Code § 13A-10-153, Ariz. Rev. Stat. Ann. § 13-2308.01, Ark. Code Ann. § 5-54-202, Fla. Stat. Ann. § 775.33, 720 Ill. Comp. Stat. Ann. 5/29D-29.9, Ind. Code § 35-46.5-2-5, La. Civ. Code Ann. art. 2315.9, Mich. Comp. Laws Ann. § 750.543k, Mo. Rev. Stat. Ann. § 576.080, Nev. Rev. Stat. Ann. § 202.445, N.J. Rev. Stat. 2C:38-5, Ohio Rev. Code Ann. § 2909.22, 42 Pa. Stat. and Consol. Stat. Ann. § 8318, Tennessee Code § 39-13-807, Va. Code § 18.2-46.5.

States have vital interests in ensuring the safety and security of their citizens and attempt to do so through state law. Indeed, many States have enacted analogues and complements to the federal antiterrorism laws—including private rights of action for persons injured by those who provide material support for terrorists and terror organizations. The facts presented here are incredibly disturbing. At this motion to dismiss stage, construing all facts in Plaintiffs' favor, the Court should hold that Plaintiffs have grounds to proceed on the ATA claims. Allowing Plaintiffs to take their claims to trial not only allows for justice to be done but also furthers the purpose of the ATA in combatting terrorism.

## II.    The ATA is the most effective tool for these Plaintiffs to attempt to receive compensation from Defendants

Although criminal prosecution can hold terrorists and their supporters accountable, a private right of action for damages is the most effective method for the actual victims of terrorism to be compensated. The federal ATA was created for this exact purpose, and this Court should not shut the courthouse doors for Plaintiffs who have put forward credible allegations that they were seriously injured by Defendants' material support of terror in the horrific October 7 attacks and subsequent actions by Hamas.

The ATA was passed precisely to provide plaintiffs like the ones here a civil cause of action for damages. In 1986, Congress had passed legislation that provided extraterritorial *criminal* jurisdiction for acts of international terrorism against U.S. nationals. See H.R. Rep. No. 102-1040, at 5. But a subsequent case showed Congress that there was a "gap" in this country's "efforts to develop a comprehensive legal response to international terrorism." *Id.* After a cruise passenger was executed and thrown overboard by terrorists, his widow and family pursued legal remedies against the terrorists in the courts of their home state of New York. *Id.* "Only by virtue of the fact that the attack violated certain Admiralty laws and that the organization involved—the Palestine

Liberation Organization—had assets and carried on activities in New York, was the court able to establish jurisdiction over the case." *Id.* A similar attack "occurring on an airplane or in some other locale might not have been subject to civil action in the U.S." *Id.*

Congress thus passed the expansive ATA statute. The ATA permits civil claims for injuries caused by an "act of international terrorism." 18 U.S.C. § 2333(a). "International terrorism" is defined as activities that "occur primarily outside the territorial jurisdiction of the United States" or "transcend national boundaries" in "the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum." *Id.* § 2331(1)(C). "International terrorism" is contrasted with "domestic terrorism," which is limited to activities that "occur primarily within the territorial jurisdiction of the United States." *Id.* § 2331(5)(C).

The ATA was meant to "codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law." *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1010 (7th Cir. 2002). The Act "accords victims of terrorism the remedies of American tort law, including treble damages and attorney's fees." *Id.* (quoting 137 Cong. Rec. S4511-04 (April 16, 1991)). The Act is "powerfully broad" and is meant to "bring in all of the substantive law of the American tort law system." *Id.* (quoting *Antiterrorism Act of 1990*, Hearing Before the Subcommittee on Courts and Administrative Practice of Committee on the Judiciary, United States Senate, 101st Congress, Second Session, July 25, 1990, Testimony of Joseph Morris, at 136 (brackets omitted)).

Congress thus created the ATA to overcome obstacles to holding terrorists accountable in American courts. Congress recognized that allowing private civil actions for these horrific attacks would not only provide remedies to the victims of terror but also could provide "an important

instrument in the fight against terrorism," *Antiterrorism Act of 1991*, Hearing Before the Subcomm. on Intellectual Property & Judicial Admin. of the H. Comm. on the Judiciary, 102d Cong. 10 (1992), at 10 (letter from Sen. Grassley), by striking at "the resource that keeps [international terrorists] in business – their money," 138 Cong. Rec. S17252-04 (1992) (statement of Sen. Grassley). The ATA reaffirmed America's "commitment to the rule of law," under which "the people of the United States" could "bring terrorists to justice the American way, by using the framework of our legal system to seek justice against those who follow no framework or defy all notions of morality and justice." *Antiterrorism Act of 1990*, Hearing Before the Subcommittee on Courts and Administrative Practice of the Senate Committee on the Judiciary, 101st Cong., 2nd Sess., at 2–3 (July 25, 1990).

The ATA is thus a critical tool for citizens of *Amici* States to receive compensation for the effects of horrific acts of international terrorism, like the October 7 attacks. Although the treble damages provision of the ATA was intended to punish terrorists, it also serves the important purpose of attempting—in some small way—to make victims whole after life-altering events. See *Stansell v. Revolutionary Armed Forces of Columbia*, 2022 WL 17830551, at *5 (S.D.N.Y. Dec. 21, 2022) (The ATA "reflects both a desire to punish terrorists via criminal and civil penalties and to compensate victims of terrorism."). Indeed, "it is important to realize that treble damages have a compensatory side, serving remedial purposes in addition to punitive objectives." *Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003). The ATA's legislative history "reflects that Congress conceived of the ATA, at least in part, as a mechanism for protecting the public's interests through private enforcement." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 112 (2d Cir. 2013). Thus, "[t]reble damages under the ATA are compensatory damages because they are remedial in nature, and function, in essence, as a form of liquidated damages." *Stansell*, 2022 WL

17830551, at *3. ATA damage awards can "compensate the estates of victims and their family members for non-economic harms such as pain and suffering, loss of companionship and mental anguish." *Id.* at *6; see also *Knox v. Palestine Liberation Org.*, 442 F. Supp. 2d 62 (S.D.N.Y. 2006) (awarding damages for "loss of consortium, loss of companionship, society and guidance, and damages of mental anguish"); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216 (D.D.C. 2008) (awarding damages for loss of consortium and pain and suffering); *Estates of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 239 (D.R.I. 2004).

New York courts, unlike certain other States, have not recognized a private right of action for victims of terrorism to seek damages from the supporters of terrorism. *See Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589–90 (E.D.N.Y. 2005) (holding a bank's conduct that would be "sufficient to make out statutory claims under the ATA" does not support a claim under New York law). Thus, it would be difficult to receive damages against Defendants in state courts. The ATA is likely Plaintiffs' only avenue to receive compensation for the horrific crimes perpetrated against them. This Court should not dismiss Plaintiffs' ATA claims and allow Defendants to escape liability without Plaintiffs having a chance to prove their case.

III.    **Recent Supreme Court opinions highlight the need for flexibility and broad interpretation in ATA case.**

Civil antiterrorism cases will often involve complicated—and tragic—facts. Beyond the statute, a body of jurisprudence has built up explaining when, and how, perpetrators may be held responsible. In the last few years, the Supreme Court has issued opinions in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), and *Fuld v. Palestine Liberation Org.*, 606 U.S. 1 (2025), that shed light on the proper interpretation of the ATA. Both cases highlight the need for flexibility and a broad interpretation of the ATA in cases like this.

11

*First*, *Twitter* recognized the need for flexibility in ATA cases. That case emphasized that aiding and abetting law must be applied flexibly "to impose liability on those who consciously and culpably participated in the tort at issue." *Twitter*, 598 U.S. at 506. Plaintiffs' allegations survive a motion to dismiss under this standard.

Under federal law, a person "who aids and abets, by knowingly providing substantial assistance" to a foreign terrorist organization ("FTO") may be held liable for the acts of international terrorism that the person aided and abetted. 18 U.S.C § 2333(d)(2). While "[n]othing in the statute defines any of these critical terms," they are "familiar to the common law, which has long held aiders-and-abettors secondarily liable for the wrongful acts of others." *Twitter*, 598 U.S. at 484. Defendants instead ask this Court to rigidly apply the D.C. Circuit's "three-element and six-factor test" from *Halberstam*. *Cf. Twitter*, 598 U.S. at 488 (citing *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)); *see* Dkt. 52 at 11; Dkt. 55 at 14–15.

But the Supreme Court recognized *Halberstam* "may not be entirely adequate" when dealing with "international terrorist networks and world-spanning internet platforms." *Twitter*, 598 U.S. at 487–88. Instead, courts should "ascertain the 'basic thrust' of *Halberstam*'s elements" and "the common law of aiding and abetting upon which *Halberstam* rested." *Id.* at 488. In doing so, they can recognize that "[b]y their very nature, the concepts of aiding and abetting and substantial assistance do not lend themselves to crisp, bright-line distinctions" like those used by Defendants in this case. *Id.* at 506.

Of course, the *Halberstam* test still matters: Section 2333(d)(2) "points to the elements and factors articulated by *Halberstam*." *Twitter*, 598 U.S. at 497. But the factors should be "applied as a framework designed to hold defendants liable when they consciously and culpably 'participate[d] in' a tortious act in such a way as to help 'make it succeed.'" *Id.* at 497 (citation omitted). In other

words, the *Halberstam* framework must yield to the purpose of aiding and abetting liability. The "fundamental question of aiding-and-abetting liability" is "[d]id defendants consciously, voluntarily, and culpably participate in or support the relevant wrongdoing?" *Id.* at 505.

In *Twitter*, plaintiffs sued Facebook, Twitter, and Google, alleging that an FTO used their social media platforms to recruit and raise funds. *Twitter*, 598 U.S. at 478. The plaintiffs plausibly alleged that defendants knew both that the FTO committed torts and that defendants themselves were "playing some sort of role in [the FTO's] enterprise." *Id.* at 497. But the plaintiffs failed to allege that defendants gave "knowing and substantial assistance," because plaintiffs relied on negligence, rather than on culpable action. *Id*. at 498; *see also id*. at 500 ("[T]he claim here rests less on affirmative misconduct and more on an alleged failure to stop ISIS from using these platforms."). The plaintiffs did not plead that Twitter or the other defendants "culpably 'associate[d themselves] with'" the tortious act, gave the FTO "any special treatment or words of encouragement," or "carefully screened any content before allowing users to upload it onto their platforms." *Id*. at 498–99. Ultimately, the plaintiffs failed to show "that defendants treated [the FTO] any differently from anyone else." *Id*. at 500.

Unlike in *Twitter,* Plaintiffs here plausibly claim Defendants consciously, voluntarily, and culpably assisted Hamas's terrorist attacks. Plaintiffs allege Associational Defendants had prior knowledge of the October 7 attacks based on the speed with which Defendants responded to the attack, the use of graphics that suggest insider information about the attack, and reactivation of an account shortly before the attack. SAC ¶¶ 105–06. Even if Defendants did not know about the specific October 7 attack in advance, they worked closely with AMP/NSJP, an organization founded to distribute propaganda for Hamas, *id*. ¶¶ 66–77, including by distributing NSJP's propaganda, *id*. ¶¶ 103, 109–29.

13

Defendants knew they were distributing Hamas propaganda because materials they posted and handed out were marked with Hamas logos and designations. SAC ¶¶ 11, 92–93, 191. The toolkit Associational Defendants used after October 7 further identified its creators as part of a "Unity Intifada" operating "under unified command" in Gaza. *Id*. ¶¶ 97–98. Defendant Columbia SJP further signed the Towfan Al-Aqsa Statement on October 7, declaring its support for Hamas and their actions. *Id*. ¶¶ 102, 104. For these reasons and because FTOs including Hamas thanked Defendants, Defendants were aware they were aiding an FTO, *id*. ¶¶ 115–16, 118, 154, 156–58, yet continued to provide such assistance, *id*. ¶¶ 159–92, 200, 205–07, 209–10. Here, "defendants consciously, voluntarily, and culpably participate[d] or support[ed] the relevant wrongdoing." *Twitter*, 598 U.S. at 505.

Defendants argue there is no "nexus" between their actions and Hamas's actions. Dkt. 55 at 6–7; Dkt. 59 at 16. But just like the defendants in *Twitter*, Defendants here "overstate the nexus that § 2333(d)(2) requires between the alleged assistance and the wrongful act." *Twitter*, 598 U.S. at 495. Aiding and abetting "does not require the defendant to have known 'all particulars of the primary actor's plan.'" *Id*. Defendants in this case do not need to have had personal knowledge of any of the specific torts committed against Plaintiffs (like kidnapping or murder) because "[a]s *Halberstam* makes clear, people who aid and abet a tort can be held liable for other torts that were a 'foreseeable risk' of the intended tort." *Id*. at 496. "[E]ven more remote support can still constitute aiding and abetting in the right case." *Id*.

Plaintiffs do not deny their support for Hamas's actions or goals, but contend they merely engaged in "independent advocacy." Dkt. 59 at 20; Dkt. 52 at 28–29. But "aiding and abetting does not require any agreement with the primary wrongdoer to commit wrongful acts." *Twitter*, 598 U.S. at 489–90. Aiding and abetting is grounded in "culpable misconduct" because it requires

14

"the defendant . . . to take some 'affirmative' act with the intent of facilitating the offense's commission.'" *Id*. at 490. "Such intentional participation can come in many forms, including . . . encouraging . . . the commission of the offense, such as through words of encouragement." *Id*. "For example, *Halberstam* recognized that giving verbal encouragement (such as yelling 'Kill him!') could be substantial assistance." *Id*. at 492.

This is important because Plaintiffs continue to suffer injuries after the October 7 attack. Plaintiff Haggai was harmed by Hamas when Hamas members kidnapped and murdered her parents and held their bodies captive until June 5, 2025, and that harm continues to this day in the form of severe mental and emotional pain, suffering, and distress. SAC ¶ 13. Plaintiff Doe suffered mental anguish and pain while serving in the Israel Defense Forces, fighting Hamas for 100 consecutive days after October 7. *Id*. ¶ 14. He suffers ongoing mental and emotional trauma. *Id*. "Every attack by Hamas is an individual act of international terrorism as well as part of the ongoing, continuing act of international terrorism that began on October 7." *Id*. ¶ 84. By supporting Hamas's continued terrorist acts, Defendants contributed to the ongoing injuries these Plaintiffs suffer. Those injuries are foreseeable consequences of Hamas's terrorist acts.

"Moreover, in appropriate circumstances, a secondary defendant's role in an illicit enterprise can be so systematic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise." *Twitter*, 598 U.S. at 496. "At this point, aiding-and-abetting liability begins to blur with conspiracy liability, which typically holds co-conspirators liable for all reasonably foreseeable acts taken to further the conspiracy." *Id*. The Supreme Court noted it "cannot rule out the possibility that some set of allegations involving aid to a known terrorist group would justify holding a secondary defendant liable for all of the group's actions or perhaps some definable subset of terrorist acts." *Id*. at 501. Beyond Defendants' propagandizing on Hamas's

behalf, the SAC describes how Hamas, through its affiliate AMP, operates Associational Defendants. SAC ¶¶ 66–77. Plaintiffs further describe how Defendant Bazrouk "acted as an intermediary through which the remaining Defendants indirectly communicated with Hamas." *Id.* ¶ 226. Discovery is necessary to further show the systematic ties between Defendants and Hamas and identify additional intermediaries.[3]

*Second*, the Court breathed new life into the ATA in *Fuld*, illustrating the importance of broadly interpreting the statute. When Congress and the President align on an issue of foreign policy, including holding terrorism supporters accountable, the courts do not "cavalierly interfere with" their "delicate judgments." *Fuld*, 606 U.S. at 19. In *Fuld*, the Supreme Court affirmed the viability of actions brought under various antiterrorism acts. *Id.* at 25. In enacting antiterrorism laws, "Congress and the President made a considered judgment to subject" violators "to liability in U.S. courts as part of a comprehensive legal response to 'halt, deter, and disrupt' acts of international terrorism that threaten the life and limb of American citizens." *Id.* at 19–20 (quoting H.R. Rep. No. 115–858, pp. 7–8 (2018)). That makes sense because "[c]ombating terrorism is . . . 'an urgent objective of the highest order.'" *Id.* at 20 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010)).And the Supreme Court recognized that the federal government "has a strong interest in permitting American victims of international terror to pursue justice in domestic

---

[3] The Second Circuit has explained that "culpability for the same amount of assistance would increase with an increase in either the blameworthiness of the tortious act aided or the seriousness of the foreseeable consequences." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 857 (2d Cir. 2021); *see also Halberstam*, 705 F.2d at 484 & n.13 (D.C. Cir. 1983) ("[A] court might also apply a proportionality test to particularly bad or opprobrious acts, *i.e.*, a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences."). Here, Defendants allegedly materially supported a terrorist organization in the rape, kidnapping, and murder of entire families. SAC ¶¶ 78–81. Both the blameworthiness of the tortious act and the seriousness of the foreseeable consequences should raise Defendants' level of culpability.

16

courts." *Id.* At times, facilitating "adjudication of ATA claims" is "'vital' to 'furthering the safety of Americans abroad, facilitating compensation for injuries or death, and deterring international terrorism.'" *Id.* (quoting Brief for United States, *Fuld v. Palestine Liberation Org.*, Nos. 24-20 & 24-151 (U.S. Jan. 13, 2025) & Brief for Senator Charles Grassley, *et al.*, *Fuld v. Palestine Liberation Org.*, Nos. 24–20 & 24–151 (U.S. Aug. 8, 2024)).

*Fuld* involved personal jurisdiction over certain foreign terror groups and applied the narrower Promoting Security and Justice for Victims of Terrorism Act rather than other antiterrorism statutes. *Id.* at 8. While it is not directly on point, it is the most recent evidence of the Supreme Court's desire for America's antiterrorism laws to be judiciously used to hold accountable terrorists and their supporters. The Court's sweeping language and clear guidance on a related statute instructs lower courts to effectuate Congress's validly enacted antiterrorism statutes.

## CONCLUSION

For all these reasons, this Court should decline to dismiss Plaintiffs' claims.


Dated: September 22, 2025                    Respectfully submitted,

*Daniel Aaron*

Daniel J. Aaron, Esq.
danielaaron@djaaron.onmicrosoft.com
Daniel J. Aaron, P.C.
125 Park Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 684-4466
*Attorney for the State of Iowa*

Brenna Bird
    *Attorney General*

Eric Wessan
    *Solicitor General*

Office of the Attorney General
1305 E. Walnut St.
Des Moines, Iowa 50319
(515) 823-9117 – Telephone

eric.wessan@ag.iowa.gov

*Counsel for the State of Iowa*

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on September 22, 2025, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will then send a

notification of such filing (NEF) to all parties of record.

*Daniel Aaron*
_____
Daniel J. Aaron, Esq.
*Counsel for Iowa*

## CERTIFICATE OF WORD COUNT

THIS IS TO CERTIFY that this Memorandum of Law contains fewer than 8,750 words

in conformity with L.R. 7.1(c).

*Daniel Aaron*
_____
Daniel J. Aaron, Esq.
*Counsel for Iowa*

*Attorneys General for Additional* Amici *States*

| | |
|---|---|
| Steve Marshall<br>Attorney General of Alabama | Michael T. Hilgers<br>Attorney General of Nebraska |
| Stephen J. Cox<br>Attorney General of Alaska | Drew Wrigley<br>Attorney General of North Dakota |
| Tim Griffin<br>Attorney General of Arkansas | Gentner Drummond<br>Attorney General of Oklahoma |
| James Uthmeier<br>Attorney General of Florida | Dave Sunday<br>Attorney General of Pennsylvania |
| Chris Carr<br>Attorney General of Georgia | Alan Wilson<br>Attorney General of South Carolina |
| Theodore E. Rokita<br>Attorney General of Indiana | Jonathan Skrmetti<br>Attorney General of Tennessee |
| Kris Kobach<br>Attorney General of Kansas | Ken Paxton<br>Attorney General of Texas |
| Liz Murrill<br>Attorney General of Louisiana | Jason S. Miyares<br>Attorney General of Virginia |
| Lynn Fitch<br>Attorney General of Mississippi | John B. McCuskey<br>Attorney General of West Virginia |
| Andrew T. Bailey<br>Attorney General of Missouri | |
| Austin Knudsen<br>Attorney General of Montana | |