## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HAGGAI, *et al.*,

                         *Plaintiffs*,

        v.

KISWANI, *et al.*,

                      *Defendants*.

Case No. 1:25-cv-02400-JAV

HON. JEANNETTE A. VARGAS

## TAREK BAZROUK'S MOTION TO DISMISS
## <u>PLAINTIFFS' SECOND AMENDED COMPLAINT</u>

# TABLE OF AUTHORITIES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................10

*Ateş v. Gülen*, No. 3:15-cv-2354, 2016 WL 3568190 (M.D. Pa. June 29, 2016) ..................23

*Balintulo v. Daimler AG*, 727 F.3d 174 (2d Cir. 2013) ..........................................23

*Balintulo v. Ford Motor Co.*, 796 F.3d 160 (2d Cir. 2015)......................................24

*Barahona v. LaSalle Mgmt. Co.*, No. 23-cv-1012, 2025 WL 961437 (S.D.N.Y. Mar. 31, 2025)

.............................................................................................................13

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007) .............................10

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57 (2d Cir. 1985) .......................16

*Cabrera v. Schafer*, 178 F. Supp. 3d 69 (E.D.N.Y. 2016) ......................................13

*Collins v. Northeast Grocery, Inc.*, 149 F.4th 163 (2d Cir. 2025) ............................16

*Conopco, Inc. v. Roll Int'l*, 231 F.3d 82 (2d Cir. 2000)..........................................11

*Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965 (N.D. Cal. 2018)..........................17

*Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452 (S.D.N.Y. 2001) ........................17

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349 (S.D.N.Y. 2007)..17

*Global View Ltd. Venture Capital v. Great Cent. Basin Exploration, L.L.C.*, 288 F. Supp. 2d 482

(S.D.N.Y. 2003) ................................................................................................11

*Grandon v. Merrill Lynch & Co.*, 147 F.3d 184 (2d Cir. 1998)...............................10

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)...........................................27

*Homevestors of Am., Inc. v. Warner Bros. Discovery, Inc.*, Civ. No. 22-1583-RGA, 2023 U.S.

Dist. LEXIS 187653 (D. Del. Oct. 18, 2023) ................................................29

*In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011) ................20

*In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478 (S.D.N.Y. 2011) ........................17

*In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118 (2d Cir. 2013) ...................................20

*Jara v. Núñez*, 878 F.3d 1268 (11th Cir. 2018) ...................................................................22

*Jesner v. Arab Bank, PLC*, 584 U.S. 241 (2018) ....................................................................19

*K & K Prods. v. Walt Disney Studios Motion Pictures*, No. 2:20-CV-1753 JCM (NJK), 2021 U.S. Dist. LEXIS 182012 D. Nev. Sep. 23, 2021), *affirmed*, 2022 U.S. App. LEXIS 23466 (9th Cir. 2022) ...............................................................................................................29

*Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) ..................................................22

*Kistler v. Stanley Black & Decker, Inc.*, No. 23-cv-1580, 2024 WL 4370941 (S.D.N.Y. 2024)..11

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) .....................................................11

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...................................................................16

*Moore v. Hadestown Broadway Ltd. Liab. Co.*, No. 23-CV-4837 (LAP), 2024 U.S. Dist. LEXIS 40245 (S.D.N.Y. Mar. 7, 2024) .......................................................................................29

*Mwani v. Bin Ladin*, No. CIV A 99–125 CKK, 2006 WL 3422208 (D.D.C. Sept. 28, 2006) 20

*Napear v. Bonneville Int'l Corp.*, 669 F. Supp. 3d 948 (2023) ..............................................14

*Nestle USA, Inc. v. Doe*, 593 U.S. 628 (2021) .....................................................................22

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163 (S.D.N.Y. 2006) ............................................................................................................17

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009) ..............21

*Roberts v. Babkiewicz*, 582 F.3d 418 (2d Cir. 2009) ............................................................11

*Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976) ..........................16

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).....................................................................20

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) .......................................................................19

*Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433 (2017) .................................................16

*Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433 (2017) ....................................................19

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) ....................................................................21

*U.S. v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422 (E.D.N.Y. 2007) .............................11

*United States v. Schwimmer*, 279 U.S. 644 (1929) (Holmes, J., dissenting)............................30

## Table of Contents

I.   INTRODUCTION ................................................................................................1

II.  BACKGROUND ................................................................................................4

III. FACTUAL ALLEGATIONS ...........................................................................7

   A. The Parties ......................................................................................................7

   B. Procedural History...........................................................................................8

IV.  STANDARDS OF REVIEW.............................................................................9

   A. Fed. R. Civ. Proc. 12(B)(6) Requires Facts Sufficient To Make A Claim Plausible.........9

   B. Judicial Notice................................................................................................10

V.   ARGUMENT ....................................................................................................15

   A. Plaintiffs Lack Article Iii Standing................................................................15

   B. This Court Lacks Subject Matter Jurisdiction Under The Ats................................18

     1. Plaintiffs Fail To Plead A Violation Of An International Norm Justiciable Under The Ats 19

       i.   *No Universal Norm Against "Terrorism" Exists Under Customary International Law* ......19

       ii.  *Aiding And Abetting Liability Requires Purpose, Not Mere Membership* .....................20

       iii. *Judicial Deference To Congress Forecloses Recognition Of A New Cause Of Action* ..........20

     2. Plaintiffs Cannot Overcome The Presumption Against Extraterritoriality .................21

     3. Mr. Bazrouk Cannot Be Held Liable Under The Ats As An Individual Alleged To Be A Member Of An Unincorporated Association ......................................................22

   C. The Non-Citizen Plaintiffs Fail To State A Claim Under The Ats ...........................23

     1. The Governing Standard ........................................................................23

     2. The Sac Fails To Plead Practical Assistance .................................................23

     3. The Sac Fails To Plead Purpose ................................................................24

     4. The $750,000 Allegation Is Pure Speculation ...............................................24

     5. Membership And Attendance Are Constitutionally Protected And Legally Insufficient 25

6. <u>The Foreign Plaintiffs' Claims Fail As To Mr. Bazrouk In Their Entirety</u> ................ 25

**D. The U.S. Citizen Plaintiffs Fail To State A Claim Under The Ata** ......................... 26

**E. Mr. Bazrouk's Alleged Activities Constitute Protected First Amendment Speech** ........ 28

**VI. CONCLUSION** ............................................................................................... 29

# I. INTRODUCTION

Tarek Bazrouk's initial exposure to the brutality of the Palestinian experience came when he was just four years old. Shortly after visiting his family in the West Bank as a toddler, Mr. Bazrouk learned that one of his family members there, Rashad Khater, was killed in a lynching by Zionist settlers.[1] As is custom, the Zionist murderers of a Palestinian were neither arrested nor apprehended.[2] The lesson was indelibly seared into Mr. Bazrouk at an early age: Palestinian life is not merely devalued—it is systematically extinguished under a regime of state-sanctioned terrorism designed to ensure it.

This system of oppression continues today, with Palestinians facing ongoing dispossession through home demolitions, land confiscation, and forced displacement—all carried out under the explicit mandate of maintaining Jewish dominance.[3] The trauma of this systematic erasure echoes through generations of Palestinian families like Mr. Bazrouk's, who have witnessed their families and communities fragmented, their rights systematically denied, their properties seized or destroyed, and their humanity unrecognized under a settler-colonial regime that explicitly positions indigenous Palestinians as *Untermenschen* ("subhuman") while privileging European Jews as the *Herrenvolk* ("master race")—the dominant ethnoreligious group. It is against this backdrop of generational dispossession and state-sanctioned dehumanization that Mr. Bazrouk's conscience was formed.

---

[1] *See* Doc. No. 43, Case No. 1:25: CR-00203-RMB,

[2] *Id.*

[3] Amal Jamal, *Jewish Sovereignty and the Inclusive Exclusion of Palestinians: Shifting the Conceptual Understanding of Politics in Israel/Palestine*, 4 FRONTIERS POL. SCI. 995371 (2022). Available at: https://www.frontiersin.org/journals/political-science/articles/10.3389/fpos.2022.995371/full.

Since October 7, 2023, Israel has carried out a relentless genocide against the people of Palestine. Mr. Bazrouk does not use the term "genocide" as a rhetorical device, but as a concrete legal prohibition that exists in federal and international law. *See* 18 U.S.C § 1091 (implementing the Genocide Convention). Israel's genocidal conduct in Palestine has been recognized by international courts,[4] United Nations experts,[5] genocide scholars,[6] leading medical professionals,[7] and even U.S. courts,[8] among others. Demanding an end to this genocide and justice for the people being annihilated is not only lawful and constitutionally protected, but also a legal imperative upon all nations under the Genocide Convention.[9] It is

---

[4] *See* International Court of Justice, Dkt. No. 87, ICJ opinion dated January 26, 2024, at ¶ 30.

[5] *See, e.g.,* United Nations, "Anatomy of a Genocide, Report of the Special Rapporteur on the Situation of Human Rights in the Palestinian Territories Occupied Since 1967, Francesca Albanese," A/HRC/55/73 (March 25, 2024), https://perma.cc/9GRF-XR7K; United Nations, "Gaza: UN Human Rights Experts Call on International Community to Prevent Genocide Against the Palestinian People—OHCHR Press Release" (November 16, 2023), https://perma.cc/XDS8-PJF2.

[6] *See, e.g.,* "Declaration of William A. Schabas in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-5 (November 16, 2023), https://perma.cc/4MH2-ENU5; *see also* "Declaration of Dr. John Cox, Dr. Victoria Sanford and Dr. Barry Trachtenberg in Support of Plaintiffs' Motion for Preliminary Injunction," 4:23-cv-05829-DMR, Document 19-6 (November 16, 2023), https://perma.cc/3RPE-F6AN.

[7] *See, e.g.,* "[Proposed] Brief of Amici Curiae Medical Doctors in Support of Plaintiffs' Motion for Preliminary Injunction and Opposition to Defendants' Motion to Dismiss," 4:23-cv-05829-JSW, Document 52-1 (December 30, 2023), https://perma.cc/A68V-DU4C.

[8] In his decision in *Defense for Children International-Palestine v. Biden*, Judge Jeffrey S. White noted that "the undisputed evidence before this Court comports with the finding of the ICJ and indicates that the current treatment of the Palestinians in the Gaza Strip by the Israeli military may plausibly constitute a genocide in violation of international law. Both the uncontroverted testimony of the Plaintiffs and the expert opinion proffered at the hearing on these motions as well as statements made by various officers of the Israeli government indicate that the ongoing military siege in Gaza is intended to eradicate a whole people and therefore plausibly falls within the international prohibition against genocide." 714 F.Supp.3d 1160, 1163 (N.D. Cal. 2024). (Because the Judge granted Defendants' Motion to Dismiss based on the political question doctrine, this section of the opinion does not have legal force as a factual finding).

[9] The Genocide Convention, supra note 1, Article I; *see also* Application of Convention on Prevention and Punishment of Crime of Genocide (Bosn. & Herz. v. Serb. & Montenegro), Judgment, 2007 I.C.J. 43, 221, ¶ 430.

this imperative—rooted in law, in conscience, and in the lived reality of families like Mr. Bazrouk's—that animates everything the Defendants stand for.

In a blatant overreach, Plaintiffs allege that this lawful, constitutionally protected, and morally compelled advocacy constitutes support for terrorism. The Second Amended Complaint's ("SAC") (Doc. No. 66) claims reduce to a single, constitutionally untenable proposition: that all expressions of solidarity with Palestine are Hamas, and Hamas is all expressions of solidarity with Palestine. Plaintiffs allege that Defendants in this case, including Mr. Bazrouk, constitute an ideological arm of Hamas in the United States that had foreknowledge of the October 7th action and aided in its promulgation—and that all Defendants thereby violated the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d), and the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. SAC at 232–262. However, it is plain from the face of the SAC that all Defendants, including Mr. Bazrouk, are individuals of conscience who take the ongoing genocide in Palestine seriously and who vigorously defend Palestinian rights through lawful, protected advocacy.

After extensive preparation by seven attorneys across four law firms and organizations—Greenberg Traurig LLP, Holtzman Vogel PLLC, the National Jewish Advocacy Center, and the Law Office of David I. Schoen, Plaintiffs have presented this Court with a SAC that fails to meet the required pleading standards *and* dangerously attempts to criminalize Defendants' First Amendment rights. The SAC represents an attempt to intimidate and malign advocates for Palestinian human rights by criminalizing their constitutionally protected speech and association—fundamental rights at the core of our First Amendment.

Mr. Bazrouk's civic activities affirming the value of Palestinian life are at the very core of American ideals to combat tyranny, resist oppression, and defend the dignity of the dispossessed. By attempting to silence his voice through legal action, Plaintiffs engage in precisely the kind of lawfare that reduces the serious purpose of anti-terrorism statutes to an instrument of political suppression and chills the free expression that our courts exist to protect.

Moreover, the SAC's overreach demonstrates a fundamental misunderstanding of anti-terrorism law. The ATA and ATS were never intended to be wielded against advocates exercising their right to political expression, no matter how controversial their views may be. Such an application threatens to dilute the serious purpose of these laws and trivialize the real dangers of terrorism. No ATA lawsuit of this type—premised on the theory that domestic political advocacy constitutes "substantial assistance" to a foreign terrorist organization—has survived a motion to dismiss.[10]

For the reasons set forth below, this Court must dismiss the SAC.

## II.  BACKGROUND

Within hours of the actions of October 7, 2023 that allegedly harmed Plaintiffs, the Zionist Occupier of Palestine (the "Occupier" or "Occupation") launched its genocidal assault. That same day, the Occupation began immediate, indiscriminate aerial bombing of civilian infrastructure and population centers across Gaza.[11] The Prime Minister immediately

---

[10] *See, e.g.*, *Keren Kayemeth Leisrael-Jewish National Fund v. Education for a Just Peace in the Middle East*, 530 F.Supp.3d 8 (2021) (dismissed because domestic political advocacy supporting the BDS movement was too attenuated from terrorist acts to establish substantial assistance under terrorism statutes).

[11] "Damning Evidence of War Crimes as Israeli Attacks Wipe Out Entire Families in Gaza," Amnesty International (October 20, 2023), https://perma.cc/AY8W-38K5.

declared that "the enemy will pay an unprecedented price," signaling the acts of genocide that would follow.[12] Within the first twenty-four hours of the Occupier's genocide, it had already killed 313 Palestinians and injured more than 2,000, while 20,000 had been forcibly displaced.[13]

By October 9, 2023, the Occupier's political and military leaders had openly proclaimed their genocidal intentions to the world, the Minister of Defense declared that "no electricity, no food, no water, no fuel" would be allowed to the "human animals" in Gaza.[14] The Energy Minister declared that "[w]hat *was* will not *be*."[15] The Occupation's Major General Ghassan Alian declared "there will only be destruction."[16]

By the end of the first week of the Occupation's genocide, its military had already begun using chemical weapons such as white phosphorous,[17] and had murdered 2,800 Palestinians, the majority women and children.[18] The Occupier also began its campaign of

---

[12] "Active Genocide Alert – Israel-Palestine: There is No Justification for Genocide," Lemkin Institute for Genocide Prevention and Human Security (October 13, 2023), https://perma.cc/B9BZ-E62R.

[13] United Nations, "Identical Letters Dated 8 October 2024 from the Permanent Observer of the State of Palestine to the United Nations Addressed to the Secretary-General, the President of the General Assembly and the President of the Security Council" A/ES-10/1012-S/2024/719 ("Letter from Permanent Observer of the State of Palestine") (October 8, 2024), https://perma.cc/B957-TDL.

[14] Sanjana Karanth, "Israeli Defense Minister Announces Siege on Gaza to Fight 'Human Animals,'" Huffington Post (October 9, 2023), https://perma.cc/HXN5-DQRJ.

[15] Israel Katz, @Israel_Katz, Tweet (12:48 pm, 9 October 2023) ("I ordered to immediately cut off the water supply from Israel to Gaza. Electricity and fuel were cut off yesterday. What was will not be."), https://perma.cc/33TM-5Z2F.

[16] Gianluca Pacchiani, "COGAT Chief Addresses Gazans: 'You Wanted Hell, You Will Get Hell,'" Times of Israel (October 10, 2023), https://perma.cc/6J5E-SYKH.

[17] White phosphorous is a chemical weapon that causes burns that penetrate through skin and flesh straight to the bone, and reignite whenever exposed to oxygen. *See* "Questions and Answers on Israel's Use of White Phosphorus in Gaza and Lebanon," Human Rights Watch (October 12, 2023), https://perma.cc/5TNA-PY8J.

[18] Chris McGreal, "The Language Being Used to Describe Palestinians is Genocidal," The Guardian (October 16, 2023), https://perma.cc/XT6C-7FSC.

targeting life-sustaining civilian infrastructure, which now includes hospitals, pharmacies, refugee camps, sanitation facilities, electricity networks, apartment complexes, mosques, and churches.[19] Within less than a month, the Occupation dropped the equivalent of two nuclear bombs on Gaza.[20]

It was with this sense of urgency that people of conscience—Jews, Christians, Muslims, agnostics, and atheists—organically and swiftly rose into action to demand an end to these horrifying atrocities. They organized emergency rallies and protests across the country in hopes of averting the ongoing annihilation by the Zionist Occupation.

Tarek Bazrouk was one of those people of conscience. A native New Yorker, Mr. Bazrouk saw the streets of New York City filled with tens of thousands of people who shared his anguish. He joined them, attending protests throughout New York City—peaceful, constitutionally protected demonstrations demanding an end to the slaughter of Palestinian civilians.

The same moral force that drove him to the streets—the image of his cousin Rashad's killing, the checkpoints, the bombed hospitals, the children pulled in pieces from rubble—is the moral force that Plaintiffs now seek to criminalize. Plaintiffs do not allege that Mr. Bazrouk planted a bomb, transferred funds to Hamas, or directed any military operation. They allege that he is a member of an advocacy organization, attended protests, and vocally opposed a genocide. That is the sum total of the "substantial assistance" they claim he provided to Hamas.

---

[19] Letter from Permanent Observer of the State of Palestine, *supra* n.11, at 1.
[20] Euro-Med Human Rights Monitor, "Israel Hits Gaza Strip With the Equivalent of Two Nuclear Bombs," November 2, 2023, https://perma.cc/U45J-PET7.

Now, Plaintiffs seek to punish a 21-year-old New Yorker, raised in a Palestinian family scarred by settler violence and military occupation, who took to the streets demanding an end to genocide.

## III.   FACTUAL ALLEGATIONS

### A. The Parties

Plaintiffs are nine individuals—a mix of U.S. citizens and Israeli nationals—who allege they suffered injuries arising from Hamas's attack on October 7, 2023, and its aftermath. SAC ¶¶ 13–21. The U.S. citizen Plaintiffs—Iris Weinstein Haggai, John Doe, Richard Roe, and Jane Moe—bring claims under the ATA, 18 U.S.C. § 2333(d). *Id.* ¶¶ 13–16, and 232.. The Israeli national Plaintiffs—Shlomi Ziv, Ayelet Samerano, Talik Gvili, Roee Baruch, and James Poe—bring claims under the ATS 28 U.S.C. § 1350. *Id.* ¶¶ 16-21 and 243–244. Several Plaintiffs are current or former members of the Israel Defense Forces ("IDF") who are directly complicit in the Occupation's genocide in Gaza and subsequently returned to Columbia University. *Id.* ¶¶ 14–16.

The organizations sued in this action—Within Our Lifetime–United for Palestine ("WOL"), Columbia Students for Justice in Palestine ("Columbia SJP"), Columbia-Barnard Jewish Voice for Peace ("Columbia JVP"), and Columbia University Apartheid Divest ("CUAD")—are pro-Palestinian student advocacy organizations based in New York City and on the Columbia University campus. SAC ¶ 6. Plaintiffs sue these organizations through their alleged leaders: Nerdeen Kiswani (WOL), Maryam Alwan (Columbia SJP), Cameron Jones (Columbia JVP), and Mahmoud Khalil (CUAD). *Id.* The theory animating the entire action is that these organizations function as Hamas's "propaganda arm" in New York City and are

therefore liable for aiding and abetting Hamas's October 7 actions and its aftermath. *Id.* ¶¶ 1–2.

Tarek Bazrouk is a 21-year-old native New Yorker, born in New York City on December 13, 2004. He is the youngest of four children in a Palestinian-American family that resides in Manhattan. His family retains close ties to the West Bank, where relatives continue to live under Israeli military occupation. When Mr. Bazrouk was approximately four years old, his family traveled to their ancestral village in the West Bank, where he met his cousins— including Rashad Khater, then 19 years old. The following summer, in May 2008, Rashad was killed by Israeli settlers, an event documented by the respected human rights organization B'Tselem. The perpetrators were never arrested or charged. As Mr. Bazrouk matured and came to understand that his cousin's killers had faced no accountability, he became increasingly engaged with the cause of Palestinian rights.

At the time of the events in question, Mr. Bazrouk was a student at New York City College of Technology ("City Tech"), where he had nearly completed an associate's degree. He has since been admitted to Baruch College, where he intends to pursue a degree in business and marketing.

## B. Procedural History

Plaintiffs commenced this action on March 24, 2025, by filing a 79-page Complaint (Doc. No. 1) against Nerdeen Kiswani, Maryam Alwan, Cameron Jones, Mahmoud Khalil, and their respective organizations. Tarek Bazrouk was not named as a defendant. The Complaint asserted claims under the ATA and ATS, alleging that the organizational defendants served as Hamas's "propaganda arm" in New York City and had provided knowing and substantial assistance to Hamas's acts of international terrorism.

On May 29, 2025, Plaintiffs filed a First Amended Complaint ("FAC")—an 85-page pleading naming the identical set of defendants as the Original Complaint. Once again, Tarek Bazrouk was not named as a defendant. The FAC asserted the same two counts under the ATA and ATS as the Original Complaint.

On June 19, 2025, all defendants named in the FAC timely moved to dismiss under Rule 12(b). *See* Doc. Nos. 52-54, 57, 61.

On July 14, 2025—facing four pending motions to dismiss and an express warning that no further amendment would be permitted—Plaintiffs filed the SAC. For the first time, after nearly four months of litigation and more than six weeks after filing the FAC, Plaintiffs added Tarek Bazrouk as a defendant, solely in his individual capacity as a "member of Within Our Lifetime." SAC ¶ 6.

All previously-named defendants filed new motions to dismiss. *See* Doc. Nos. 70, 71, 75, 78, 81-82. Those motions are fully briefed and still pending. Mr. Bazrouk was not served until January 28, 2026—more than six months after the SAC was filed. Doc. No. 111. He now moves to dismiss the frivolous SAC.

## IV.    STANDARDS OF REVIEW

### A. Fed. R. Civ. Proc. 12(b)(6) Requires Facts Sufficient to Make a Claim Plausible

When deciding a motion to dismiss under Rule 12(b)(6), the court must first identify the elements of the plaintiff's claim and then determine whether the plaintiff has pleaded those elements with sufficient factual support to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009). A claim is facially plausible when the plaintiff's factual allegations allow the court to draw a reasonable inference of the defendant's liability. *Id.* at 678. The factual allegations must raise the right to relief above a speculative level, pushing

the claims "across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

While the Court must accept well-pleaded factual allegations as true and draw all reasonable inferences in Plaintiffs' favor, *Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998), that obligation extends only to facts—not to speculation, conjecture, or legal conclusions dressed as allegations. Dismissal is required where the complaint fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility demands more than a "sheer possibility" of unlawful conduct; where a complaint pleads facts "merely consistent with" liability, it "stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft*, 556 U.S. at 678 (internal quotation marks omitted). Dismissal is equally appropriate where an affirmative defense or other bar to relief is apparent from the face of the complaint. *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86–87 (2d Cir. 2000). In conducting this analysis, the Court may consider the complaint, any documents attached to or incorporated by reference, and matters subject to judicial notice. *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009).

The Court need not accept Plaintiffs' legal conclusions, unwarranted inferences, or conclusory allegations as true. *Global View Ltd. Venture Capital v. Great Cent. Basin Exploration, L.L.C.*, 288 F. Supp. 2d 482, 484-85 (S.D.N.Y. 2003) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

**B. Judicial Notice**

On a motion to dismiss, the Court's review is confined to "the factual allegations in [the] complaint, documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice could be taken, and documents either in plaintiffs'

possession or of which plaintiffs had knowledge and relied on in bringing suit." *U.S. v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 451-53 (E.D.N.Y. 2007); *see also Kistler v. Stanley Black & Decker, Inc.*, No. 23-cv-1580, 2024 WL 4370941, at *9 (S.D.N.Y. 2024). Critically, courts take judicial notice of documents only to determine "what statements [they] contained," not "for the truth of the matters asserted." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). Because "the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy." *United States ex rel. Hart v. McKesson Corp.*, 602 F. Supp. 3d 575, 591 (S.D.N.Y. 2022).

Mr. Bazrouk objects to judicial notice of the SAC's exhibits and underlying sources on three grounds.

First, the SAC's central "factual" basis for the claim that Mr. Bazrouk has been a WOL member "since at least 2021" is a profile published by Canary Mission. SAC ¶ 213. To state that Canary Mission is not a reliable source would be a woeful understatement. Canary Mission is an anonymous cyberstalking and blacklisting operation that systematically targets Palestinian rights advocates through coordinated harassment campaigns designed to damage their professional and educational opportunities.[21] Its operations are funded through a labyrinth of pass-through entities—including the Jewish Community Federation of San Francisco, the Milstein Family Foundation, and the Helen Diller Family Foundation— routed through Megamot Shalom, a Zionist organization in occupied Palestine working directly under the Occupation's Ministry of Strategic Affairs.[22] Canary Mission maintains no

---

[21] *See* James Bamford, *Who Is Funding Canary Mission?*, The Nation (Dec. 27, 2023).
[22] *See id.*; Josh Nathan-Kazis, *Israel Uses Canary Mission Blacklist Info to Bar Activists*, The Forward (Oct. 4, 2018).

disclosed leadership, no identified staff, and no physical address. Its domain registration has been traced to a private Zionist attorney through bank records.[23] Its sole mission is one of economic coercion and reputational destruction, not factual reporting.[24]

Canary Mission's unreliability has been widely recognized. The Jewish Telegraphic Agency condemned its methods as "antithetical to democratic and Jewish values" and "morally reprehensible" for using "hateful," "Islamophobic," and "racist" rhetoric to "villainize individuals" under the guise of combating antisemitism.[25] J Street called it a "right-wing organization" that "aims to promote a toxic atmosphere of harassment and fear on US college campuses."[26] The profiles it maintains on over 18,000 individuals—disproportionately people of color, overwhelmingly Arab, Muslim, Palestinian, and Black students—have been used by ICE to target advocates for deportation, and by employers to terminate workers for protected political expression.[27]

A source of this character—anonymous, driven by ideological hate, funded through covert foreign-linked unlawful networks, condemned by mainstream Jewish organizations, and designed to destroy lives rather than report facts—is the antithesis of a source "whose accuracy cannot reasonably be questioned" under Rule 201(b). *See Cabrera v. Schafer*, 178 F. Supp. 3d 69, 72 (E.D.N.Y. 2016); *Barahona v. LaSalle Mgmt. Co.*, No. 23-cv-1012, 2025 WL

---

[23] Hamzah Raza & Max Blumenthal, *Who Is Behind Canary Mission?*, The Grayzone (Aug. 22, 2018).
[24] Zack Beauchamp, *This Pro-Israel Group Keeps a Blacklist*, Vox (Apr. 25, 2025).
[25] Gabrielle Roth & Joseph Goldberg, *Jewish Students: Blacklist of BDS Supporters Hurting Efforts to Defend Israel on Campus*, JTA (Apr. 23, 2018).
[26] T'ruah, the Rabbinic Call for Human Rights, labeled it "Jewish McCarthyism."
[27] *See* Sophie Hurwitz, *How a Shadowy Online Blacklist Became a Legal Threat*, Mother Jones (July 8, 2025).

961437, at *5-6 (S.D.N.Y. Mar. 31, 2025). The Court should afford Canary Mission's profile of Mr. Bazrouk no evidentiary weight.

Second, Exhibit 3 to the SAC is an anonymous and unverified document distributed online on or around October 8, 2023. It carries no author, no date of composition, no digital signature, and no chain of custody. Plaintiffs rely on it as proof that AMP/NSJP directed the Associational Defendants to coordinate with Hamas on a specific date. *See* SAC ¶¶ 94-95. The document's authenticity is vigorously disputed by all defendants, and the inferential leap from its distribution to the conclusion of Hamas coordination is contested. Courts may take notice only of what the document says, not that the facts it asserts—including any claimed Hamas "unified command"—are true. *See McKesson*, 602 F. Supp. 3d at 591; *Barahona*, 2025 WL 961437, at *5-6.

Third, Exhibit 4 consists of political solidarity statements published on social media and online platforms by pro-Palestinian organizations following October 7, 2023. Such statements are, at most, public expressions of political viewpoint — which is precisely what the First Amendment protects. *See* SAC ¶ 95. Courts may take notice that the statements were published. They may not take notice that the content of those statements constitutes a "loyalty pledge to Hamas,", or proof of coordination with a foreign terrorist organization. *See Napear v. Bonneville Int'l Corp.*, 669 F. Supp. 3d 948, 959 (2023) (social media posts noticeable only "as an indication of what information was in the public realm at the time").

Fourth, Exhibit 5 consists of screenshots purportedly taken from a Telegram channel. SAC ¶ 102. Screenshots of social media or messaging application content present acute authentication problems: they can be fabricated, cropped, or taken out of context with minimal effort, and carry no intrinsic indicia of reliability. *See Cabrera*, 178 F. Supp. 3d at 72.

Courts may take notice only that content of this character circulated online, not that it establishes any fact asserted in the SAC—including the identity of who posted it, when, or with what intent.

Fifth, Exhibits 6 and 7 are the most consequential and the most defective exhibits in the SAC. It is a document in what appears to be Arabic or Farsi, submitted without a certified translation, without any identified author, without any chain of custody, and without any explanation of how Plaintiffs obtained it. *See* SAC ¶¶ 154, 202-211 & Exs. 6-7. Plaintiffs use it to sustain the extraordinary allegation that all Defendants—including Mr. Bazrouk—were secretly operating under the direction of the Islamic Revolutionary Guard Corps. SAC ¶ 208. The authenticity, meaning, and provenance of this document are vigorously contested by every defendant in this case. An untranslated, uncertified, anonymous document of entirely unverified origin is precisely the kind of exhibit whose "accuracy can reasonably be questioned"—and as to which judicial notice is therefore categorically forbidden under Rule 201(b). *See McKesson*, 602 F. Supp. 3d at 591; *Cabrera*, 178 F. Supp. 3d at 72. The Court should afford these two exhibits zero evidentiary weight.

Finally, virtually every substantive allegation against Mr. Bazrouk is drawn from the government's pretrial detention letter in an unrelated criminal matter that has no bearing, relevance, or connection to Plaintiffs and their woefully deficient allegations. *See* SAC ¶¶ 214–223 & Exs. 8-9. A prosecutor's one-sided, adversarial submission to obtain detention is not an adjudicated finding of fact. The Court should not treat it as one—particularly at the pleading stage, where Mr. Bazrouk has had no opportunity to test or rebut its contents. *See Kramer*, 937 F.2d at 774.

The Court should accordingly decline to treat any of these sources as establishing facts and should assess Mr. Bazrouk's motion solely on whether the SAC's well-pleaded allegations—stripped of speculation, conjecture, and contested exhibits—state a plausible claim. They do not.

## V. ARGUMENT

### A. Plaintiffs Lack Article III Standing

Plaintiffs bear the burden of demonstrating standing. *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017). Plaintiffs must show that they have (1) suffered an injury in fact, (2) which is fairly traceable to Mr. Bazrouk's conduct, and (3) is likely to be redressed by a favorable ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs lack standing to sue Mr. Bazrouk because their claimed injuries are not fairly traceable to his conduct in any way. *See Collins v. Northeast Grocery, Inc.*, 149 F.4th 163, 171 (2d Cir. 2025).

To determine whether a Plaintiff has pled harms that are fairly traceable to the defendant's alleged aiding and abetting, the Court assesses how direct the causal relationship is between the alleged harm and the challenged conduct. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 28-9 (1976)). Article III standing is lacking when "it is purely speculative" whether Plaintiffs' claimed harms are fairly traceable to the challenged conduct, rather than the result of third-party decisions and actors not before the Court. *Simon*, 426 U.S. at 42-43 (finding that Plaintiffs lacked standing because it was "'purely speculative' whether removal of the challenged tax breaks would cause the hospitals" to cease discriminating against Plaintiffs). The plaintiff may only sue a party that bears some responsibility for its injury. *Lujan*, 504 U.S. at 560-61.

In an aiding and abetting claim under the ATA, Plaintiffs must allege that Mr. Bazrouk's conduct *proximately* caused their injuries—not merely that it was a but-for cause. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 59-60, 63 (2d Cir. 1985) ("allegations of a 'but for' causal relationship are insufficient"; the complaint must allege that the aider and abettor's acts "proximately caused the harm" and that the injury was "a direct or reasonably foreseeable result of the conduct"). Plaintiffs must plead that their injuries were "a direct or reasonably foreseeable result" of Mr. Bazrouk's specific assistance. *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 371 (S.D.N.Y. 2007); *accord In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 514-15 (S.D.N.Y. 2011); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 202 (S.D.N.Y. 2006); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001). Where, as here, the alleged harm flows through the independent actions of a third party—Hamas's October 7 actions—and Mr. Bazrouk's purported "assistance" consists of nothing more than attending protests and, at most, failing to maintain his composure when confronted by three individuals at demonstrations months after October 7, any causal chain connecting his conduct to Plaintiffs' injuries is so attenuated as to be legally insufficient.[28]

---

[28] *See Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965, 975 (N.D. Cal. 2018) (dismissing ATA/JASTA aiding and abetting claims for lack of proximate causation where perpetrator was "radicalized in part through social media" but acted independently, finding general ideological influence insufficient to establish the required causal nexus between defendants' conduct and plaintiffs' injuries); *Owens v. BNP Paribas S.A.*, 235 F. Supp. 3d 85, 98 (D.D.C. 2017) (dismissing ATA claims arising from 1998 embassy bombings where bank defendants processed transactions for Sudan; causation too attenuated because Sudan was "not merely a funnel of funds to terrorists" and defendants were "one step further removed from the acts that caused the plaintiffs' injuries, separated by a sovereign state" that may have used funds for legitimate purposes), *aff'd*, 897 F.3d 266 (D.C. Cir. 2018).

Here, Plaintiffs fail to allege any facts demonstrating Mr. Bazrouk's involvement in the injuries they allegedly sustained on October 7, 2023. The SAC lacks any non-conclusory allegations linking Mr. Bazrouk's activities to injuries allegedly sustained by Plaintiffs' family members, bodily injuries Plaintiffs' allegedly sustained as willing participants in the Occupation's genocide in Gaza, and Plaintiffs' alleged severe emotional distress. *See*, *e.g.*, SAC ¶¶ 212–227 (alleging only that Mr. Bazrouk was a WOL member, attended protests, assaulted three individuals at protests in April 2024, December 2024, and January 2025, possessed pro-Hamas propaganda on his phone, and—entirely "on information and belief"— "indirectly communicated with Hamas" and "acted as an intermediary"); ¶¶ 239–242 (asserting in conclusory terms that "Defendants" aided and abetted Hamas with no allegation specific to Mr. Bazrouk beyond his WOL membership); ¶ 240 (alleging, without factual support, that the Associational Defendants "so pervasively and systemically assisted Hamas as to render them liable for every Hamas terror attack"). Any purported causal relationship between Mr. Bazrouk's conduct and these injuries is so attenuated as to be legally insufficient.

The most powerful refutation of Plaintiffs' causal theory comes not from Mr. Bazrouk's counsel, but from the U.S. Department of Justice itself. The federal government investigated, arrested, prosecuted, and sentenced Mr. Bazrouk. It had every incentive—and every resource—to charge him with Hamas-related offenses if any evidence of such a connection existed. It did not. *See* Sentencing Hr'g Tr. at 40:10–24, 61:16–22, *United States v. Bazrouk*, No. 25-cr-203 (RMB) (S.D.N.Y. Oct. 28, 2025). Not one of the government's bail applications, sentencing submissions, or any other filing in the criminal case alleged that Mr. Bazrouk had any connection to Hamas, to October 7, or to any designated foreign terrorist organization. *Id.* The DOJ expressly stated on the record at sentencing that the $750,000 in

cash seized from Mr. Bazrouk's home—which the SAC luridly implies has some sinister Hamas connection, SAC ¶ 222—had nothing to do with his protest arrests; the funds came from his work at unlicensed smoke shops in Connecticut, and prosecutors unambiguously stated: "We are not at all implying that arrest [in Connecticut] is intertwined in the conduct here." Sentencing Hr'g Tr. at 61:16–22. If the DOJ—armed with subpoena power, surveillance authority, and the full investigative apparatus of the federal government—found no Hamas nexus, Plaintiffs' counsel, armed with nothing but a Canary Mission profile and a detention letter, cannot manufacture one through conclusory "on information and belief" pleading.

The SAC provides no plausible basis for the Court to find a causal connection between Mr. Bazrouk's actions and Hamas's military capabilities or operations, either before or after October 7, 2023. The alleged causal relationship is purely speculative and far too remote for Plaintiffs' harms to be "fairly traceable" to Mr. Bazrouk's conduct. *See Lujan*, 504 U.S. at 560-61. The SAC does not allege that Mr. Bazrouk's conduct had any impact on Hamas's military capabilities, its planning of October 7, or its ability to execute its resistance to the Occupation.

In short, the SAC fails to establish the requisite causal connection between Mr. Bazrouk's conduct and Plaintiffs' alleged injuries. Plaintiffs have not established Article III standing, and the SAC must be dismissed. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

## B. This Court Lacks Subject Matter Jurisdiction Under the ATS

The ATS, enacted by the First Congress in 1789, grants district courts jurisdiction over civil actions brought by aliens for torts committed "in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. It is "strictly jurisdictional and does not by its own terms provide or delineate the definition of a cause of action." *Jesner v. Arab Bank, PLC*,

584 U.S. 241, 254 (2018). "ATS claims must be subject to vigilant doorkeeping." *Id.* at 256.

Plaintiffs bear the burden of establishing subject matter jurisdiction, *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017), and they cannot carry it here.

1. Plaintiffs Fail to Plead a Violation of an International Norm Justiciable Under the ATS

   i. *No Universal Norm Against "Terrorism" Exists Under Customary International Law*

The Supreme Court has limited ATS causes of action to three common law torts that achieved universal recognition, specificity, and obligatory status in 1789: violations of safe conduct, infringement of the rights of ambassadors, and piracy. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 723–24 (2004). To establish subject matter jurisdiction over any new cause of action, Plaintiffs must plausibly plead that the new tort is "specific, universal, and obligatory" in the same way. *Jesner*, 584 U.S. at 257–58.

Plaintiffs cannot clear that bar. The Second Circuit has categorically held that "no universal norm against 'terrorism' existed under customary international law as of September 11, 2001." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 122, 125 (2d Cir. 2013). The court explained that "there continues to be strenuous disagreement among States about what actions do or do not constitute terrorism" and that the world has "not shaken [itself] free of the cliché that 'one man's terrorist is another man's freedom fighter.'" *Id.* This holding is dispositive. An ATS claim premised on "aiding and abetting terrorism" cannot survive where the Second Circuit has already determined that terrorism lacks the universal, specific, and obligatory character required by *Sosa. See also In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1317 (S.D. Fla. 2011) (rejecting attempt to "create a cause of action" under the ATS for the "broad, ill-defined class of conduct" of terrorism or "material support thereof"); *Mwani v.*

*Bin Ladin*, No. CIV A 99–125 CKK, 2006 WL 3422208, at *3 n. 2 (D.D.C. Sept. 28, 2006) ("The law is seemingly unsettled with respect to defining terrorism as a violation of the law of nations.").

      ii.    *Aiding and Abetting Liability Requires Purpose, Not Mere Membership*

Even if Plaintiffs identified a cognizable international norm — which they cannot — ATS aiding and abetting liability in the Second Circuit requires that a defendant "(1) provide[] practical assistance to the principal which ha[s] a substantial effect on the perpetration of the crime, and (2) d[o] so with the purpose of facilitating the commission of that crime." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 258 (2d Cir. 2009) (internal quotation marks omitted). Importantly, Plaintiffs themselves acknowledge this standard as the controlling test. *See* SAC ¶ 254.

Mr. Bazrouk attended protests. He lost his composure during three encounters. The SAC contains not a single non-conclusory allegation that he provided practical assistance to Hamas—let alone that he did so *with the purpose* of facilitating Hamas's October 7 attack or its other actions. The entirety of the SAC's theory as to Mr. Bazrouk rests on allegations made "on information and belief" that he served as an "intermediary" through which Defendants "indirectly communicated" with Hamas. SAC ¶¶ 225–227. Threadbare, conclusory allegations on "information and belief," unsupported by any specific facts, do not satisfy *Iqbal*'s plausibility standard. This claim fails at the threshold.[29]

      iii.    *Judicial Deference to Congress Forecloses Recognition of a New Cause of Action*

---

[29] *See also Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) (rejecting ATA aiding-and-abetting liability where plaintiffs failed to allege defendants consciously and culpably participated in the specific acts of terrorism that caused their injuries, as distinct from providing general assistance).

Even if the Court were to find a cognizable norm and sufficient pleading of purposeful facilitation—both of which Mr. Bazrouk expressly disputes—the Court would still be required to ask whether there is "even one sound reason to think Congress might doubt the efficacy or necessity of [the new] remedy." *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 637 (2021). The Supreme Court has answered that question definitively: "there will *always* be a sound reason for courts not to create a cause of action for violations of international law — other than perhaps for those three torts that were well established in 1789." *Id.* at 637-38 (emphasis added). The recognition of a new ATS cause of action for aiding and abetting terrorism by domestic advocacy organizations and their members "lies within the province of the Legislative Branch." *Id.* at 640. Congress has not acted. This Court may not.

### 2. Plaintiffs Cannot Overcome the Presumption Against Extraterritoriality

The presumption against extraterritoriality applies to claims under the ATS. *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013). "Even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Jesner*, 584 U.S. at 257. "[G]eneric allegations" of domestic activity cannot "draw a sufficient connection between the cause of action . . . and domestic conduct." *Nestle*, 593 U.S. at 634. Domestic conduct must be "extensive and specific"—and must directly cause the international law violation alleged. *Jara v. Núñez*, 878 F.3d 1268, 1273 (11th Cir. 2018).

Here, the international law violation alleged is the October 7 attack. SAC ¶ 249. None of the planning, preparation, funding, or execution of that attack occurred in the United States. None of the attackers are alleged to be U.S. citizens. The only domestic conduct attributed to Mr. Bazrouk consists of attending protests and, at most, altercations at three

demonstrations—all of which occurred *months after* October 7. *Id.* ¶¶ 212-227. Post-attack political activity cannot overcome the extraterritoriality bar. *See Balintulo v. Daimler AG*, 727 F.3d 174, 190 (2d Cir. 2013) ("if all the relevant conduct occurred abroad, that is simply the end of the matter under *Kiobel*").

To illustrate, video speeches and television broadcasts made from Pennsylvania were found insufficient to overcome the presumption against extraterritoriality because the pleadings offered "only circumstantial and tenuous allegations of a connection between [the defendant's] domestic conduct and the violations of Plaintiffs' rights in Turkey." *Ateş v. Gülen*, No. 3:15-cv-2354, 2016 WL 3568190, at *10 (M.D. Pa. June 29, 2016). The court dismissed the ATS claims for lack of subject matter jurisdiction, finding that the domestic conduct alleged did not "touch and concern" the United States with sufficient force to displace the presumption against extraterritorial application. *Id.* Same too here. The non-citizen Plaintiffs' ATS claims must be dismissed under Rule 12(b)(1).

### 3. Mr. Bazrouk Cannot Be Held Liable Under the ATS as an Individual Alleged to be a Member of an Unincorporated Association

While *Jesner* preserved the theoretical availability of individual ATS liability, *Jesner*, 584 U.S. at 260, that holding does not rescue Plaintiffs' claims against Mr. Bazrouk. As demonstrated above, there is no cognizable international norm, no sufficient domestic conduct, and no plausible allegation of purposeful facilitation. The absence of any one of these elements is independently fatal. The absence of all three compels dismissal. *See Sosa*, 542 U.S. at 723–24.

Moreover, the SAC sues Mr. Bazrouk solely as an individual "member of Within Our Lifetime." SAC ¶ 6. WOL is itself an unincorporated advocacy association. The Supreme Court has already foreclosed extending ATS liability to "corporations or other artificial

entities" absent a specific, universal, and obligatory norm establishing such liability. *Jesner*, 584 U.S. at 260, 263. Plaintiffs have identified no norm—and no court has recognized one— that would extend ATS liability to alleged individual members of domestic unincorporated advocacy organizations for the overseas operations of a foreign terrorist organization. The ATS claims against Mr. Bazrouk must be dismissed with prejudice.

### C. The Non-Citizen Plaintiffs Fail to State a Claim Under the ATS

Even if Plaintiffs were somehow able to establish that the ATS confers jurisdiction over their aiding and abetting terrorism claims, the SAC still fails to plausibly state a claim.

#### 1. The Governing Standard

As explained, ATS aiding and abetting liability requires that a defendant "(1) provide[] practical assistance to the principal which ha[s] a substantial effect on the perpetration of the crime, and (2) d[o] so with the purpose of facilitating the commission of that crime." *Presbyterian Church of Sudan*, 582 F.3d at 259 (internal quotation marks omitted). The *mens rea* requirement is demanding: "knowledge of or complicity in the perpetration of a crime, without evidence that the defendant purposefully facilitated the commission of that crime, is thus insufficient to establish a claim of aiding and abetting liability under the ATS." *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 167 (2d Cir. 2015). This is not a negligence standard. It is not a foreseeability standard. It requires that a defendant consciously directed his actions toward the specific goal of furthering the principal's violation of the law of nations.

#### 2. The SAC Fails to Plead Practical Assistance

The SAC alleges that Mr. Bazrouk: (1) attended protests organized by Within Our Lifetime; (2) assaulted three individuals at those protests; and (3) possessed pro-Hamas and

pro-Hezbollah materials on his phone. SAC ¶¶ 212–221. None of these allegations, taken individually or together, constitutes "practical assistance" to Hamas's commission of hostage-taking, murder, or the kidnapping of remains — the specific law-of-nations violations that form the basis of the Israeli Plaintiffs' claims. *See id.* ¶¶ 243–254. Street-level assaults at New York City protests are not practical assistance to the military operations of a foreign terrorist organization in Gaza. Plaintiffs plead no facts connecting Mr. Bazrouk's conduct to the specific acts that injured the Israeli Plaintiffs — October 7, the hostage takings, or the withholding of the deceased. The causal chain Plaintiffs ask this Court to draw is not plausible; it is speculative.

### 3. The SAC Fails to Plead Purpose

Even if some form of "assistance" could be inferred, the SAC does not — and cannot — plead that Mr. Bazrouk acted with the *purpose* of facilitating Hamas's violations of the law of nations. The entirety of the SAC's theory of Mr. Bazrouk's connection to Hamas rests on three paragraphs pleaded "on information and belief": that he "at least indirectly communicated with Hamas," SAC ¶ 225; that he "acted as an intermediary through which the remaining Defendants indirectly communicated with Hamas," *id.* ¶ 226; and that "other intermediaries similarly situated to Bazrouk" exist and "will be revealed in discovery," *id.* ¶ 227. These are precisely the kind of "threadbare recitals" and "conclusory statements" that *Iqbal* instructs courts to disregard. *Ashcroft*, 556 U.S. at 678. A plaintiff cannot plead the *purpose* element of ATS aiding and abetting liability with the words "on information and belief" followed by nothing. *See Balintulo*, 796 F.3d at 167 (purpose, not mere knowledge or complicity, is required).

### 4. The $750,000 Allegation Is Pure Speculation

Plaintiffs further allege — again "on information and belief" — that $750,000 in cash seized from Mr. Bazrouk "is related to the efforts of Bazrouk, Within Our Lifetime, and the remaining Defendants to support Hamas." SAC ¶ 222. Plaintiffs acknowledge that Mr. Bazrouk's own defense counsel offered an innocent explanation for those funds. *Id.* Speculation piled on speculation does not satisfy *Iqbal*. A pleading that says, in substance, "we do not believe the innocent explanation, therefore the money must be Hamas-related," is not a well-pleaded factual allegation — it is conjecture. The Court is not required to accept it as true. *Iqbal*, 556 U.S. at 678.

5. <u>Membership and Attendance Are Constitutionally Protected and Legally Insufficient</u>

Mr. Bazrouk's attendance at protests and his supposed membership in Within Our Lifetime cannot, standing alone, give rise to ATS liability. Liability based on mere association with an organization — without proof that the individual personally provided purposeful assistance to the specific violations at issue — is both constitutionally suspect and legally foreclosed. *See* SAC ¶¶ 213, 218 (alleging attendance at protests and organizational membership as the core of Bazrouk's alleged connection to Defendants). The Second Circuit has made clear that the purpose element must attach to the defendant's *own* conduct, not to the conduct of an organization with which he is affiliated. *Talisman Energy*, 582 F.3d at 259. Mr. Bazrouk's conduct — however reprehensible the government found his assaults to be — does not satisfy that standard.

6. <u>The Foreign Plaintiffs' Claims Fail as to Mr. Bazrouk in Their Entirety</u>

For these, the Count II ATS claims brought by Plaintiffs Shlomi Ziv, Ayelet Samerano, Talik Gvili, Roee Baruch, and James Poe against Mr. Bazrouk must be dismissed with prejudice. The SAC lacks any non-conclusory allegation that Mr. Bazrouk provided

practical assistance to Hamas, let alone that he did so with the purpose of facilitating the specific acts that injured these Plaintiffs. This is not a pleading defect that can be cured by amendment — it is a substantive failure that reflects the absence of any plausible theory of liability against Mr. Bazrouk under the ATS.

### D. The U.S. Citizen Plaintiffs Fail to State a Claim Under the ATA

Having filed two prior complaints without naming Mr. Bazrouk as a defendant, Plaintiffs now seek to hold him liable under the Anti-Terrorism Act based on protest attendance, organizational membership, and "on information and belief" speculation about Hamas intermediaries. This transparent effort to intimidate an advocate for Palestinian human rights through the machinery of federal litigation finds no support in the statute, the case law, or the SAC's own non-conclusory allegations, and this claim must be dismissed.

The ATA creates a cause of action for U.S. nationals injured by an act of international terrorism against (in relevant part) "any person who aids and abets, by knowingly providing substantial assistance" to the actor who commits the act of international terrorism. 18 U.S.C. § 2333(d)(2). Such "aiding and abetting liability" is governed by the legal framework in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), coupled with the rules applying the ATA in *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 490 (2023). *See Taamneh*, 598 U.S. at 493, 498. *Halberstam* sets forth three pleading requirements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time he provides assistance;" and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477.

Plaintiffs fail to carry their burden on all three *Halberstam* fronts as to Mr. Bazrouk.

First, Plaintiffs do not plausibly allege that Mr. Bazrouk performed any act that caused the U.S. Citizen Plaintiffs' injuries. The SAC's allegations against Mr. Bazrouk are confined to three unrelated street-level confrontations at New York City protests, organizational membership, and protest attendance. SAC ¶¶ 212–221. All allegations are temporally placed months after October 7, 2023. None of those allegations caused—or could plausibly have caused—the October 7 action or any other act by Hamas that allegedly injured the U.S. Citizen Plaintiffs. The first *Halberstam* element is not satisfied.

Second, Plaintiffs do not plausibly allege that Mr. Bazrouk was "generally aware of his role as part of an overall illegal or tortious activity" in coordination with Hamas. *Halberstam*, 705 F.2d at 477. The SAC's entire theory of Mr. Bazrouk's Hamas awareness rests on three paragraphs pleaded "on information and belief," alleging that he "at least indirectly" communicated with Hamas and "acted as an intermediary." SAC ¶¶ 225–227. Under *Iqbal*, such conclusory allegations, unsupported by any specific facts, are not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 678. Possession of "pro-Hamas" materials on a private phone, SAC ¶ 220, and travel to the West Bank and Jordan to visit family, *id.* ¶ 221, do not plausibly establish that Mr. Bazrouk understood himself to be a participant in an international terrorist enterprise. The second *Halberstam* element is not satisfied.

Third, Plaintiffs do not plausibly allege that Mr. Bazrouk "knowingly and substantially assist[ed] the principal violation." *Halberstam*, 705 F.2d at 477. As the Supreme Court made clear in *Twitter, Inc. v. Taamneh*, aiding and abetting liability under the ATA requires more than passive association or generalized support for a cause—it demands a showing that the defendant consciously and culpably participated in the specific acts of international terrorism

that injured the plaintiffs. 598 U.S. at 504. Mr. Bazrouk's confrontations at protests—however serious the government found them to be—bear no plausible causal or operational relationship to Hamas's actions in Gaza many months earlier. Plaintiffs cannot bridge that gap with speculation and "on information and belief" pleading. The third *Halberstam* element is not satisfied.

The ATA claim against Mr. Bazrouk must be dismissed.

### E. Mr. Bazrouk's Alleged Activities Constitute Protected First Amendment Speech

The First Amendment provides a robust defense against Plaintiffs' baseless allegations, and this defense is ripe for consideration at the motion to dismiss stage. As other courts have held, a First Amendment defense may prevail when it is "apparent on the face of the complaint and documents relied on in the complaint." *Homevestors of Am., Inc. v. Warner Bros. Discovery, Inc.*, Civ. No. 22-1583-RGA, 2023 U.S. Dist. LEXIS 187653, at *12 (D. Del. Oct. 18, 2023). This principle has been consistently applied in cases involving creative expression and free speech. *Moore v. Hadestown Broadway Ltd. Liab. Co.*, No. 23-CV-4837 (LAP), 2024 U.S. Dist. LEXIS 40245, at *43-44 (S.D.N.Y. Mar. 7, 2024) ("The Court finds Defendant's creative expression, and therefore its First Amendment defense, is apparent both from the face of the Amended Complaint and Exhibits 4 and 5 . . . Accordingly, Defendant properly raised it with the Court in its motion"); *K & K Prods. v. Walt Disney Studios Motion Pictures*, No. 2:20-CV-1753 JCM (NJK), 2021 U.S. Dist. LEXIS 182012, at *16 (D. Nev. Sep. 23, 2021), *affirmed*, 2022 U.S. App. LEXIS 23466 (9th Cir. 2022).

In this case, the First Amendment defense is not only apparent but glaringly obvious from the face of the SAC. Plaintiffs have utterly failed to show any concerted activity between Mr. Bazrouk's protected speech and Hamas, which is required to transform pure speech into

action for the purposes of the ATS or ATA. *See In re Terrorist Attacks on September 11, 2001*, 740 F. Supp. 2d at 519-20.

Plaintiffs' attempt to criminalize Mr. Bazrouk's protected speech is part of a broader, troubling trend to chill and suppress pro-Palestinian speech through litigation and other means. This Court must recognize this lawsuit for what it is: a dangerous assault on core First Amendment principles. As Justice Holmes stated in dissent, "[i]f there is any principle of the Constitution that more imperatively calls for attachment than any other it is the principle of free thought — not free thought for those who agree with us but freedom for the thought that we hate." *United States v. Schwimmer*, 279 U.S. 644, 654–55 (1929) (Holmes, J., dissenting).

Stated simply, the First Amendment stands as an insurmountable barrier to the Plaintiffs' claims. This Court should dismiss the SAC with prejudice, reaffirming the vital importance of protecting free speech, even—and especially—when that speech is controversial or unpopular.

## VI.    CONCLUSION

Tarek Bazrouk is a young man who has understood since childhood with terrible clarity what it means to be Palestinian. The murder of his family member by settlers who faced no legal consequence was not an abstraction—it was the world announcing to him, at a young age, that Palestinian death carries no legal weight. Everything Mr. Bazrouk has done since—every protest, every chant, every act of solidarity with a people being annihilated— flows from that foundational lesson and constitutes the kind of moral witness that the First Amendment exists to protect. Plaintiffs' attempt to transform Mr. Bazrouk's conscience into a patently frivolous federal terrorism claim is the precise kind of lawfare that erodes the

foundations of a free society and degrades the serious purpose of anti-terrorism law. This Court should refuse to be its instrument. The SAC must be dismissed.

Respectfully submitted,

<table>
<tr><td>_/s/Abdel-Rahman Hamed_</td><td>_/s/ Tyler Abboud_</td></tr>
<tr><td>ABDEL-RAHMAN HAMED, ESQ.</td><td>TYLER D. ABBOUD, ESQ.</td></tr>
<tr><td>NY Bar No. 5575352</td><td>NY Bar No. 5674783</td></tr>
<tr><td>**Hamed Law**</td><td>685 Third Avenue, 18th Floor</td></tr>
<tr><td>1215 31st St. NW, # 25085</td><td>New York, NY 10017</td></tr>
<tr><td>Washington, D.C. 20027</td><td>(720) 252-9782</td></tr>
<tr><td>(202) 888-8846</td><td>tyler.abboud25@gmail.com</td></tr>
<tr><td>Advocates@HamedLaw.com</td><td></td></tr>
</table>

*Attorneys for Defendant Tarek Bazrouk, Pro Bono Publico*

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the type-volume limitation of Local Rule 7.1(c). This memorandum of law contains 8,744 words, excluding the parts exempted by the Court's Individual Rules.

This Memorandum of Law complies with the typeface requirements because this brief has been prepared in a proportionally spaced font size 12 typeface.

_/s/Abdel-Rahman Hamed_
ABDEL-RAHMAN HAMED, ESQ.

*Attorney for Defendant Tarek Bazrouk*